**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
SEP 13  PM 1: 40

CLERK'S OFFICE
AT GREENBELT

_____ DEPUTY

| | | |
|---|---|---|
| STATE OF MARYLAND, | * | |
| *Plaintiff*, | * | |
| v. | | |
| | * | |
| UNITED STATES OF AMERICA<br>36 S. Charles Street 4th Floor<br>Baltimore, Maryland 21201 | * | Case No.:  **ELH 18 CV2849** |
| | * | |
| JEFFERSON B. SESSIONS, III in his<br>official capacity as Attorney General<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530-0001 | * | |
| | * | |
| UNITED STATES DEPARTMENT OF<br>JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530-0001 | * | |
| | * | |
| ALEX M. AZAR, in his official capacity as<br>Secretary for Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | * | |
| | * | |
| UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | * | |
| | * | |
| CHARLES P. RETTIG, in his official<br>capacity as Commissioner of Internal<br>Revenue<br>1111 Constitution Ave., N.W.<br>Washington, DC 20224 | * | |
| | * | |
| UNITED STATES INTERNAL<br>REVENUE SERVICE<br>1111 Constitution Ave., N.W.<br>Washington, DC 20224, | * | |
| | * | |
| *Defendants*. | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## NATURE OF THE ACTION

**The Affordable Care Act Expanded Access to Health Care and Improved Quality of Care in Maryland and Throughout the United States.**

1. In 2010, Congress enacted the Patient Protection and Affordable Care Act ("Affordable Care Act" or "Act"), 124 Stat. 119, "to increase the number of Americans covered by health insurance and decrease the cost of healthcare." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("*NFIB*").

2. The Affordable Care Act has delivered on its promises. In Maryland alone, more than a hundred thousand residents have obtained private health coverage, more than a million are now covered by Medicaid, and uncompensated care costs have declined by over $300 million. The State has received billions of dollars in federal funding to help care for its residents, and it has reoriented many of its policy and enforcement priorities to comply with the Affordable Care Act's requirements and take advantage of the opportunities afforded by the statute.

3. The Affordable Care Act expanded Medicaid, by giving States the option to cover additional segments of the population eligible to receive benefits. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14)(I)(i) (childless adults with incomes of up to 138% of the federal poverty level may receive Medicaid). The Act also obligates the federal government to pay the States for at least 90% of the cost of this expansion. *See* 42 U.S.C. § 1396d(y)(1). By the end of 2016, over 11.8 million newly qualified low-income individuals were receiving health coverage in the states that expanded their Medicaid program.

2

4. The Affordable Care Act authorized the creation of health insurance exchanges that allow consumers "to compare and purchase insurance plans." *King v. Burwell*, 576 U.S. __, 135 S. Ct. 2480, 2485 (2015). Since June 1, 2011, Maryland has operated a state-based exchange, the Maryland Health Benefit Exchange, as "a public corporation and a unit of State government." Md. Code Ann., Ins. § 31-102(b)(2) (LexisNexis 2017). Nationally, 10.3 million people obtained health coverage through the exchanges in 2017, and 84 percent of this group receive the Affordable Care Act-funded premium tax credits to help them pay for insurance premiums.

5. Eliminating the Affordable Care Act would cause immediate and long-term harm to Maryland. In Fiscal Year 2017 alone, Maryland received more than $2.77 billion in federal funds as part of its budget to provide health coverage to its residents because of the Affordable Care Act. Additionally, Maryland received approximately $65 million from the law's Prevention and Public Health Fund between fiscal years 2012 and 2016. Elimination of these funds would cause immediate and severe curtailment of essential public health activities and would restrict the ability of Maryland to provide a more efficient healthcare insurance market to its residents.

6. Maryland has invested enormous amounts of state money and shifted the focus of its administrative programs to comply with and take advantage of opportunities afforded by the Affordable Care Act. Since 2010, Maryland has been mindful of the challenges to the Affordable Care Act, which has been the subject of intense litigation, including review by the United States Supreme Court. *NFIB*, 567 U.S. at 540-43; *King*, 135 S. Ct. 2480 (upholding Affordable Care Act authorization of tax credits for purchases on federal health

3

exchange). In the landmark *NFIB* decision, the Supreme Court upheld the constitutionality of the Affordable Care Act's minimum coverage requirement[1] that most people purchase health insurance. *Id.* at 574. The Court concluded that Congress had the power to impose a tax on those without health insurance and had exercised that power in enacting the Affordable Care Act. *Id.* at 575. With these major constitutional questions settled, Maryland finalized its implementation of the Affordable Care Act by enacting a procedure to eliminate its state-operated risk pool; establishing a funding stream for its fledgling independent agency, the Maryland Health Benefit Exchange; and expanding Medicaid eligibility. Maryland Health Progress Act of 2013, 2013 Md. Laws ch. 159.

7. Subsequent to the decision in *NFIB*, some members of Congress have attempted to repeal the law an estimated 70 times; yet, all these efforts have failed. *See, e.g.*, H.R. 3762, 114th Cong. (2015); H.R. 45, 113th Cong. (2013); H.R. 6079, 112th Cong. (2012).[2] Less than a year ago, the United States Senate rejected a so-called "skinny repeal" that would have repealed substantial portions of the Affordable Care Act. H.R. 1628, 115th Cong. (2017). These unsuccessful bills demonstrate that the Act's opponents have been consistently unable to prevail in their attempts at repealing the Act in part or in whole.

---

[1] For ease of reference, we refer to the "requirement to maintain minimum essential coverage" under 26 U.S.C. § 5000A as the "minimum coverage" requirement. This requirement is sometimes referred to as the "individual mandate," and the "shared responsibility payment" under this same provision as the "individual mandate penalty."

[2] For a list of efforts, see "Legislative Actions in the 112th, 113th, and 114th Congresses to Repeal, Defund, or Delay the Affordable Care Act," Congressional Research Service, February 7, 2017, https://fas.org/sgp/crs/misc/R43289.pdf.

