THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**Baltimore Division**

THE STATE OF MARYLAND,

*Plaintiff,*

v.

UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

*Defendants.*

Civil Action No. 1:18-cv-02849-ELH

**BRIEF OF THE DISTRICT OF COLUMBIA, THE COMMONWEALTH OF
PENNSYLVANIA, AND THE STATES OF CONNECTICUT, DELAWARE, HAWAII,
ILLINOIS, MAINE, MASSACHUSETTS, NEW MEXICO, NEW YORK, NORTH
CAROLINA, OREGON, RHODE ISLAND, VIRGINIA, AND WASHINGTON AS *AMICI
CURIAE* SUPPORTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION,
TO SUBSTITUTE DEFENDANT, AND TO EXPEDITE CONSIDERATION**

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.     THE STATES HAVE A SIGNIFICANT INTEREST IN THE LEGITIMACY OF THE ACTING ATTORNEY GENERAL. ............................ 2

          A.    The Attorney General Enjoys Vast Authority That Has Major Implications For The States. ....................................................................... 2

          B.    Questions About The Legitimacy Of The Acting Attorney General Undermine The States' Ability To Protect Their Residents. ...................... 6

    II.    CONGRESS HAS PROTECTED THE SENATE'S CONFIRMATION POWER BY SPECIFYING THAT THE DEPUTY ATTORNEY GENERAL ACTS AS THE ATTORNEY GENERAL IN THE EVENT OF A VACANCY................................................................................................ 7

          A.    Congress's Selection Of A Specific Order Of Succession For The Justice Department Controls Over The More General Provisions Of The Vacancies Reform Act........................................................................ 7

          B.    OLC's Interpretation Would Impermissibly Restrict The Senate's Confirmation Power Without Clear Congressional Approval. ................. 11

CONCLUSION..................................................................................................................... 15

## TABLE OF AUTHORITIES

*Cases*

*Burns v. United States*, 501 U.S. 129 (1991) ................................................................. 9

*Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill. filed Aug. 7, 2017) ......................... 3

*Freytag v. Commissioner*, 501 U.S. 868 (1991) ........................................................ 11

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) .................................................... 11, 13

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 724 F.3d 230 (D.C. Cir. 2013) ......................................................................................................................... 12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ........... 9, 10

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) ........................................ 10

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 18-15068, 2018 WL 5833232 (9th Cir. Nov. 8, 2018) .................................................................................. 4

*United States v. California*, No. 2:18-01539 (E.D. Cal. filed Sept. 30, 2018) .............. 5

*United States v. Haning*, No. 18-cr-139 (E.D. Mo. Nov. 13, 2018) ............................. 6

*United States v. Under Seal*, 709 F.3d 257 (4th Cir. 2013) ...................................... 10

*Washington v. United States*, No. 3:18-cv-1979 (S.D. Cal. filed June 26, 2018) .......... 5

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) .............................................. 11

*Constitution and Statutes*

U.S. Const. art. II, § 2, cl. 2 ...................................................................................... 11

5 U.S.C. § 3345 ................................................................................... 9, 10, 12, 14

5 U.S.C. § 3347 ............................................................................................... 8, 14

18 U.S.C. § 2510 ....................................................................................................... 4

28 U.S.C. § 508 ............................................................................... 8, 10, 13, 14

28 U.S.C. § 509 ....................................................................................................... 2

28 U.S.C. § 519 ........................................................................................................... 2

Act of July 20, 1870, ch. 150, 16 Stat. 162 ............................................................... 2, 7

Act of July 23, 1868, ch. 227, 15 Stat. 168 .................................................................. 7

Act of June 20, 1874, ch. 333, 18 Stat. 113 ................................................................. 8

Judiciary Act of 1789, ch. 20, 1 Stat. 73 ...................................................................... 2

Presidential Transitions Effectiveness Act, Pub. L. No. 100-398, 102 Stat. 985 (1988) .............. 13

Pub. L. No. 89-554, 80 Stat. 378 (1966) ....................................................................... 8

Rev. Stat. § 179 (1st ed. 1875) ...................................................................................... 8