8. In December 2017, as part of a larger revision of federal income tax laws, Congress amended the tax code by reducing the shared responsibility payment for individuals failing to demonstrate health insurance coverage, which is based on a percentage of the taxpayer's household income. That amendment reduced the shared responsibility percentage from "2.5%" to "zero percent," and the applicable dollar amount from "$695" to "$0." *See* Pub. L. 115-97, 2017 HR 1, at *2092 (Dec. 22, 2017) ("Tax Cut and Jobs Act"). With this change, set to start in 2019, Congress did not repeal any provision of the Affordable Care Act. *Id.*

9. Despite the clear intent expressed by Congress to maintain all provisions of the Affordable Care Act as enacted, while setting to zero the shared responsibility payment that can be assessed against those without insurance for 2019, a group of states, led by Texas, filed a complaint for declaratory judgment and preliminary injunction in the Northern District of Texas, approximately two months after the President signed the Tax Cuts and Jobs Act. Compl., ECF No. 1, *Texas v. United States*, No. 18-00167 (N.D. Tex. Feb. 26, 2018). Texas and its fellow plaintiff States claim that because that law made the shared responsibility payment for failing to purchase insurance $0, the Affordable Care Act's minimum coverage requirement is no longer constitutional under *NFIB*. They further assert that the minimum coverage requirement is not severable from the rest of the Affordable Care Act and have asked the court to invalidate the Act "in whole." Am. Compl., ECF No. 27, ¶ 57, *Texas v. United States*, No. 18-00167 (N.D. Tex. April 23, 2018).

5

10.  On June 7, 2018, in accordance with the requirement of 28 U.S.C. § 530D that the Attorney General send notification when he declines to defend a duly enacted law in court, Attorney General Sessions sent Congress a letter indicating that the Department of Justice will not defend the constitutionality of 26 U.S.C. § 5000A(a), the minimum essential coverage requirement, in the context of *Texas v. United States* and would further argue that § 5000A(a) is not severable from two other provisions of the Act, namely those "'guarantee[ing] issuance of coverage in the individual and group market' ('guaranteed issue'), 42 U.S.C. 300gg-1, 300gg-3, 300gg-4(a), and 'prohibiting discriminatory premium rates' ('community rating'), *id.* 300gg(a)(1), 300gg-4(b)."   One of those provisions, 42 U.S.C. § 300gg-3, prohibits carriers from excluding coverage of pre-existing conditions from plans and applies even to self-insured plans, the segment of the health insurance market under exclusively federal jurisdiction.  Attorney General Sessions cited among his reasons for declining to defend the statute that the President "has made manifest that it should not be defended."   Then, in the Texas litigation itself, the Department of Justice filed a brief urging the court to "hold that the ACA's individual mandate will be unconstitutional as of January 1, 2019, and that the ACA's guaranteed-issue and community-rating provisions are inseverable from the mandate," and further requesting that the court grant declaratory relief to that effect.  Federal Defs.' Mem. in Resp. to Pls.' Appl. for Prelim. Inj., ECF No. 92, at 25-26, *Texas v. United States*, No. 18-00167 (N.D. Tex. June 7, 2018).  Recently at oral argument on September 5, 2018, the Department of Justice professed that "the current administration supports protections for people with pre-existing health conditions," before reaffirming its position that the minimum coverage

requirement will be unconstitutional and that the community rating and guaranteed issue provisions—including pre-existing condition protections—"must fall" as well. During the same hearing, the Department of Justice asserted that the court "wouldn't need to enter an injunction" against the government because the government would implement any declaratory relief issued.

11. Although Attorney General Sessions's letter did not specify how President Trump manifested to him that he believed 26 U.S.C. § 5000A(a) to be unconstitutional, one of President Trump's core policy goals has been to undo the Affordable Care Act. After President Trump failed to persuade Congress to repeal the Affordable Care Act, the President has continued his campaign to undermine the enforcement of its provisions, by launching a series of measures that include suspending cost-sharing reduction payments; directing his agencies to implement statutorily unauthorized rules disrupting enforcement of nondiscrimination provisions and disrupting individual and small group market reforms; and curtailing funding for the federally-facilitated exchanges.

12. These actions and inactions harm Maryland through the President's assault on the continued availability and viability of essential federal programs, authorized and required by federal statute, on which Maryland's own state programs and state statutes depend. Maryland therefore brings this action to establish that the Affordable Care Act is constitutional and, moreover, that any potential constitutional infirmity arising from Congress's recent decision to reduce the shared responsibility payment for violating the minimum coverage requirement to zero does not produce the drastic consequence of invalidating any of the Act's remaining provisions.

## PARTIES, JURISDICTION, AND VENUE

13. The plaintiff is the State of Maryland.

14. The State of Maryland is a sovereign state of the United States of America. The State is represented by and through its chief legal officer, the Attorney General of Maryland. He has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state government. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

15. Defendants are the United States of America; the United States Department of Justice; Jefferson B. Sessions, III, in his official capacity as Attorney General; the United States Department of Health and Human Services ("Department"); Alex M. Azar, II, in his official capacity as Secretary of Health and Human Services; the United States Internal Revenue Service ("IRS"); and Charles P. Rettig, in his official capacity as Commissioner of Internal Revenue.

16. The Department is a federal agency, under the direction of the Secretary for Health and Human Services, Alex M. Azar, II, and is responsible for administration and enforcement of the Affordable Care Act's provisions. *See generally* 20 U.S.C. § 3508; 42 U.S.C. §§ 202–03, 3501.

17. The IRS is a bureau of the Department of Treasury, under the direction of the Commissioner of Internal Revenue, Charles P. Rettig, and is responsible for collecting taxes, administering the Internal Revenue Code, and overseeing various aspects of the Act. *See generally* 26 U.S.C. §§ 7803-7806; *see* https://www.irs.gov/affordable-care-act/affordable-care-act-tax-provisions.

18. The United States Department of Justice is a federal agency, under the direction of Attorney General Jefferson B. Sessions, III, and is responsible for the defense of the laws of the United States. *See generally* 28 U.S.C. §§ 501, 503, 516.

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

20. Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Maryland is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and where one of "the plaintiff[s] resides."