## Other Authorities

Authority of the President to Name an Acting Attorney General, 31 O.L.C. 208 (2007) ............ 15

Brad Heath, *As Feds Focused on Detaining Kids, Border Drug Prosecutions Plummeted*,
USA Today (Oct. 10, 2018) ........................................................................................ 6

Fed. R. Crim. P. 6 ....................................................................................................... 4

M. Carey, Cong. Research Serv., *Presidential Appointments, the Senate's Confirmation
Process, and Changes Made in the 112th Congress* (2012) ......................................... 10

M. Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to Protect the
Senate's Confirmation Prerogative* (1998) ................................................................. 13

Memorandum from Counsel to the President Regarding Agency Reporting Requirements
under the Vacancies Reform Act (Mar. 21, 2001) ...................................................... 14

Office of Legal Counsel, Dep't of Justice, Memorandum on Designating an Acting Attorney
General (Nov. 14, 2018) ..................................................................... 8, 9, 12, 14

Press Release, Dep't of Justice, Justice Department Demands Documents and Threatens To
Subpoena 23 Jurisdictions As Part of 8 U.S.C. 1373 Compliance Review (Jan. 24, 2018) ........... 5

Press Release, Dep't of Justice, Statement by Attorney General Sessions on Today's New
Lawsuit Against the State of California (Apr. 2, 2018) ................................................ 5

Sari Horwitz & Maria Sacchetti, *Sessions Vows To Prosecute All Illegal Border Crossers
and Separate Children from Their Parents*, Wash. Post (May 7, 2018) ........................ 5

The Federalist No. 76 (A. Hamilton) (C. Rossiter ed. 1961)........................................................ 11

U.S. Dep't of Justice, *FY 2018 Budget Request At A Glance* ........................................................ 2

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* the District of Columbia, the Commonwealth of Pennsylvania and the States of Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, New Mexico, New York, North Carolina, Oregon, Rhode Island, Virginia, and Washington (the "*Amici* States") support Plaintiff State of Maryland's request to enjoin Matthew Whitaker from exercising the authority of the United States Attorney General and to substitute Deputy Attorney General Rod Rosenstein as a defendant. The Attorney General makes many decisions fundamentally affecting the lives of *Amici* States' residents. Additionally, the *Amici* States work closely with the Department of Justice every day, coordinating law enforcement activities and administering hundreds of millions of dollars in grant programs. They thus have a compelling interest in the Department's ability to effectively carry out its statutory responsibilities consistent with the rule of law. Unfortunately, the legal controversy surrounding Mr. Whitaker's appointment has threatened the legitimacy of the Department's actions and the vital relationships between the Department and the States. The *Amici* States therefore have an urgent interest in the resolution of this issue, so that no doubts surround the legitimacy and authority of the United States Attorney General and the United States Department of Justice.

The *Amici* States have concluded that Mr. Whitaker's appointment is unlawful. At minimum, it violates Congress's express and controlling statutory designation of the Deputy Attorney General as the Acting Attorney General in the event of a vacancy. This unlawful appointment requires immediate correction to prevent harm to the Amici States caused by the actions of an improperly designated Attorney General whose decisions are subject to possible invalidation.

## ARGUMENT

### I.   THE STATES HAVE A SIGNIFICANT INTEREST IN THE LEGITIMACY OF THE ACTING ATTORNEY GENERAL.

#### A.   The Attorney General Enjoys Vast Authority That Has Major Implications For The States.

The Office of the Attorney General occupies a critical and unique position within the Executive Branch.  It was one of four original cabinet positions created in 1789, predating the Department of Justice itself by more than 80 years.  *See* Judiciary Act of 1789, ch. 20, 1 Stat. 73; *see also* Act of July 20, 1870, ch. 150, 16 Stat. 162.  The Attorney General has near-total authority over the Department's operations, as virtually "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General."  28 U.S.C. § 509.  The Attorney General oversees a vast array of law enforcement organizations, including the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Prisons, the U.S. Marshals Service, and all 94 U.S. Attorney's Offices, among many other offices and agencies.  In total, more than 100,000 employees work under the Attorney General as law enforcement agents, attorneys, and in a variety of other capacities.  *See* U.S. Dep't of Justice, *FY 2018 Budget Request At A Glance*, https://www.justice.gov/jmd/page/file/968216/download.