## ALLEGATIONS

### Statutory and Legal Background

21. The Affordable Care Act worked fundamental changes in the market for health insurance. Among these changes, was a requirement known as "guaranteed issue," generally requiring each insurer offering coverage in the individual and group markets in a State to "accept every employer and individual in the State that applies for such coverage." 42 U.S.C. § 300gg-1(a). As a corollary, an insurer in the individual or group

market cannot limit or exclude coverage based on a pre-existing condition. 42 U.S.C. § 300gg-3.

22.     To address premium increases insurers would seek in response to the "guaranteed issue" requirements, Congress enacted a "community rating" provision to limit premium discrimination in the individual and small group markets. *See NFIB*, 567 U.S. at 651 (joint dissent); *King*, 135 S. Ct. at 2485-86 (2015). The community rating provision forbade premium variation except based on certain narrow factors. Affordable Care Act § 2701, 42 U.S.C. § 300gg. For example, tobacco use is a permissible factor, "except that such rate shall not vary by more than 1.5 to 1"; so is age, "except that such rate shall vary by not more than 3 to 1 for adults"; and geography may be considered only in the context of rating areas established by the State. *Id.* Thus, factors such as health status, claims history, race, gender, sexual orientation, geography (except for rating areas established by the State), occupation, and many others simply may not be considered by insurers in setting rates. *Id.*

23.     Congress also enacted 26 U.S.C. § 5000A, which requires that "certain individuals pay a financial penalty for not obtaining health insurance," *NFIB*, 567 U.S. at 574, as an effort "plainly designed to expand health insurance coverage," *id.* at 567. Section 5000A, known as the "minimum coverage requirement," requires specified individuals to pay a shared responsibility payment if they fail to ensure that they or their dependents "[are] covered under minimum essential coverage." 26 U.S.C. § 5000A(a). Under the Tax Cuts and Jobs Act of 2017, that amount will drop to zero on January 1, 2019.

24. To put these reforms into practice, Congress created health insurance exchanges to enable individuals and businesses to shop online for individual market and small group market insurance. Affordable Care Act § 1311(b)(1), 42 U.S.C. § 18031(b)(1); *see also* Affordable Care Act § 1321(a), 42 U.S.C. § 18041(a). Congress also sought "to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line," *King*, 135 S. Ct. at 2487 (citing 26 U.S.C. § 36B), which can be used to pay insurance premiums in advance through an exchange. *See* 42 U.S.C. § 18082.

25. A total of 153,571 Marylanders enrolled in private health coverage during the 2018 open enrollment period for Maryland Health Connection, the state-based health insurance exchange operated by the Maryland Health Benefit Exchange. In January 2018, 121,400 Marylanders—79% of enrollees—received a total of \$63.9 million in federal tax credits to help them purchase insurance.

26. Rounding out the availability of these subsidies and expansion of the individual market for health insurance, the Affordable Care Act expanded Medicaid, which the States administer, to make additional segments of the population eligible to receive coverage. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14)(I)(i) (childless adults with incomes of up to 138% of the federal poverty level—approximately \$23,000 in 2017—may receive Medicaid). The Act also obligates the federal government to pay for all or almost all the cost of this investment: 100% for years 2014-2016, 95% in 2017, 94% in 2018, 93% in 2019, and 90% in 2020 and beyond. *See* 42 U.S.C. § 1396d(y)(1).

11

27.   In Maryland, which adopted Medicaid expansion on May 2, 2013, overall enrollment in Medicaid had grown to more than 1.3 million as of July 2017, including 309,540 individuals who have coverage thanks to new eligibility categories added under the Affordable Care Act.

28.   Around the country and in Maryland, the Affordable Care Act's reforms increased health coverage, thereby reducing uncompensated care costs.  In Maryland the uninsured rate for Marylanders between the ages of 18 and 64 fell by more than 64 percent between 2013 and 2016.  Because of the Affordable Care Act's coverage expansion, hospitals' uncompensated care costs decreased by $10.4 billion nationwide in 2015 alone. In Maryland, from fiscal year 2013 to 2015, hospital uncompensated care costs declined by approximately $311.0 million.

**The Tax Cuts and Jobs Act Amends Section 5000A**

29.   In December 2017, as part of an overall revision to federal income tax laws, Congress amended the tax code by reducing the shared responsibility payment to zero dollars for individuals failing to maintain health insurance coverage.  *See* Pub. L. 115-97, 2017 H.R. 1, at *2092 (Dec. 22, 2017).  By design, this change did not repeal any statutory provision of the Affordable Care Act.  *Id.*

30.   The legislative history of the Tax Cuts and Jobs Act conclusively demonstrates that Congress intended to preserve every aspect of the Affordable Care Act, other than the shared responsibility payment for failing to comply with the minimum coverage requirement.  As Senator Pat Toomey (R-PA) emphasized, "We don't change any of the subsidies.  They are all available to anyone who wants to participate.  We don't change the

rules.  We don't change eligibility.  We don't change anything else."  163 Cong. Rec.

S7672 (daily ed. Dec. 1, 2017), https://www.congress.gov/crec/2017/12/01/CREC-2017-

12-01-senate.pdf.

31.  Senator Shelley Moore Capito (R-WV) remarked, "No one is being forced off

of Medicaid or a private health insurance plan by the elimination of the individual mandate.

By eliminating the individual mandate, we are simply stopping penalizing and taxing

people who either cannot afford or decide not to buy health insurance plans."  163 Cong.

Rec. S7383 (daily ed. Nov. 29, 2017), https://www.congress.gov/crec/2017/11/29/CREC-

2017-11-29-senate.pdf.

32.  Senator Orrin Hatch (R-UT) similarly asserted the legislative intent to preserve

the Affordable Care Act:

> Let us be clear, repealing the tax does not take anyone's health
> insurance away. No one would lose access to coverage or subsidies that
> help them pay for coverage unless they chose not to enroll in health
> coverage once the penalty for doing so is no longer in effect. No one
> would be kicked off of Medicare. No one would lose insurance they are
> currently getting from insurance carriers. Nothing—nothing—in the
> modified mark impacts Obamacare policies like coverage for preexisting
> conditions or restrictions against lifetime limits on coverage.