Exercising the tremendous authority of the office, the Attorney General is responsible for "supervis[ing] all litigation to which the United States, an agency, or officer thereof is a party."  28 U.S.C. § 519.  As a result, he or she ultimately determines the positions taken in court by the Executive Branch.  These decisions have profound consequences for the *Amici* States and their residents.  The present lawsuit, for example, arose from the decision of former Attorney General Sessions not to defend certain provisions of the Affordable Care Act in court.  *See* Md. Mot. for Prelim. Inj., Mem., Dkt. 6-1, at 2 (Nov. 13, 2018).  That decision could have devastating

consequences for the millions of Americans with preexisting medical conditions.  On many other significant issues—ranging from the protection of undocumented immigrants who arrived in this nation as children, to the legality of removing voters from the rolls for not voting, to discrimination against transgender individuals—the former Attorney General reversed the Department's earlier position.

The Attorney General makes decisions that directly affect the *Amici* States' own law enforcement efforts.  For instance, state and local law enforcement agencies depend on Justice Department funding to accomplish their missions.  The Justice Department oversees numerous grant programs that provide hundreds of millions of dollars to states and local governments each year.  Funding through the Byrne Justice Assistance Grant program and Community Oriented Policing Services provides essential support for state and local law enforcement agencies.  Other grant programs, such as the Justice Reinvestment Initiative and the Byrne Criminal Justice Innovation Program, support state and local initiatives to develop data-driven approaches to criminal justice reform and crime prevention.  The decisions made by the Attorney General in administering these programs can result in loss of that crucial funding.  For example, former Attorney General Sessions sought to withhold federal grant funding from jurisdictions that, in his view, did not cooperate sufficiently with federal immigration enforcement agencies.  *See, e.g.*, *Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill. filed Aug. 7, 2017) .

In addition, the *Amici* States regularly collaborate with the Justice Department, with state law enforcement agents relying every day on the Department's authority.  State narcotics officers jointly investigate cases with agents of the Drug Enforcement Administration.  Assistant U.S. Attorneys and their state counterparts work hand-in-hand to bring down criminal organizations.  State and federal agencies jointly investigate violations of the antitrust statutes and other consumer protection laws.

3

Law enforcement efforts are often intertwined: federal and state agents assist each other in executing search warrants and share evidence for use in prosecuting offenders, whether in federal or state court.  Federal criminal statutes recognize that state officials will play a significant role in enforcing federal criminal laws.  For example, the federal wiretap statute specifically authorizes state law enforcement officials to submit affidavits in support of applications for electronic surveillance.  18 U.S.C. § 2510.  And the Federal Rules of Criminal Procedure specifically permit the sharing of federal grand jury information with certain state officials, reflecting the recognition that state officers are often involved in the investigation of federal crimes.  Fed. R. Crim. P. 6(e)(3)(A)(ii).  The Attorney General ultimately sets the policies that guide such law enforcement collaboration.

While the *Amici* States and the Justice Department frequently collaborate, they are also often adversaries in litigation.  State attorneys general have filed numerous lawsuits against this Administration and its predecessors.  Some of the recent litigation between States and the federal government resulted from decisions made by former Attorney General Sessions himself.  *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 18-15068, 2018 WL 5833232 (9th Cir. Nov. 8, 2018) (the rescission of Deferred Action for Childhood Arrivals).  Decisions made by the Acting Attorney General about these cases and other matters will have a direct and significant impact on the *Amici* States and their residents.  The Acting Attorney General could continue on the path set by former Attorney General Sessions.  Alternatively, he could withdraw or modify some of the policies that have spurred litigation with the States and work to ensure that the Department more faithfully complies with the law going forward—thus potentially resolving current lawsuits with the *Amici* States and reducing the likelihood of future ones.