Transcript, *Continuation of the Open Executive Session to Consider an Original Bill*

*Entitled the Tax Cuts and Jobs Act Before the S. Comm. on Fin.* 106, Senate, 115th

Congress, Nov. 15, 2017, https://www.finance.senate.gov/imo/media/doc/11-15-17%20--

%20The%20Tax%20Cuts%20and%20Jobs%20Act%20--%20Day%203.pdf.     Senator

Hatch further emphasized that "[t]he bill does nothing to alter Title I of Obamacare, which

includes all of the insurance mandates and requirements related to preexisting conditions and essential health benefits." *Id.* at 286.

33. Senator Tim Scott (R-SC) also declared from the Senate floor that "[a]nyone who doesn't understand and appreciate that the individual mandate and its effects in our bill take nothing at all away from anyone who needs a subsidy, anyone who wants to continue their coverage—it does not have a single letter in there about preexisting conditions or any actual health feature." 163 Cong. Rec. S7666 (daily ed. Dec. 1, 2017), https://www.congress.gov/crec/2017/12/01/CREC-2017-12-01-senate.pdf.    The record contains many other similar examples.

34. Moreover, in enacting the Tax Cuts and Jobs Act, Congress could not have intended to alter any substantive provisions of the Affordable Care Act, such as the guaranteed issue, community rating, and prohibition on pre-existing exclusions provisions. As the United States has conceded in its briefing in *Texas v. United States*, Congress "could not have revoked the guaranteed-issue or community-rating provisions through reconciliation," the procedure used to pass the Tax Cuts and Jobs Act, with a simple majority. Federal Defs.' Mem. in Resp. to Pls.' Appl. for Prelim. Inj., ECF No. 92, n.4, No. 4:18-cv-00167 (N.D. Tex. Jun. 6, 2018). In electing to pass the amendment to § 5000A using its own reconciliation procedure, Congress demonstrated its intent to limit its action.

**Despite the Clear Message from Congress, the President Has Signaled His Refusal to Appropriately Enforce the Act.**

35. Since taking office, the Trump Administration has engaged in a sustained effort to "explode" the Affordable Care Act by making it more difficult and expensive for

14

individuals to procure health insurance through the Act's Exchanges.  *See* Goldstein & Eilperin, *Affordable Care Act Remains 'Law of the Land,' but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017.  On the day of his inauguration, President Trump signed an Executive Order titled "Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal."[3]

36.  On October 12, 2017, with only minimal explanation, the President announced that his Administration was reversing course on a longstanding policy of the Secretaries of Health and Human Services and Treasury to make cost-sharing reduction (one way the Act subsidizes individual purchase of health insurance) payments ("CSR payments") each month under the authority provided to them by the Affordable Care Act's permanent appropriation.  In a curt written statement issued by the White House Press Secretary, the Administration stated that the Department of Health and Human Services had concluded that the Affordable Care Act's permanent appropriation does not apply to CSR payments. On the morning of October 13, 2017, the United States Department of Justice made a court filing including a copy of a new opinion by the Attorney General addressing the purported legal basis for the Administration's action.  Early that same morning, the President tweeted, "The Democrats ObamaCare is imploding.  Massive subsidy payments to their pet insurance companies has stopped. Dems should call me to fix!"[4]

---

[3]  https://www.federalregister.gov/documents/2017/01/24/2017-01799/minimizing-the-economic-burden-of-the-patient-protection-and-affordable-care-act-pending-repeal.

[4]  https://twitter.com/realDonaldTrump/status/918772522983874561.

37.  On June 19, 2018, shortly after another Congressional repeal effort had failed, the President complained about Senator John McCain's (R-Ariz.) decision to cast a decisive "no" vote against Affordable Care Act repeal legislation.  The President stated: "we actually thought we had the votes, and then one man, very early in the morning, went thumbs down. So that was that.  But we almost got rid of Obamacare without him.  And that was a very sad day for the Republican Party.  That was a very sad day for the country when that vote was cast — that final vote was cast. A thumbs down. I remember it well."[5] He then touted Congress's decision to reduce the shared responsibility payment to $0,[6] stating: "Our historic tax cuts also ended one of the most unfair taxes imaginable — Obamacare's individual mandate."[7]

38.  Referring to one of his executive actions, a final rule allowing an expanded category of plans, known as association health plans, to be exempt from certain Affordable Care Act requirements, the President proclaimed that it was a "truly historic step in our efforts to rescue Americans from ObamaCare and the ObamaCare nightmare."[8]  The President said "ObamaCare has been especially brutal for small businesses" and that the Final Rule would "escape some of ObamaCare's most burdensome mandates."[9]  The President likewise stated, "For the first time ever, sole proprietors will be able to come

---

[5]     https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration/.

[6] Pub. L. No. 115-97, § 11081 (effective January 1, 2019).

[7]     https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration/.

[8] *Id.*

[9] *Id.*

together and buy lower-cost group insurance instead of getting ripped off by this disaster that we all know as Obamacare."[10]

**The President and the Department of Justice Have Seized upon Non-Binding and Irrelevant Litigation Results in Attempts to Excuse Illegal Administrative Actions.**

39.     Other recent controversies have demonstrated the Executive Branch's willingness to abandon prior policies based on threatened or ongoing litigation, as opposed to judicial determination of merits issues.  For example, the September 5, 2017 Department of Homeland Security Memorandum on Rescission of Deferred Action For Childhood Arrivals      (DACA)      ("DACA      Rescission      Memorandum"), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca,      relied      on threatened litigation as the reason for halting a significant work-authorization program on which the states had come to rely.  The single paragraph in the DACA Rescission Memorandum explaining the rationale behind this sudden shift merely asserts that DACA "should be terminated" based on consideration of two factors: (1) the appellate rulings in a case regarding a 2014 memorandum from then-DHS Secretary Johnson that expanded DACA and created a new program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court sub nom. United States v. Texas*, 136 S. Ct. 2271 (2016); and (2) a September 4, 2017, letter from Attorney General Jefferson B. Sessions arguing that DACA was "unconstitutional" and was invalid for the same reasons the Fifth Circuit struck down DAPA in the *Texas* case. Letter from Attorney General Jefferson B. Sessions to

---

[10] *Id.*

17

Acting                 Secretary                 Elaine                 Duke,

https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-

DACA.pdf.