In addition, under former Attorney General Sessions, the Department focused its resources on pursuing litigation against "states like California that believe they are above the law."  Press

Release, Dep't of Justice, Statement by Attorney General Sessions on Today's New Lawsuit Against the State of California (Apr. 2, 2018).   It also sought declarations that state laws were unconstitutional, *e.g.*, *United States v. California*, No. 2:18-01539 (E.D. Cal. filed Sept. 30, 2018) (the California Internet Consumer Protection and Net Neutrality Act of 2018), and threatened other legal actions against states, *e.g.*, Press Release, Dep't of Justice, Justice Department Demands Documents and Threatens To Subpoena 23 Jurisdictions As Part of 8 U.S.C. 1373 Compliance Review (Jan. 24, 2018), https://tinyurl.com/ybzcvmyo.  The Department under past attorneys general sued states for violations of federal civil rights laws, including the Voting Rights Act, the Religious Land Use and Institutionalized Persons Act, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act.  The Department's priorities, shaped by the Attorney General, thus have a tremendous impact on the *Amici* States.

The impact of the Attorney General's ability to set the Justice Department's overall mission and focus its resources cannot be overstated.  For instance, former Attorney General Sessions chose to devote considerable resources to the prosecution of immigration offenses, including misdemeanor illegal entry, vowing to bring "as many of those cases as humanly possible until we get to 100 percent."  Sari Horwitz & Maria Sacchetti, *Sessions Vows To Prosecute All Illegal Border Crossers and Separate Children from Their Parents*, Wash. Post (May 7, 2018), https://tinyurl.com/ ya746seu.  The Department's "zero-tolerance" policy for immigration offenses drained resources from other enforcement activities and led to the separation of thousands of children from their parents, imposing costs on the states where these children and their families ultimately reside.  *See* Compl., Dkt. No. 1, ¶¶ 164-341, *Washington v. United States*, No. 3:18-cv-1979 (S.D. Cal. filed June 26, 2018).  This focus on immigration prosecutions resulted in drug trafficking prosecutions along the border reaching their lowest level in years.  *See* Brad Heath, *As Feds Focused on*

*Detaining Kids, Border Drug Prosecutions Plummeted*, USA Today (Oct. 10, 2018), https://tinyurl.com/y6uvst9m.

**B.      Questions About The Legitimacy Of The Acting Attorney General Undermine The States' Ability To Protect Their Residents.**

The relationship between the Justice Department and the States is so essential—whether it is collaborative or adversarial—that any doubts about the legitimacy of the Acting Attorney General threaten to harm the *Amici* States.  That is why the identity of the legitimate Acting Attorney General must be resolved as soon as possible.  To allow doubts about the legality of Mr. Whitaker's appointment to linger is to invite legal challenges to both significant and routine actions undertaken by the Department while he is serving as Acting Attorney General.  *See, e.g.*, Mot. to Dismiss Indictment, or in the Alternative, to Disqualify Prosecution Team, Dkt. No. 72, *United States v. Haning*, No. 18-cr-139 (E.D. Mo. Nov. 13, 2018) (citing Mr. Whitaker's appointment).

Regardless of how these legal challenges are ultimately resolved, the fact that Mr. Whitaker's appointment has exposed the Department to such challenges creates grave risks for the States.  Every day, States make decisions in response to the Department's actions.  They choose how to allocate litigation resources in reaction to the Justice Department's actions.  They weigh whether and how to fund crucial programs based on the availability or lack of key Justice Department funds.  They rely on federal warrants and investigative resources in making prosecutorial decisions, in some cases choosing to forego state charges for serious crimes in favor of federal prosecution.  And they respond to changes in Justice Department enforcement priorities in areas such as civil rights and consumer protection by refocusing their own resources to ensure that their residents are protected.

In all these respects, the *Amici* States depend on the legitimacy of the authority overseeing the Department.  To create even the slightest risk that such authority is invalid poses real harm to the *Amici* States, warranting immediate resolution of the questions raised by Maryland's motion.

## II.   CONGRESS HAS PROTECTED THE SENATE'S CONFIRMATION POWER BY SPECIFYING THAT THE DEPUTY ATTORNEY GENERAL ACTS AS THE ATTORNEY GENERAL IN THE EVENT OF A VACANCY.