40.     Another recent example where the government reversed tactics before

adjudication on the merits is the settlement agreement entered into in *Defense Distributed*

*v. United States Department of State*, No. 15-CV-372 RP (W.D. Tex.).   There, the

government successfully prevented a plaintiff website owner who sought to distribute 3-D

printed gun plans on the internet from prevailing on preliminary injunction.   *Defense*

*Distrib. v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016), *cert. denied*,

138 S. Ct. 638 (2018).   Nevertheless, in June 2018, the government entered into a

settlement agreement with the plaintiff that would allow publication of the plans,

apparently without notifying Congress as required under the applicable export-control

statute.   *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

Release (July 20, 2018), https://democrats-foreignaffairs.house.gov/news/pressreleases/

engel-decries-state-department-policy-allow-3-d-gun-printing.       While the government

relied on ongoing rulemaking to justify this action, the rulemaking is not final and the

government has not offered any adequate reason supporting its decision to grant Defense

Distributed a "temporary modification" of the existing rule.

41.   These hasty and ultra vires acts have required Maryland to move decisively to

protect its interests in response to the President and Attorney General's unwillingness to

enforce validly enacted laws.   *See, e.g.*, *Regents of the Univ. of Cal. v. United States Dep't*

*of Homeland Sec.*, No. 17-0523518-15068 (N.D. Cal. Sept. 11, 2017) (Maryland's

18

challenge to the DACA Rescission Memorandum); *Washington v. Department of State*, No. 2:18-cv-01115, (W.D. Wash. July 30, 2018) (Maryland's challenge to the State Department's Settlement Agreement with Defense Distributed).

42.  It is in this context of open hostility to enforcement of the Affordable Care Act and a demonstrated willingness to seize upon the threat or pendency of litigation, regardless of merit, as an excuse to abandon long-held administrative enforcement policies, that Attorney General Sessions announced his decision not to defend 26 U.S.C. § 5000A(a), the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions.   Combined with the President's past actions, Attorney General Sessions's decision not to defend the Affordable Care Act in the Texas litigation threatens the continued viability of some of its major provisions and presents an imminent risk that the Defendants will not enforce the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions, which the administration has argued must fall along with the minimum coverage requirement it now asserts is the lynchpin of the Act's constitutionality.

**Maryland Is Harmed by Any Threat to the Viability of the Affordable Care Act**

43.  Maryland has fundamentally altered its healthcare delivery, healthcare payment, and insurance regulatory schemes in reliance on the provisions of the Affordable Care Act. Through executive action and legislation enacted beginning in 2011, Maryland established the Maryland Health Care Reform Coordinating Council and the Governor's Office of Health Care Reform; brought the State's health insurance laws into compliance with new federal consumer protections; and standardized the health insurance premium rate review

19

and approval process. Maryland also established the Maryland Health Benefit Exchange to develop and operate the Individual Exchange and the Small Business Health Options Program Exchange; established a funding stream for Maryland Health Benefit Exchange; expanded Medicaid coverage for low-income individuals; provided for the transfer of Maryland Health Insurance Plan ("MHIP") members to other coverage and the dissolution of MHIP; established Maryland Health Connection, Maryland's online insurance exchange, which went live in October 2013; and established a time-limited State Reinsurance Program for 2015 and 2016. Furthermore, Maryland established the Maryland Health Insurance Coverage Protection Commission to monitor and assess potential and actual federal changes to the Affordable Care Act, Medicaid, the Maryland Children's Health Program, Medicare, and the Maryland All-Payer Model and provide recommendations for State and local action to protect access to affordable health coverage; eliminated prescription drug coverage for Medicare-eligible State of Maryland retirees and their dependents to coincide with the closing of the so-called donut hole under the Affordable Care Act; and entered into the new Total Cost of Care Model with Centers for Medicaid and Medicare Services ("CMS").

44. These investments are put at risk by the President's and Attorney General's pronouncements that they believe the Affordable Care Act's major market reforms are unconstitutional. Given the contradictory positions of Congress and the Executive, Maryland is left without clear guidance whether public dollars are better spent investing in market reforms compatible with the Affordable Care Act, such as Maryland's Section 1332 reinsurance program, or in re-establishing needed consumer protections in the Maryland

insurance market, which are unlikely to be as effective as uniform federal law. This uncertainty could result in the inefficient use and waste of public funds.

45. The effect of eliminating the Affordable Care Act would be destabilizing across the entire healthcare market in Maryland and would specifically damage the administration of Medicare in Maryland, a model program that pre-dated the Affordable Care Act. Even if the Affordable Care Act is only partially invalidated, any significant disruption in the federal government's administration of the Affordable Care Act will increase uncompensated care costs and therefore directly harm Maryland. From 1977 through 2014, Maryland operated an all-payer hospital reimbursement demonstration project that was authorized by Section 1814(b)(3) of the Social Security Act. In an all-payer system, all payers of hospital costs, including insurers, consumers, and governments, pay the same rate for services. In 2014, given the availability of new waiver authority specifically permitting all-payer models under Section 1115A(b)(2)(B)(xi) of the Social Security Act, newly enacted as part of the Affordable Care Act, Maryland elected to no longer be reimbursed under the terms of the prior program and to discontinue its prior demonstration project. Instead, Maryland entered into a new agreement with the federal government to allow Medicare reimbursement through its all-payer system consistent with the requirements of the Affordable Care Act (the "Maryland All-Payer Model"). Maryland has engaged in continued cooperation with the federal government. Recently, Maryland and CMS announced the latest iteration of this program, the Total Cost of Care Model, which is set to run between 2019 and 2023. The Maryland Total Cost of Care Model builds on the success of the Maryland All-Payer Model by creating greater incentives for

healthcare providers to coordinate with each other and provide patient-centered care, and by committing the State to a sustainable growth rate in per capita total cost of care spending for Medicare beneficiaries. Maryland is a payer in the system through its participation in Medicaid and state supplemental programs, and through the operation of its self-insured employee and retiree health benefit plans. Elimination of this program would be immediately disruptive to the payment system for all Maryland hospitals, and all Maryland payers, including Medicaid and Medicare, in Maryland.