Since Congress first established the Justice Department a century and a half ago, it has specified the officer to temporarily fill an Attorney General vacancy.  It has done so through a specific succession statute, rather than general vacancies acts.  The purported appointment of Mr. Whitaker—rather than the Deputy Attorney General as the current succession statute requires— contravenes Congress's intent.  The general provisions of the 1998 Vacancies Reform Act do not support Mr. Whitaker's appointment and, as a matter of basic statutory interpretation, cannot control over the office-specific statute directing that the Deputy Attorney General succeed the Attorney General.  Moreover, if the Vacancies Reform Act were treated as an alternative method of succession that can supplant Congress's specific legislative selection, it would allow the President essentially free choice of an acting Attorney General, even one who occupies a position, as here, that is not Senate-confirmed.  At minimum, such a significant relinquishment of the Senate's advice and consent power on so consequential an appointment should not be inferred without a clear indication from Congress, which is entirely absent here.  Nothing less would suffice to protect the Senate's advice and consent power, an essential safeguard of liberty in our constitutional scheme.

### A.   Congress's Selection Of A Specific Order Of Succession For The Justice Department Controls Over The More General Provisions Of The Vacancies Reform Act.

Since the Justice Department's founding, Congress has directly provided in its enabling statute for temporarily filling an Attorney General vacancy.  In 1870, when creating the Department with the Attorney General as its head, Congress specified an officer (the Solicitor General) to temporarily act as Attorney General.  Act of July 20, 1870, ch. 150, § 2, 16 Stat. at 162.  It did so even though just two years prior it had enacted a Vacancies Act, generally addressing vacancies in the executive departments. Act of July 23, 1868, ch. 227, 15 Stat. 168.  When Congress codified all

existing statutes in 1874, the Attorney General was expressly exempted from the general Vacancies Act.  Rev. Stat. § 179 (1st ed. 1875); *see* Act of June 20, 1874, ch. 333, § 2, 18 Stat. 113, 113.  In 1966, Congress re-codified the Attorney General succession statute and the Vacancies Act, with the latter still expressly inapplicable to the Attorney General.  Pub. L. No. 89-554, 80 Stat. 378, 426 (1966) (5 U.S.C. § 3347).  In its current form (unchanged since 1977), the Attorney General succession statute, 28 U.S.C. § 508, provides that the Deputy Attorney General is first in line of succession, followed by the Associate Attorney General.

The Vacancies Reform Act, passed in 1998, did not abrogate the Attorney General succession statute or this longstanding precedent.  Far from repealing the Attorney General succession statute, the Vacancies Reform Act establishes itself as "the exclusive means for temporarily authorizing an acting official" to fill an executive agency office requiring Presidential appointment and Senate confirmation, *unless* "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1)(B).  Because the Attorney General succession statute is such an express statutory designation, it continues to apply unaffected by the Vacancies Reform Act.

Disregarding this plain text, the U.S. Department of Justice Office of Legal Counsel ("OLC") erroneously advised that the President could appoint Mr. Whitaker using the Vacancies Reform Act.  Memorandum on Designating an Acting Attorney General (Nov. 14, 2018) ("OLC memo").  The OLC memo incorrectly opines that, even if the Vacancies Reform Act is not the "exclusive means" to fill such a vacancy, it is still an alternative means.  OLC Memo 4.  The act says no such thing.  If Congress had intended that the Vacancies Reform Act operate as an alternative mechanism, it would have said so. It would also have further addressed when and how this alternative procedure would operate, given the unanswered questions it would create.  For example, if a succession occurs

automatically under both the office-specific succession statute and the Vacancies Reform Act, 5 U.S.C. § 3345(a)(1), do the latter act's time limitations and other restrictions apply?  Can the two alternative mechanisms be piggybacked, thus allowing successive temporary appointments for the same vacancy?  The answers would only raise further questions, such as whether the President must choose which alternative mechanism applies, and how and when such choice may be made.