46. Under the Maryland All-Payer Model, Maryland agreed to limit all-payer per capita hospital growth, including inpatient and outpatient care, to 3.58 percent. Maryland also agreed to limit annual Medicare per capita hospital cost growth to a rate lower than the national annual per capita growth rate per year for 2015 – 2018. Moreover, the Maryland system may serve as a model for other states interested in developing all-payer payment systems. Under this model, it was estimated that Medicare would save at least $330 million over the next five years. Recent data indicates that actual savings will exceed that projection: already Maryland has achieved an estimated $429 million in total Medicare hospital savings to date.

47. The Total Cost of Care Model sets Maryland on course to achieve fixed amounts of savings to Medicare per capita total cost of care during each model year between 2019 and 2023. The Model's financial targets are structured to obtain a total of over $1 billion in Medicare total cost of care savings by the fifth performance year of the Model. Improvement in quality of care will also help Maryland to meet the model cost of care targets.

22

48. Any disruption of the existing healthcare market that would lead to increased uncompensated care, including lower enrollment due to consumer confusion surrounding the implementation of the Government's decision not to enforce some or all of the Affordable Care Act; administrative disruption or delay of tax-credit assistance; or the ability of self-insured plans (which are governed by federal, not state law) to exclude coverage of pre-existing conditions, will harm Maryland because of its unique all-payer system. Under the current Maryland agency policy, uncompensated care for all Maryland hospitals is funded by a statewide pooling system in which regulated Maryland hospitals draw funds from the pool if they experience a greater-than-average level of uncompensated care and pay into the pool if they experience a less-than-average level of uncompensated care. This policy ensures that the cost of uncompensated care is shared equally across all the hospitals within the system. Thus, when uncompensated care increases, hospital rates increase accordingly, and payers must pay increased rates. Because of the coverage expansions under the Affordable Care Act, including the new availability of health insurance to those who were previously excluded because of pre-existing conditions and the expansion of Medicaid, the Maryland regulatory agency reduced the statewide uncompensated care pool assessment from 7.23 percent to 6.14 percent to reflect the impact of the Affordable Care Act in the first year. Maryland Health Servs. Cost Review Comm'n, "Final Recommendations for the Uncompensated Care Policy for Rate Year 2018" (July 12, 2017), http://www.hscrc.state.md.us/Documents/commission-meeting/2017/HSCRC-Public-pre-cm-Packet-2017-7-7.pdf. Recently, with full experience of claims rates under the Affordable Care Act, agency staff recommended a rate reduction to 4.51 percent for

rate year 2018.  *Id.*  Because Maryland is a payer of hospital rates, Maryland is directly

injured by any increase to the uncompensated care rate that will occur if the uninsured

population in Maryland increases.

49.     Partial or total invalidation of the Affordable Care Act would also have

destabilizing effects on the market for individual insurance.   Although Maryland has

enacted free-standing provisions to implement the Affordable Care Act, the elimination of

the guaranteed issue provision in other states or on a nationwide basis may cause significant

destabilization in the Maryland market.    The guaranteed issue provision operates

independently from the minimum coverage requirement; markets that have adjusted and

no longer need the minimum coverage requirement for stability could still be negatively

affected if the guaranteed issue provision is eliminated.  *See* "Brief Amici Curiae for

Economic Scholars in Support of the Intervenor-Defendants," ECF No. 150, 11-12; 27-31,

*Texas v. United States of America*, 18-00167 (N.D. Tex. June 14, 2018) (discussing how

guaranteed   issue   and   community   rating   provisions   support   insurance   markets

independently of any minimum coverage requirement).   The interconnectedness of state

economies limits the efficacy of any solution chosen by a state that departs substantially

from policies adopted by other states.  In the 1990s, a number of states attempted to address

an increasing lack of access to individual insurance for sicker residents by enacting reform

packages   including   "guaranteed   issue"   requirements.    *See*  Len   M.   Nichols,  *State

Regulation: What Have We Learned So Far?*, 25 J. Health Pol., Pol'y & L. 175, 188 (2000).

Several of the states that attempted to institute these reforms saw insurance providers pick

up stakes and cease participation in those states' insurance markets because they could

continue to do business in states who had not implemented reforms. In Kentucky, for example, 40 insurers departed the Commonwealth, leaving only two remaining providers to serve the statewide market, after the reforms were instituted in 1994. *See* Adele M. Kirk, *Riding the Bull: Experience with Individual Market Reform in Washington, Kentucky, and Massachusetts*, 25 J. Health Pol., Pol'y & L. 152 (2000). When national carriers can avoid exposure to such losses by simply ceasing to participate in reformed markets, states are forced to abandon wanted policies. *See id.* at 133, 136-37, 152, 158; Nancy C. Turnbull, *et al.*, *Insuring the Healthy or Insuring the Sick? The Dilemma of Regulating the Individual Health Insurance Market: Short Case Studies of Six States*, Feb. 2005, at 7. Maryland currently has only four carriers approved to issue plans in the individual insurance market; three of those carriers belong to the same corporate family. *See* Maryland Ins. Admin., *Carriers with Approved Individual Health Benefit Plans in Maryland* (Dec. 8, 2017), http://www.mdinsurance.state.md.us/Consumer/Documents/publicnew/indmktcarriers.pd f. In thirteen counties in Maryland, CareFirst is the only carrier offering qualified health plans in the Exchange, and, therefore, the only participant in the individual insurance market. The exit of a single carrier could have significant effects.