The Vacancies Reform Act's silence indicates that the OLC's strained interpretation is incorrect.  To be sure, the Vacancies Reform Act also lacks an express statement that it is *not* an alternative mechanism.  *See* OLC Memo 4 (relying on the fact that the Vacancies Reform Act "nowhere says that if another statute remains in effect, the Vacancies Reform may not be used").  But there would have been no necessity, or reason, to say this.  Since those office-specific statutes unquestionably remain in effect, they still govern.  *See Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.")  The OLC memo's theory—that Congress would deliberately establish two conflicting methods of succession without giving any thought or guidance to how they would interact—is novel and exceedingly strange.  It is unsurprising that the drafters of the Vacancies Reform Act did not anticipate OLC's interpretation and take pains to expressly refute it.

The Vacancies Reform Act should not be interpreted to create a conflict with the Attorney General succession statute, which has always controlled over general vacancies acts.  Even if there were a seeming conflict, the Attorney General succession statute continues to apply as the specific choice of Congress for temporarily filling an Attorney General vacancy.  It is "a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  Under this basic principle, "a statute dealing with a

narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). In other words, "a subsequent statute . . . treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all." *Id.*; *accord United States v. Under Seal*, 709 F.3d 257, 262 (4th Cir. 2013) (where statutes conflict, "a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision").

This well-established canon of construction best reconciles the statutes here and effectuates Congress's intent. The Vacancies Reform Act is the general, default statute for the roughly 1,200 executive offices subject to Presidential appointment and Senate confirmation. 5 U.S.C. § 3345; *see* M. Carey, Cong. Research Serv., *Presidential Appointments, the Senate's Confirmation Process, and Changes Made in the 112th Congress* 7 (2012). In contrast, the Attorney General succession statute deals only with one office: the Attorney General. Its terms plainly direct that the Deputy Attorney General is the Acting Attorney General. 28 U.S.C. § 508(a). The general provisions of the Vacancies Reform Act do not expressly contradict the Attorney General succession statute, nor is it absolutely necessary that those provisions do so, for they still apply to the vast majority of Senate-confirmed offices. Given the importance of the Attorney General position, it is only natural that Congress has long used a specific provision, rather than relying on a general act, to govern a vacancy in that office. The Vacancies Reform Act thus does not submerge, and nullify, Congress's specific command applicable to this very position. *See RadLAX*, 566 U.S. at 645 ("To eliminate the contradiction, the specific provision is construed as an exception to the general one.").

**B.      OLC's Interpretation Would Impermissibly Restrict The Senate's Confirmation Power Without Clear Congressional Approval.**

OLC also fails to show any clear intent of Congress to diminish the Senate's constitutional role over such a key appointment as the Attorney General.  The OLC memo contends that the Vacancies Reform Act abrogated a longstanding statute and unbroken tradition under which Congress specified the Senate-confirmed office whose occupant would serve as Acting Attorney General in the event of a vacancy.  But courts do not interpret legislation to enact such a fundamental legal change without a clear indication of Congress's intent.  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  In other words, Congress does not "hide elephants in mouseholes." *Id*.  This principle of statutory construction applies with special force here, for this is no ordinary elephant.  At issue is not Congress's routine implementation of legislation through a regulatory framework. *See, e.g.*, *id*.  Instead, at stake is the Senate's advice and consent power: a "critical structural safeguard of the constitutional scheme."  *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (internal quotation marks omitted); *see* U.S. Const. art. II, § 2, cl. 2.

This Court should presume that Congress did not intend to weaken this critical constitutional protection.  "The manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism."  *Freytag v. Commissioner*, 501 U.S. 868, 883 (1991) (citation and internal quotation marks omitted).  To check this executive power, the Framers "empowered the Senate to confirm principal officers on the view that 'the necessity of its co-operation in the business of appointments will be a considerable and salutary restraint upon the conduct of' the President."  *SW Gen.*, 137 S. Ct. at 948 (quoting The Federalist No. 76, at 514 (A. Hamilton) (C. Rossiter ed. 1961)).  As the Framers envisioned, the Senate's confirmation power provides "'an excellent check upon a spirit of

favoritism in the President' and a guard against 'the appointment of unfit characters.'" *Id*. at 935 (quoting The Federalist No. 76, at 457). This power is integral to the balanced separation of powers, which the Framers understood as essential to the preservation of liberty. *Id.* at 948.