50. Another source of risk is the ongoing investment Maryland is making in optimizing its implementation of the Affordable Care Act. The Centers for Medicare and Medicaid Services recently approved Maryland's application for a waiver under Section 1332 of the Social Security Act, which was also added by the Affordable Care Act, to establish a state-based reinsurance program to assist in the individual market. As part of that program, the Maryland General Assembly passed two bills, H.B. 1782 and H.B. 1795,

to create a program that would assess a 2.75% fee on insurers and pay a guaranteed level of state reinsurance to insurers offering plans on the Health Benefit Exchange. The legislation mandated that the program "be designed to mitigate the impact of high-risk individuals on rates in the individual insurance market inside and outside the Exchange." Md. Code Ann., Ins. § 31-117(b) (LexisNexis 2018). Significant administrative effort was expended on the waiver application and is currently being expended on the implementing regulations, which will need to be promulgated well before January 1, 2019. A rate review hearing will be held on September 17, 2018; new approved rates incorporating the reinsurance program will be issued thereafter. *See also*, https://www.marylandhbe.com/policy-legislation/public-comment/state-reinsurance-program/ (listing schedule for public comment and hearing process). H.B. 1782 additionally requires a study of potential future market reforms under different provisions of the Act. The required study was estimated by the Department of Legislative Services to cost at least $100,000 in state funds. If the President and Attorney General's view about the constitutionality of Section 5000A(a) and the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions were to prevail, the utility of Maryland's current effort would be significantly undermined because the "impact of high-risk individuals on rates in the individual insurance market" will be markedly different in the absence of those provisions because of macro-effects from the nationwide insurance market, including the possibility that Maryland could see an influx of high-risk individuals from states with fewer state-based protections. For example, West Virginia is a border state of Maryland and it is a plaintiff state seeking an injunction to suspend application of

the Affordable Care Act to its citizens in *Texas v. United States*, No. 18-00167 (N.D. Tex.). Without the needed reforms the State is already pursuing, Maryland will be forced to re-plan and re-expend funds to achieve the legislative goal of stabilizing the individual market.

51. In addition to potentially wasting public effort and funds in pursuit of programs that could disappear or become unworkable if the Affordable Care Act were to be invalidated in part or in whole, Maryland also faces uncertainty about whether it will need to resurrect abandoned programs to provide necessary minimum consumer protections, to fill the void that would be left if the President and the Attorney General were to succeed in their efforts to destroy the Act. One example of a program that may need to be reinstated is the Maryland Health Insurance Plan, or MHIP. For over a decade, Maryland operated MHIP, a high-risk pool offering subsidized coverage for medically uninsurable individuals. Because the Affordable Care Act's prohibition on the denial of coverage for a pre-existing health condition eliminated the need for MHIP, legislation repealed MHIP and the assessment on hospital rates used to operate and administer MHIP. If MHIP were to be reinstated, the funding mechanism Maryland formerly used may no longer be available because of the changes in Maryland's all-payer system. In fiscal year 2014 (the last full year of the program), MHIP expenditures totaled $137.3 million.

52. In response to the Affordable Care Act, Maryland also repealed other provisions of State law that may need to be reinstated if the President and Attorney General's view were to prevail. For example, Maryland had a provision that required group insurance policies to allow insured individuals whose coverage is terminated to obtain from the

27

insurer an individual policy, known as a conversion policy. These provisions were repealed because, under the Affordable Care Act, an individual who loses coverage at any time during the year may enroll in individual coverage through the Health Exchange. However, if the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions of the Affordable Care Act are no longer in force, Maryland will need to re-evaluate its regulation of this sector to ensure Marylanders continue to have adequate access to health insurance when switching between large group, self-insured, small group, and individual markets. Substantial administrative effort will need to be devoted to reviewing Maryland's statutes and regulations to address any such scenarios not covered under the current laws, which were meant to work in tandem with federal protections.

53. Advanced premium tax credits ("APTC") are calculated based on a formula that assumes insurers will proceed by community rating, not individually medically underwritten rates. Currently, the Internal Revenue Service calculates APTC amounts even for state-based exchanges as part of the Federal Data Services Hub through the Premium Tax Credit Computation Engine. Internal Revenue Serv., "Internal Revenue Manuals 25.21.3, IRS Role in Supporting Affordable Care Act, Marketplace Eligibility Determinations and Reporting Requirements" at 25.21.3.3 (January 5, 2017), https://www.irs.gov/irm/part25/irm_25-021-003. If these calculations are discontinued or modified by the federal government due to the Executive's expressed position that the community rating provisions of the Affordable Care Act are unconstitutional, Maryland will incur additional costs. Maryland administers its own Exchange through a website

called Maryland Health Connection. If, because of the Executive's position that portions of the Affordable Care Act are no longer constitutional, the Internal Revenue Service eliminates or changes the Premium Tax Credit Computation Engine, or Health and Human Services eliminates the Premium Tax Credit Computation Engine from the Federal Data Services Hub, Maryland Health Connection's applications and interfaces would need to be updated, at substantial cost for Maryland. For example, in Fiscal Year 2017, Maryland expended $3.5 million in combined state and federal funds to provide enhancements to the Maryland Health Connection system and a similar outlay could be necessary to support any such changes.

54. These programmatic uncertainties pose a risk of injury to Maryland's financial well-being. Maryland maintains the highest-level bond rating, AAA, with three credit ratings agencies. As Maryland's Treasurer Nancy Kopp has explained, this distinction affirms Maryland's "longstanding commitment to prudent and proactive financial management and continuing overall fiscal strength" and allows Maryland "to continue to invest in our communities, notably our schools, libraries, institutions of higher education, healthcare facilities and cultural projects important to the residents of our State." http://www.treasurer.state.md.us/media/110051/bond_rating_release_7_24_2018.pdf. One ratings agency, S&P Global Ratings, explained, "The state's continued practice of making proactive midyear adjustments to align the budget in case of slower than-anticipated revenue growth will remain an important credit factor over the two-year outlook horizon, given Maryland's above-average economic dependence on federal government employment and spending." *Id.* Any actual or threatened decrease in federal

spending requires Maryland to consider taking proactive financial management steps to maintain its bond rating, which could require either financial harm to Maryland or an inability to carry out desired programs to the fullest extent. Such costly measures may not be necessary if the current uncertainty is removed by the relief requested.

55. Moreover, Maryland, like any state, must choose between competing public policy priorities when working to balance its budget. Money allocated to certain programs, such as implementation of the current provisions of the Affordable Care Act, is unavailable for other uses, including adaptation to whatever provisions of the Affordable Care Act the federal government chooses to implement. Therefore, Maryland is additionally impacted by the need to seek bonds for projects, requiring payment of interest, and by lost investment income, which could be gained if revenue were not expended.

56. The uncertainty caused by the President's and the Attorney General's pronouncements about the constitutionality of the Affordable Care Act are directly damaging to Maryland.