Moreover, the Senate's advice and consent power is easy to cede, but hard to restore. Passing an act giving the President broad discretion in filling vacancies requires only a simple majority of Congress. But once enacted, such legislation likely cannot be changed without a veto-proof supermajority. A president bestowed with such broad authority would naturally resist a legislative repeal. Courts should therefore ensure that, at minimum, Congress has spoken clearly before legislation is construed to shift the balance of power from Congress to the President (even assuming that Congress can constitutionally do so). *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 724 F.3d 230, 236 (D.C. Cir. 2013) (requiring clear statements for "statutes that significantly alter the balance between Congress and the President").

The requisite clear intent of Congress is absent here. The OLC memo acknowledges that, for more than a century, Congress specified the Senate-confirmed office whose occupant would act temporarily as the Attorney General. OLC Memo 13. But OLC claims that Congress inexplicably changed course, abrogated the statute, and gave the President a choice from over a thousand individuals to unilaterally appoint, including those whom the Senate had never confirmed for their positions. *Id.* at 4-5; *see* 5 U.S.C. § 3345(a)(2), (3). As here, this would mean that the President can place a mere employee in charge of scores of Senate-confirmed Justice Department officers, including all 94 U.S. Attorneys. OLC identifies scant evidence that this dramatic turnabout is what Congress in fact intended. It relies on a single, vague sentence in a Senate report on a version of a bill that was not enacted. OLC Memo 4. It then cites an obsolete reference in the Attorney General succession statute to the former Vacancies Act, inaccurately describing it as a reference to the

Vacancies *Reform* Act (which did not even exist at the time). *Id.* at 5; *see* 28 U.S.C. § 508 (1994). Finally, OLC notes that the Attorney General succession statute uses the term "may"—without noting that it also uses "shall"—before OLC claims that using "shall" would have made no difference anyway.  OLC Memo 5 & n.4; *see* 28 U.S.C. § 508.  Mouseholes, at best.

Contrary to OLC's suggestion that the Vacancies Reform Act significantly relinquished the Senate's confirmation power, Congress enacted it to *protect* this power against ongoing executive encroachment.  *SW Gen.*, 137 S. Ct. at 935-36.  During the 1970s and 1980s, Congress opposed claims of executive departments that the Vacancies Act was inapplicable if the agency's "authorizing legislation vests all powers and functions of the agency in its head and allows the head to delegate such powers and functions to subordinates in her discretion."  M. Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* 1 (1998), https://www.everycrsreport.com/reports/98-892.html.  Such interpretation would have significantly curtailed the Vacancies Act, since all executive departments had such broad delegation provisions. *See id.*  Even though Congress amended the Vacancies Act to reject such an interpretation, executive departments still adhered to it based upon a subsequent OLC opinion that ignored Congress's stated intent.  *Id.* at 3; *see* Presidential Transitions Effectiveness Act, Pub. L. No. 100-398, §7, 102 Stat. 985, 988 (1988).  By 1998, about 20 percent of offices subject to Senate confirmation in those departments had temporary designees, most of whom were acting beyond the act's time limits. Rosenberg, *supra* at 1, 3-4.  "Perceiving a threat to the Senate's advice and consent power," Congress "acted again" and replaced the Vacancies Act with the Vacancies Reform Act.  *SW Gen*, 137 S. Ct. at 936.

OLC's interpretation disregards this history and statutory purpose.  In OLC's view, for offices with their own succession statutes, the Vacancies Reform Act served only to expand the

President's authority at the expense of the Senate's advice and consent power.  As OLC has advised, the President is now free to disregard Congress's selections of specific officers to temporarily fill vacancies in the most important offices, including Attorney General.  According to OLC, the succession order for an Attorney General vacancy is no longer what Congress specifically provided: the Deputy Attorney General, followed by the Associate Attorney General.  28 U.S.C. § 508. Instead, the President can select an Acting Attorney General from any of 1,200 Senate-confirmed positions throughout government or, as here, from various *non*-Senate-confirmed positions within the Department of Justice.  *See* OLC Memo 4-5 (citing 5 U.S.C. § 3345(a)(2), (3)).  This cannot be. OLC erroneously interprets the Vacancies Reform Act to allow the President to virtually hand-pick an Acting Attorney General without any Senate oversight, when the act's purpose was the opposite: to reassert and protect the Senate's constitutional authority over such appointments.