**The Affordable Care Act Remains Constitutional Under *NFIB*.**

57. Despite the President's and Attorney General's protestations to the contrary, the minimum coverage provision continues to meet the *NFIB* factors and, therefore, remains constitutional and there is no basis to bootstrap a claim that the community rating, prohibition on pre-existing condition exclusions, and guaranteed issue provisions should be held unconstitutional because they cannot be severed. In *NFIB*, the Supreme Court explained that the shared responsibility payment "looks like" a tax in several respects. *NFIB*, 567 U.S. 563-64. First, the requirement to pay is found in the Internal Revenue

Code and enforced by the IRS, which must assess and collect it "in the same manner as taxes." *Id.* The payment is based on "such familiar factors as taxable income, number of dependents, and joint filing status." *Id.* at 563. Second, the shared responsibility payment produces "at least some revenue for the Government." *Id.* at 564. Third, the payment is a tax and not a penalty because the tax amount would be far less than the cost of purchasing health insurance for those who make the "financial decision" to pay rather than purchase coverage. *Id.* at 566. The Supreme Court thus concluded that because it had a "duty to construe a statute to save it, if fairly possible, that § 5000A can be interpreted as a tax." *Id.* at 574.

58.    The Court relied on several tax-like features of the minimum coverage requirement in its determination that the payment constituted a tax, and the fact that the shared responsibility payment generated revenue was not central to the Court's constitutional determination.  The Court noted that "[a]lthough the payment will raise considerable revenue, it is plainly designed to expand health insurance coverage," which is a perfectly valid exercise of Congress's taxing powers. *NFIB*, 567 U.S. at 567.  If all non-exempt taxpayers made the "financial decision" to purchase insurance, the provision would not raise any revenue whatsoever. *Id.* at 566.

59.    Setting the shared responsibility payment amount at zero does not transform an option to purchase insurance or pay a tax, as the *NFIB* Court understood § 5000A, into an unconstitutional mandate to purchase insurance.  Under the Tax Cuts and Jobs Act amendment, citizens have the choice to purchase insurance or not, with a shared responsibility payment consequence of $0 for year 2019.  That is, non-exempt households

under the amendment incur no additional expenses, and in fact their expenses are lower, if they choose not to purchase insurance.

60.    The shared responsibility payment continues to maintain these tax-like characteristics.  Because only the dollar amount of the shared responsibility payment was changed (and could be changed again), its provisions are still contained within the Internal Revenue Code and tied to household income and filing status, and non-exempt households can continue to make a "financial decision" as to whether to purchase insurance coverage. The shared responsibility payment will generate revenue beyond January 1, 2019, because the shared responsibility payment for the 2018 tax year is not due until April 15, 2019, and the IRS can collect the payment for 2018 by way of offsets until all sums due are collected.

61.    As clearly expressed through the language of the Tax Cuts and Jobs Act and through the contemporaneous statements of those who voted on the legislation, Congressional intent was limited to modifying only the amount of shared responsibility liability incurred by an individual who failed to provide evidence of minimum coverage and did not extend to modification or repeal of any other portion of the Affordable Care Act.  Therefore, if the amendment is determined to be unconstitutional, then striking the amendment would be the only action compatible with Congressional intent.  Moreover, if the changes to the minimum coverage requirement were to render it unconstitutional and unenforceable, and the amendment is not struck, the minimum coverage requirement ought to be regarded as severable from the remainder of the statute, including the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions.

32

## CLAIM FOR RELIEF

### Declaratory Judgment Act

62.   Plaintiff realleges and incorporates herein by reference every allegation and paragraph set forth previously.

63.   An actual controversy presently exists between Maryland and the Defendants about whether key provisions of the Affordable Care Act, including but not limited to those codified at 42 U.S.C. §§ 300gg-1, 300gg-3, 300gg-4(a); 300gg(a)(1) and 300gg-4(b) are constitutional and enforceable.

64.   Maryland is entitled to a declaration that the Affordable Care Act, including but not limited to those provisions codified at 42 U.S.C. §§ 300gg-1, 300gg-3, 300gg-4(a); 300gg(a)(1) and 300gg-4(b), is constitutional and enforceable, notwithstanding 26 U.S.C. § 5000A, as amended by the Tax Cuts and Jobs Act, or, in the alternative, that the portion of the Tax Cuts and Jobs Act amending 26 U.S.C. § 5000A(c) is unconstitutional.

### PRAYER FOR RELIEF

WHEREFORE, the State of Maryland respectfully requests that this Court enter a judgment in its favor and against the Defendants, consisting of:

(a) a declaratory judgment, stating that the Affordable Care Act, including but not limited to those provisions codified at 42 U.S.C. §§ 300gg-1, 300gg-3, 300gg-4(a); 300gg(a)(1) and 300gg-4(b), is constitutional and enforceable, notwithstanding 26 U.S.C. § 5000A, as amended by the Tax Cuts and Jobs Act, or, in the alternative, that the portion of the Tax Cuts and Jobs Act amending 26 U.S.C. § 5000A(c) is unconstitutional.

(b) injunctive relief, enjoining the Defendants from taking any action inconsistent with the Court's declaration;

(c) attorneys' fees and costs under 28 U.S. Code § 2412; and

(d) such other and further relief as this Court may deem just and proper.

THE STATE OF MARYLAND

By: _____

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN (BAR NO. 24930)
ssullivan@oag.state.md.us
SARAH W. RICE (BAR NO. 29113)
srice@oag.state.md.us
KIMBERLY S. CAMMARATA (BAR NO. 11997)
kcammarata@oag.state.md.us
Assistant Attorneys General
200 St. Paul Place
Baltimore, Maryland 21202
T: (410) 576-6325
F: (410) 576-6955

THOMAS C. GOLDSTEIN, *admission pending*
TGoldstein@goldsteinrussell.com
KEVIN K. RUSSELL, *admission pending*
KRussell@goldsteinrussell.com
SARAH E. HARRINGTON, *admission pending*
Sharrington@golsteinrussell.com
TEJINDER SINGH (BAR NO. 17888)
TSingh@goldsteinrussell.com
DANIEL WOOFTER (BAR NO. 20474)
dhwoofter@goldsteinrussell.com
Goldstein & Russell, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0637 (direct)
(800) 574-2033 (fax)

*Attorneys for the State of Maryland*

34