Any notion of clear legislative intent supporting OLC's interpretation is refuted by the contemporary application of the Vacancies Reform Act.  Shortly after its enactment, the Counsel to the President issued a memorandum to all federal executive departments and agencies, advising that the act does *not* apply to positions, including the Attorney General, governed by office-specific succession statutes.  Memorandum from Counsel to the President Regarding Agency Reporting Requirements under the Vacancies Reform Act 1-2 (Mar. 21, 2001) ("2001 Memo").   The memorandum explained that "positions for which another statute designates who shall serve as an acting officer" are exempt from the Vacancies Reform Act's coverage.  *Id*. at 2; *accord* 5 U.S.C. § 3347(a)(1)(B).  It specifically stated that the position of Attorney General was exempt "because 28 U.S.C. § 508 governs who shall act as Attorney General in the case of a vacancy."  2001 Memo 2 n.2.  Although OLC later sought to minimize the 2001 memorandum as addressing only the Vacancies Reform Act's reporting requirements, *see* Authority of the President to Name an Acting

14

Attorney General, 31 O.L.C. 208, 210 (2007), the 2001 memorandum addressed, necessarily, what positions the Vacancies Reform Act covered in order to ascertain what positions were covered by any of its provisions.  OLC cannot overcome this contradiction.  Congress could not have clearly enacted the fundamental change that OLC posits and yet, at the same time, acted so surreptitiously that the executive branch was totally unaware of it.

The President's appointment of Mr. Whitaker is fraught with constitutional doubts.  That the Senate never confirmed him for his permanent position raises a separate constitutional concern that he cannot temporarily act as Attorney General even with legislative approval, at least absent an exigency not present here.  *See* Md. Mot. for Prelim. Inj., Mem. 22-27.  The canon of constitutional avoidance dictates that the Vacancies Reform Act should not be interpreted in such a constitutionally suspect manner.  But even setting that concern aside, there must still be clear indication that Congress *did* in fact authorize succession of someone in Mr. Whitaker's position to Acting Attorney General.  That clear intent remains necessary to protect the critical constitutional safeguard of the Senate's advice and consent power.  Requiring a clear intent ensures that Congress has acted deliberately and unmistakably—without possibility for misinterpretation—before it is found to have significantly transferred its constitutional authority over key appointments to the President (even assuming that it has such authority).

Because the Vacancies Reform Act does not reflect such an intent clearly, this Court should recognize and enforce Congress's express direction in the Attorney General succession statute that the Deputy Attorney General is the Acting Attorney General.

## CONCLUSION

This Court should grant the State of Maryland's motion for a preliminary injunction and motion to substitute.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

AIMEE D. THOMSON
Deputy Attorney General

Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov

KARL A. RACINE
Attorney General
District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Deputy Solicitor General

CARL J. SCHIFFERLE
Senior Assistant Attorney General
Office of the Solicitor General

*/s/ Valerie M. Nannery*
VALERIE M. NANNERY
Assistant Attorney General
Bar No. 20441
441 4th Street NW, Suite 630 South
Washington, D.C. 20001
(202) 442-9596 (phone)
(202) 730-1465 (fax)
valerie.nannery@dc.gov

GEORGE JEPSEN
Attorney General
State of Connecticut
55 Elm Street
Hartford, CT  06106

MATTHEW P. DENN
Attorney General
State of Delaware
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

RUSSELL A. SUZUKI
Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI  96813

LISA MADIGAN
Attorney General
State of Illinois
100 West Randolph Street
12th Floor
Chicago, IL 60601

JANET T. MILLS
Attorney General
State of Maine
6 State House Station
Augusta, ME 04333-0006

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

HECTOR BALDERAS
Attorney General
State of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

JOSHUA H. STEIN
Attorney General
State of North Carolina
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27603

PETER F. KILMARTIN
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504-0100

BARBARA D. UNDERWOOD
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

MARK R. HERRING
Attorney General
Commonwealth of Virginia
202 North Ninth Street
Richmond, VA 23219