**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF MARYLAND, | * | |
| *Plaintiff*, | * | |
| v. | * | |
| UNITED STATES OF AMERICA, *et al.*, | * | Case No.:  1:18-cv-2849-ELH |
| *Defendants*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS ........................................................ 1

BACKGROUND ......................................................................................................................... 1

STANDARD OF REVIEW .......................................................................................................... 3

ARGUMENT ............................................................................................................................... 5

I.   MARYLAND HAS ADEQUATELY ALLEGED THAT DEFENDANTS' IMPENDING REFUSAL TO
     ENFORCE THE ACA WILL CAUSE THE STATE MULTIPLE INJURIES-IN-FACT............................ 5

     A.  The Amended Complaint Alleges That Defendants Will Shortly Cease
         Enforcement of Some or All of the ACA ............................................................ 5

     B.  Defendants' Impending Refusal to Enforce the ACA Will Invade the State's
         Legally Protected Interests ................................................................................. 8

         1.  The Amended Complaint Alleges Injuries to Maryland's Proprietary and
             Pecuniary Interests ..................................................................................... 8

         2.  The Amended Complaint Alleges Injuries to the State's Quasi-Sovereign
             Interests ...................................................................................................... 12

         3.  The Amended Complaint Alleges Injuries to the State's Sovereign Interests ........... 15

II.  DEFENDANTS' CHALLENGES TO MARYLAND'S STANDING ARE MERITLESS .......................... 16

     A.  Maryland's Injuries Arise from Defendants' Impending Conduct, Not from Any
         Litigation Position or the Future Decision of Another Court ........................... 17

     B.  Maryland Alleges Multiple Ways in Which Defendants' Conduct Will Invade the
         State's Legally Protected Interests ................................................................... 18

     C.  Maryland's Injuries Are Not Speculative ........................................................ 18

III. THE AMENDED COMPLAINT STATES A CLAIM ...................................................................... 21

     A.  The Amended Complaint Alleges a Cause of Action ...................................... 21

     B.  The Amended Complaint Alleges an "Actual Controversy" ........................... 23

CONCLUSION............................................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .................................................................................................. *passim*

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ............................................................................................................ 22

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ..................................................................................................... 14

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ................................................................................................ 22, 23

*Aziz v. Trump*,
    231 F. Supp. 3d 23 (E.D. Va. 2017)................................................................................. 14

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) .......................................................................................................... 21

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .......................................................................................................... 20

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013)....................................................................................... 4, 18

*District of Columbia v. Trump*,
    291 F. Supp. 3d 725 (D. Md. 2018) ...................................................................... 4, 8, 14, 19

*Hensley ex rel. North Carolina v. Price*,
    876 F.3d 573 (4th Cir. 2017)............................................................................................ 20

*Johnson v. City of Shelby*,
    135 S. Ct. 346 (2014) ................................................................................................... 22, 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................. 3, 4, 21

*Martin v. Wilks*,
    490 U.S. 755 (1989) .......................................................................................................... 18

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ............................................................................................................ 8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................................ 4, 14, 16

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) .......................................................................................................... 14

*MedImmune, Inc. v. Genetech, Inc.*,
    549 U.S. 118 (2007) .......................................................................................................... 23

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................................................... 3, 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................ 9, 10

*Printz v. United States*,
  521 U.S. 898 (1997) ............................................................................. 12

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................................... 4

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................. 21

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ....................................................... *passim*

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................... 14

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ............................................................................. 12

*Virginia v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) .............................................................. 14

*White Tail Park, Inc. v. Stroube*,
  413 F.3d 451 (4th Cir. 2005) .......................................................... 4, 18

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) .......................................................................... 8, 12

## Constitutional Provisions

U.S. Const. art. III ............................................................................ 1, 23

## Statutes

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ....................... 1, 22, 23

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996) ........................................ 6

Natural Gas Act, 15 U.S.C. §§ 717-717z ......................................... 13

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ..... *passim*

42 U.S.C. § 300gg-22(a) ............................................................. 10, 11, 12

42 U.S.C. § 300gg-61(a) ............................................................... 11, 12

42 U.S.C. § 1395dd ............................................................................. 19

42 U.S.C. § 18091(2)(E) ................................................................... 13

42 U.S.C. § 18091(2)(F)-(G) ............................................................ 13

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................... 5, 8

## Other Authorities

Ctrs. for Medicare & Medicaid Servs., Compliance and Enforcement,
   https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-market-
   reforms/compliance.html (last visited Dec. 2, 2018) .............................................................. 11

Carmen DeNavas-Walt, Bernadette D. Proctor & Jessica C. Smith, Dep't of Commerce,
   U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United
   States: 2009* (Sept. 2010) ..................................................................................................... 10

Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart and
   Wechsler's The Federal Courts and the Federal System* (7th ed. 2015) ................................ 15

Letter from Eric H. Holder, Jr., Attorney Gen., to John A. Boehner, Speaker, U.S. House
   of Representatives (Feb. 23, 2011), https://www.justice.gov/opa/pr/letter-attorney-
   general-congress-litigation-involving-defense-marriage-act ...................................................... 6

Letter from Jefferson B. Sessions III, Attorney Gen., to Paul Ryan, Speaker, U.S. House
   of Representatives (June 7, 2018), https://www.justice.gov/file/1069806/download................ 6

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

The State of Maryland filed this action in response to multiple indications that at some point shortly after January 1, 2019, Defendants would stop enforcing some or all of the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010).   The Amended Complaint explained how failing to enforce the statute as a whole, or even just refusing to enforce the protections for those with pre-existing conditions, would cause substantial pecuniary harm to the State, injure the health and welfare of Maryland citizens, and require the State to reconfigure its regulation of the state health and insurance industries.   Those impending injuries to the State's financial, quasi-sovereign, and sovereign interests are more than sufficient to confer standing on the State to invoke this Court's jurisdiction.   Having established a controversy between the parties sufficient to establish Article III standing, the State has also satisfied the "actual controversy" requirement for relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, which supplements the longstanding cause of action afforded by this Court's jurisdiction to provide equitable relief against federal officials' violation of federal law.   Accordingly, the Court should deny the motion to dismiss or, in the alternative, grant the State leave to file a Second Amended Complaint to supplement its standing allegations.

## BACKGROUND

1. President Trump campaigned on a promise to eliminate the ACA.  Having failed to achieve that objective through legislative repeal, his Administration has taken repeated steps to undermine its effectiveness, including by refusing to enforce critical aspects of the statutory regime.   Seizing on litigation filed by Texas and several other states, the Administration has informed Congress that it believes the ACA's minimum coverage requirement (sometimes called the "individual mandate") will become unconstitutional as of January 1, 2019.  The Administration further stated that it would view the ACA's critical protections for those with pre-existing

conditions as inseverable from the minimum coverage requirement and, therefore, unenforceable as well.  The Department of Justice then urged the district court hearing Texas's case to issue a declaratory judgment embodying the Administration's position and promised to abide by that judgment.

In response, Maryland filed this lawsuit, seeking to head off the myriad of serious harms that will befall the State and its residents if the Administration – either on its own accord, or with the cover of a court order – ceases enforcing the ACA in whole or in part.  As discussed below, the Amended Complaint explains how that failure of enforcement will impose financial costs on the State, injure the financial and physical health of its residents, and force the State to reevaluate and adjust its regulation of the State's health and insurance markets.

2.  While this case was pending, Attorney General Jefferson B. Sessions III resigned.  The Attorney General Succession Act designates the Deputy Attorney General as Acting Attorney General pending the confirmation of the Attorney General's successor.  Pl's Mot. Prelim. Inj. or Mot. Substitute, ECF 6-1 at 8-13 (Nov. 13, 2018).  Despite this, the President putatively appointed the former Attorney General's Chief of Staff, Matthew G. Whitaker, as Acting Attorney General, charged with exercising all the powers of that office, including the supervision of this litigation.  Maryland subsequently challenged Whitaker's assumption of those powers in this Court, filing an Amended Complaint, asking the Court to order Deputy Attorney General Rod J. Rosenstein substituted for former Attorney General Sessions, and seeking a preliminary injunction.

On November 13, 2018, this Court issued a scheduling order requiring the parties to brief the challenge to Whitaker's appointment by December 10, in advance of oral argument on the motion for preliminary injunction on December 19, 2018.  The Court further suggested that after the hearing, the Court would set a date for Defendants' response to Maryland's Amended

Complaint.  Order, ECF 7 (Nov. 13, 2018).  Three days later, Defendants nevertheless filed a motion to dismiss for lack of jurisdiction and failure to state a claim.

3. In ordinary circumstances, Maryland would move for permission to amend its Amended Complaint in response to the motion to dismiss, to clarify certain matters in the hopes of narrowing the issues this Court must decide.  However, after Defendants filed their motion, this Court set a briefing schedule for the motion to dismiss, noting that the standing issues raised in the motion may be relevant to the pending motion for a preliminary injunction.  Order, ECF 13 (Nov. 19, 2018).  In order to expedite the case and be responsive to the Court's concern about the interplay between the motion to dismiss and the motion for preliminary injunction, Maryland is filing this opposition to the Defendants' motion, while simultaneously filing a separate Motion For Leave To File A Second Amended Complaint, setting forth the amendments Maryland would propose to make to its Amended Complaint if the Court was inclined to grant the Defendants' motion.

## STANDARD OF REVIEW

To establishing standing, Maryland must plead facts showing that it has "suffered an 'injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  It must further allege "a causal connection between the injury and the conduct complained of" and that a favorable decision will likely redress that injury.  *Id*. at 560-61.  In cases challenging government conduct, the plaintiff need not be the subject of the government's action or inaction, so long as the government's conduct causes the plaintiff injury.  *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (plaintiffs had standing to challenge federal agency's failure to regulate a third party's use of genetically modified seeds); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (Texas had

standing to challenge federal government's failure to enforce immigration laws), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the courts] 'presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and brackets omitted). The court must also "assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (internal quotation marks omitted).

The purpose of these standing requirements is to ensure that the "'plaintiff is the proper party to bring [the] suit.'" *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)) (alteration in original). And as the Supreme Court has explained, "it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the State is the property party to represent and defend them." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 603-04 (1982) (internal quotation marks omitted). Accordingly, it "is of considerable relevance that the party seeking review here is a sovereign State and not, as it was in *Lujan*, a private individual." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Given their unique role and responsibilities in our federal system, "States are not normal litigants for purposes of invoking federal jurisdiction" but are "entitled to special solicitude in [the] standing analysis." *Id*. at 518, 520; *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725, 737 (D. Md. 2018).

## ARGUMENT

### I.    MARYLAND HAS ADEQUATELY ALLEGED THAT DEFENDANTS' IMPENDING REFUSAL TO ENFORCE THE ACA WILL CAUSE THE STATE MULTIPLE INJURIES-IN-FACT.

Defendants' standing challenge has no merit.  The Amended Complaint fully explains why, unless this Court intervenes, Defendants' conduct will soon inflict multiple injuries-in-fact on the State and its residents.

### A.    The Amended Complaint Alleges That Defendants Will Shortly Cease Enforcement of Some or All of the ACA.

The Amended Complaint begins by identifying the source of the injuries this suit is intended to avoid – Defendants' impending refusal to enforce some or all of the ACA's provisions. The Amended Complaint explains that there is "an imminent risk that the Defendants will not enforce the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions."  Am. Compl., ECF 8 ¶ 42 (Nov. 14, 2018).[1]  That fundamentally factual allegation must be accepted as true at this stage.[2]  It is well supported in any event, its factual basis set forth in detail over the course of ten paragraphs and seven pages.  *See id.* ¶¶ 6-7, pp. 35-42. The Amended Complaint explains, for example, that the Attorney General has informed Congress that the Administration will not defend the constitutionality of the Act and has affirmatively argued

---

[1] Although the Amended Complaint alleges that non-enforcement is imminent, it need not (and does not) claim that Defendants will cease enforcement exactly on January 1.  In the Texas proceedings, the Department of Justice suggested that the Department of Health and Human Services may first issue new regulations embodying the Administration's enforcement position. *See* Tr. Hearing on Mot. for Prelim. Inj. at 30-31, *Texas v. United States*, No. 18-cv-167 (N.D. Tex. Sept. 5, 2018).

[2] *See, e.g.*, *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). Defendants could have asked this Court to reach a contrary conclusion on the basis of additional evidence in support of their Fed. R. Civ. P. 12(b)(1) motion.  *See, e.g.*, *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).  But they have elected not to do so, seeking dismissal solely on the basis of the Amended Complaint as pleaded.

in court that the minimum coverage requirement will be unconstitutional in the new year, rendering the guaranteed issue, community rating, and pre-existing condition exclusion provisions unenforceable as well. *Id.* ¶ 10. Notably, in contrast to similar letters issued by other Administrations, the Attorney General made no promise that the Administration would continue to enforce these provisions while their validity was being litigated. *Compare* Letter from Jefferson B. Sessions III, Attorney Gen., to Paul Ryan, Speaker, U.S. House of Representatives (June 7, 2018), https://www.justice.gov/file/1069806/download, *with* Letter from Eric H. Holder, Jr., Attorney Gen., to John A. Boehner, Speaker, U.S. House of Representatives (Feb. 23, 2011), https://www.justice.gov/opa/pr/letter-attorney-general-congress-litigation-involving-defense-marriage-act (notwithstanding Administration's belief that the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996), was unconstitutional, "the President has instructed Executive agencies to continue to comply with Section 3 . . ., consistent with the Executive's obligation to take care that the laws be faithfully executed, unless and until Congress repeals Section 3 or the judicial branch renders a definitive verdict against the law's constitutionality").

The Amended Complaint further explains that the litigation position and congressional letter took place in a context that reinforces the inference that Defendants will refuse to enforce the statute regardless of any court order. It explains that "one of President Trump's core policy goals has been to undo the Affordable Care Act." Am. Compl. ¶ 11; *see also id.* ¶ 35 ("Since taking office, the Trump Administration has engaged in a sustained effort to 'explode' the Affordable Care Act. . . ."); *id.* ("On the day of his inauguration, President Trump signed an Executive Order titled 'Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal.'"). The Amended Complaint then details various steps the Administration has taken to achieve that goal, including not only a failed attempt at legislative

repeal, but also a variety of executive actions "to undermine the enforcement of its provisions." *Id*. Some of those measures – such as curtailing funding for federally-facilitated exchanges, *id*. ¶ 11 – provide concrete evidence that the Administration is prepared to take unilateral action to achieve its express goal of undermining the Act. But of even greater relevance, the Administration has also refused to enforce certain provisions of the statute, even absent the compulsion of a court order. The Administration has, for example, refused to enforce provisions of the law requiring cost-sharing reduction payments to insurance companies and issued rules with the effect of partially suspending enforcement of some of the Act's nondiscrimination provisions for certain plans. *Id*. ¶¶ 11, 36, 38.

The Amended Complaint also describes how the Administration has seized upon non-binding or irrelevant litigation results as an excuse to voluntarily change its enforcement policies in other areas. For example, pointing to a Fifth Circuit decision that is binding in only three states, the Administration suspended enforcement of the Deferred Action for Childhood Arrivals program throughout the nation. *See* Am. Compl. ¶ 39. The Administration similarly used the mere filing of a private lawsuit as excuse to abandon enforcement of an export-control statute with respect to plans for 3-D printed guns. *Id*. ¶ 40.

"It is in this context of open hostility to enforcement of the Affordable Care Act and a demonstrated willingness to seize upon the threat or pendency of litigation, regardless of merit, as an excuse to abandon long-held administrative enforcement policies that Attorney General Sessions announced his decision not to defend [the minimum coverage], the guaranteed issue, community rating, and prohibition on pre-existing condition exclusion provisions." Am. Compl. ¶ 42. On the basis of all this evidence, the Amended Complaint alleges, there is an "imminent risk that Defendants will not enforce" these provisions after January 1. *Id*.

Notably, Defendants do not dispute that they will stop enforcing the ACA in full or in part after January 1, even though they were entitled to ask this Court to resolve factual disputes in ruling on a Fed. R. Civ. P. 12(b)(1) motion.  *See supra* n.2.

**B.     Defendants' Impending Refusal to Enforce the ACA Will Invade the State's Legally Protected Interests.**

The Amended Complaint also sets forth the ways in which Defendants' impending conduct will cause Maryland a cognizable injury-in-fact.  The Supreme Court has held that a State may sue to avoid or remedy injuries to its proprietary, quasi-sovereign, and sovereign interests.  *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982); *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725, 737 (D. Md. 2018).  Here, the State has adequately alleged injuries of each type.

*1.     The Amended Complaint Alleges Injuries to Maryland's Proprietary and Pecuniary Interests.*

Financial injuries constitute the quintessential invasion of a legally protected interest.  *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992); *Maryland v. Louisiana*, 451 U.S. 725, 736-37 (1981).  For example, in *Texas v. United States*, the Fifth Circuit held that Texas had standing to challenge the President's alleged failure to enforce federal immigration law against a class of undocumented immigrants.  809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).   Although Texas, like Maryland, was challenging the Administration's refusal to enforce the law against third parties, the Fifth Circuit found standing because the non-enforcement caused an increase in the cost of administering a state program (issuing drivers' licenses).  *See id*. at 155-64.  Although it recognized that the chain of causation included numerous links – failure to enforce immigration laws meant there were more undocumented residents in the State; those residents were entitled under state law to receive

drivers' licenses; and issuing drivers' licenses was costly to the State – the Fifth Circuit nonetheless held that Texas established an injury-in-fact traceable to the Executive's alleged non-enforcement of federal law.  *Id*. at 155-57.

Here, the Amended Complaint likewise alleges multiple ways in which non-enforcement of the ACA, in whole or in part, would inflict similar financial costs upon the State.

a.  To start, Defendants do not (and cannot) dispute that the State would be financially injured if Defendants stopped enforcing the ACA entirely.  The Amended Complaint alleges that in "Fiscal Year 2017 alone, Maryland received more than $2.77 billion in federal funds as part of its budget to provide health care coverage to its residents because of the Affordable Care Act" and another "$65 million from the law's Prevention and Public Health Fund between fiscal years 2012 and 2016."  Am. Compl. ¶ 5.

But even if Defendants simply refused to enforce the provisions regarding pre-existing conditions, the Amended Complaint alleges that this failure would impose serious financial harm on the State.  For example, the Amended Complaint explains that Maryland operates an "all-payer" system under which the costs of uncompensated hospital care are spread among hospitals and, from there, passed on to all payers of hospital rates.  Am. Compl. ¶ 48.  Defendants cannot question that elimination of the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions would swell the ranks of the uninsured or underinsured persons in Maryland – the inability of those with pre-existing conditions to obtain insurance is the principal reason Congress enacted those protections in the first place.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 547 (2012) (*NFIB*) (opinion of Roberts, C.J.).  Nor can Defendants reasonably complain that it is speculative to assert that increased uncompensated hospital care will result from this increase in the number of uninsured or underinsured individuals with pre-existing

conditions in the State, who are more likely to need medical care (and often expensive medical care at that).[3]  From there, it requires no great leap to conclude that "[b]ecause Maryland is a payer of hospital rates, Maryland is directly injured by any increase to the uncompensated care rate that will occur if the uninsured population in Maryland increases."  Am. Compl. ¶ 48.

In addition, the Amended Complaint explains the many ways in which Maryland would be forced to review and revise its own regulation of state insurance and healthcare markets if the ACA were left unenforced by the federal government in whole or in part.  *See* Am. Compl. ¶¶ 43-44, 51.  For example, pursuant to a waiver from the Centers for Medicare and Medicaid, Maryland is in the process of implementing a state-based reinsurance program to mitigate the impact of high-risk individuals on rates in the individual market.  That program assesses fees on insurers based on a detailed (and expensive) study that assumed the continuing enforcement of the ACA.  If the Defendants refused to enforce guaranteed issue, community rating, and the prohibition on pre-existing condition exclusion provisions, the viability of the program would be undermined, and additional resources would need to be expended to achieve the program's goals.  *See id.* ¶ 50.

b.  It is no answer that the State can avoid these injuries by enforcing the ACA itself, or by enacting similar protections under state law.[4]  For one thing, the State can regulate only those

---

[3] *See NFIB*, 567 U.S. at 538 ("The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care."); *see id.* at 592 (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("In 2009, approximately 50 million people were uninsured, either by choice or, more likely, because they could not afford private insurance and did not qualify for government aid.") (citing Carmen DeNavas-Walt, Bernadette D. Proctor & Jessica C. Smith, Dep't of Commerce, U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2009*, at 23 tbl.8 (Sept. 2010)).

[4] Under the ACA, a State may elect to enforce the Act's insurance market reform provisions, subject to being replaced by the Department of Health and Human Services, if the Department determines the State is failing to adequately enforce the law.  *See* 42 U.S.C. §§ 300gg-22(a), 300gg-61(a).  If the State does not take on this responsibility, it falls upon the Department.  *Id.*; *see also* Ctrs. for Medicare & Medicaid Servs., Compliance and Enforcement,

insurers operating within its jurisdiction.  And as the Amended Complaint explains, were Maryland to enforce the pre-existing condition requirements against Maryland insurers while other states and the federal government refused to impose the same requirements elsewhere, insurers may well simply stop doing business in Maryland.  Am. Compl. ¶ 49. That is what happened in the 1990s when other states attempted to go it alone, as Defendants themselves have emphasized in the Texas litigation.  *See* Federal Defs.' Mem. in Resp. to Pls.' Appl. for Prelim. Inj. at 14-15, *Texas v. United States*, No. 18-cv-167 (N.D. Tex. June 7, 2018) (ECF 92).

In addition, if Maryland were to enforce the ACA's protections, but nearby states (like West Virginia, which is a party to the ACA litigation in Texas) did not, there is a very real "possibility that Maryland could see an influx of high-risk individuals from states with fewer state-based protections," increasing administrative and other costs for the State's waiver-based reinsurance program.  Am. Compl. ¶ 50.

Maryland thus cannot avoid injury on its own; it will suffer harm unless Defendants require compliance with the ACA's pre-existing condition provisions *nationally*.[5]

---

https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-market-reforms/compliance.html (last visited Dec. 2, 2018).

[5] For the same reasons, Maryland cannot avoid injury by enacting its own state law versions of the ACA's protections.  In addition, federal law prevents any state regulation of self-insured plans, which cover the majority of commercially insured lives in Maryland.  *See* Am. Compl. ¶ 48; 29 U.S.C. § 1144(a); Md. Ins. Admin., *2017 Report on the Number of Insured and Self-Insured Lives* tbl.3 (Dec. 1, 2017), https://insurance.maryland.gov/Consumer/Appeals%20and%20Grievances%20Reports/2017-Report-on-the-Number-of-Insured-and-Self-Insured-Lives-MSAR7797.pdf (more than fifty percent of insured persons in State covered by group self-insured plan).

In addition, the Administration has not said whether it would continue to permit a State like Maryland to continue its ACA enforcement role if the State tried to enforce provisions the Administration has decided are unconstitutional or unenforceable.

In any event, "the possibility that a plaintiff could avoid injury by incurring other costs does not negate standing." *Texas v. United States*, 809 F.3d at 156-57; *see also, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. at 447-48 (State's financial injury created standing even though State could avoid injury by altering its laws). Under the ACA, Maryland is not compelled to enforce the statute, but can leave that job to the federal government. *See* 42 U.S.C. §§ 300gg-22(a), 300gg-61(a). Defendants' non-enforcement decision would deprive the State of that right, putting Maryland to the coercive choice of either taking on the obligation (and expense) of enforcing federal law (something the federal government can never *force* a state to do, *see, e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997)) or depriving its citizens of the benefits federal law validly bestows on them. Being put to that choice, and forced to accept the injury resulting from either decision, is itself a cognizable injury-in-fact. *See, e.g.*, *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 582 (1985) (holding that "being forced to choose between" incurring costs and abandoning legal rights constitutes an injury-in-fact); *Texas v. United States*, 809 F.3d at 153 (federal action "imposing substantial pressure on [States] to change their laws" gives rise to an injury that confers standing). This is so regardless of Maryland's current choice to enforce the statute with the knowledge it could change tacks if its own circumstances were to change.

> 2. *The Amended Complaint Alleges Injuries to the State's Quasi-Sovereign Interests.*

The Amended Complaint also establishes so-called "*parens patriae*" standing based on injury to Maryland's quasi-sovereign interests. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.

a. Maryland has a quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607. That interest is indisputably injured by Defendants' threatened conduct. As noted, Congress enacted the provisions regarding pre-existing conditions precisely because it recognized that without them,

many cannot obtain or afford health insurance.  Moreover, Congress found that lack of insurance has substantial negative health and economic effects for the uninsured and the population more broadly.  *See* 42 U.S.C. § 18091(2)(E) ("The economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured."); *id.* § 18091(2)(F)-(G) (lack of insurance results in the cost of uncompensated care being passed on to families with insurance and is a leading cause of personal bankruptcies).  Defendants cannot, and do not, deny any of this.

b.  In addition, "[d]istinct from but related to the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system."  *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607-08.  "In the context of *parens patriae* actions, this means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system."  *Id.* at 608.  States thus have standing to seek enforcement of "federal statutes creating benefits or alleviating hardships" for the State's residents. *Id.* (giving examples of enforcement of federal antitrust laws and Natural Gas Act, 15 U.S.C. §§ 717-717z); *see also id.* at 609-10 (approving *parens patriae* standing to enforce federal statute governing employment of foreign workers).  This includes, particularly, federal statutes "securing residents from the harmful effects of discrimination."  *Id.* at 609; *see also  id.* (expressing no "doubt that a State could seek, in the federal courts, to protect its residents from [ethnic] discrimination to the extent that it violates federal law").  Here, Maryland independently has standing to ensure that its residents are not denied the substantial benefits the ACA affords them, including the right to secure insurance free from discrimination based on disability or other pre-existing conditions.

Again, the fact that Maryland has the option to play an enforcement role under the ACA does not defeat its standing.  To the contrary, the fact that a State "participates directly in the

operation of the federal . . . scheme makes even more compelling its *parens patriae* interest in assuring that the scheme operates to the full benefit of its residents." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 610.

c.   The other requirements of *parens patriae* standing are also easily met in this case. Maryland is not acting as merely "a nominal party" on behalf of an "identifiable group of individual residents," but rather is asserting the rights and interests of a "substantial segment of its population" affected by Defendants' conduct. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607. Moreover, although States may not bring a *parens patriae* action against the federal government seeking to *prevent* enforcement of federal law,[6] such actions are available to *compel* federal agencies and officers to abide by federal law. *See Massachusetts v. EPA*, 549 U.S. 497, 519-20 & n.17 (2007); *District of Columbia v. Trump*, 291 F. Supp. 3d at 747 (explaining distinction); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 n.10 (2015); *Aziz v. Trump*, 231 F. Supp. 3d 23, 31 (E.D. Va. 2017); *Texas v. United States*, 86 F. Supp. 3d 591, 625-27 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).[7]

---

[6] *See Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923); *Virginia v. Sebelius*, 656 F.3d 253, 268-69 (4th Cir. 2011).

[7] Denying States *parens patriae* standing to sue the federal government on behalf of their citizens in federal court would have the inevitable, but surprising, consequence of channeling such suits into state courts, where they would likely not be removable to federal court because those courts would lack jurisdiction over the matter. *See* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 435-37 (7th ed. 2015).

3.     *The Amended Complaint Alleges Injuries to the State's Sovereign Interests.*

Injury to a State's sovereign interests can also provide a basis for standing.  *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601.   Those interests include preventing interference with the state's "exercise of sovereign power over individuals and entities within [its] jurisdiction" through its creation and enforcement of state law.   *Id.*   Here, Defendants' actions will interfere with Maryland's creation and enforcement of its insurance and healthcare regulatory regime, which is premised on the continued enforcement of the ACA; it will pressure the State to modify its laws to account for the gap in ACA enforcement; and in the process, Defendants' conduct will divert state resources and attention from the State's own legislative and regulatory priorities.

The Amended Complaint describes in detail the many steps the State has taken to modify its insurance and healthcare regulatory regime in reliance on the continued enforcement of the ACA, including its provisions on pre-existing conditions.  *See* Am. Compl. ¶¶ 43, 45-48, 50-52. The likely increase in the number of uninsured and underinsured and the concomitant increase in the cost of uncompensated care will require the State to reassess multiple aspects of that regulatory regime.

For example, the Amended Complaint explains that absent enforceable ACA protections, Maryland will have to consider "re-establishing needed consumer protections in the Maryland insurance market."   Am. Compl. ¶ 44.   The Amended Complaint explains that Maryland law previously contained a "provision that required group insurance policies to allow insured individuals whose coverage is terminated to obtain from the insurer an individual policy."  *Id.* ¶ 52. That law was repealed as unnecessary when the ACA promised that such individuals would have the right to obtain substitute coverage through the health exchanges, with no risk of denial or

increased cost due to pre-existing conditions.  *Id.*  Absent those protections, the prior law (or some other measure) may need to be reinstated.  *Id.*

As noted, Defendants' actions may also require the State to reinstitute its former high-risk pool insurance program for medically uninsurable individuals.  Am. Compl. ¶ 51.  And the inevitable increase in uncompensated care costs will also require the State to reassess its uncompensated care pool arrangements, as well as the assessments charged pool participants.  *See id.* ¶ 48.

These sovereign interests warrant special solicitude in the standing analysis.  "When a State enters the Union, it surrenders certain sovereign prerogatives."  *Massachusetts v. EPA*, 549 U.S. at 519.  This includes the State's ability to completely control the regulation of domestic industries and define the rights of its residents.  As this case illustrates, that state power is subject to displacement by federal initiatives, sometimes directly (as when federal law preempts state regulation) but also indirectly, when states are forced to tailor their regulation to the legal and commercial environment created by federal laws.  Having endured this diminution of its sovereign authority by adapting its laws to the federal ACA, Maryland has an important interest in ensuring that the federal law is, in fact, enforced so that the State's adaptations can function as intended.  It is one thing for Congress to force the State to adjust its laws and regulations; it is quite another for States to be summoned to the task by executive officials attempting to undermine Congress's work or laboring under a misconception about a law's constitutionality.

## II.  DEFENDANTS' CHALLENGES TO MARYLAND'S STANDING ARE MERITLESS.

Defendants nonetheless object that Maryland is simply challenging Defendants' litigation position in another case, not anything Defendants themselves will do that will invade the State's legally protected interests.  Moreover, they say, any injuries Maryland may suffer if the ACA is no longer fully enforced are too speculative to support standing.  Those arguments fail.

### A. Maryland's Injuries Arise from Defendants' Impending Conduct, Not from Any Litigation Position or the Future Decision of Another Court.

Much of the motion to dismiss is premised on a mischaracterization of the Amended Complaint as asserting standing based on injuries that will arise if, and only if, the U.S. District Court for the Northern District of Texas enjoins Defendants from enforcing some or all of the ACA. On that premise, Defendants claim that Maryland's dispute is not with anything Defendants themselves are about to do, but rather with Defendants' "litigation position" or other "'pronouncements' concerning their belief about the ACA's constitutionality." Defs.' Mem. in Supp. of Mot. Dismiss, ECF 11-1 at 1, 15 (Nov. 16, 2018). The real source of any harm, they say, will be the Texas court's decision, about which the parties can only speculate, and for which Defendants cannot be held responsible. *Id*. at 1-2, 10, 11. As a consequence, they argue, Maryland is simply asking for an advisory opinion. *Id*. at 1.

But as explained above, that the premises of this argument are false. The Amended Complaint clearly alleges an imminent risk that Defendants will soon refuse to enforce critical parts of the ACA regardless of what the Texas court ultimately decides.[8] The Administration's litigation position and pronouncements are simply part of the evidence supporting that claim; Maryland does not allege that the statements are, themselves, the source of the State's injury-in-fact.

Nor does the Amended Complaint challenge any action the District Court for the Northern District of Texas may take. Again, the Amended Complaint alleges that Defendants' own legal views and policy preferences will lead them to suspend enforcement of critical protections in the

---

[8] If the Court believes that the Amended Complaint does not adequately convey this point, Maryland is prepared to amend the Amended Complaint to make that allegation even more clearly. *See supra* at 3.

ACA regardless of whether or how the Texas court rules before January 1. Any judicial decision accepting the Government's position would simply provide welcomed cover.

Finally, were the Texas court to order Defendants to cease enforcement of some or all of the ACA, that would not affect Maryland's standing. Defendants' conduct would still be the source of Maryland's injury; the district court order would, at best, provide a basis for Defendants to attempt to defend their conduct as lawful. But the lawfulness of injury-producing conduct has nothing to do with a party's standing to challenge it. *See, e.g.*, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460-61 (4th Cir. 2005); *cf. Martin v. Wilks*, 490 U.S. 755, 769 (1989) (white firefighters permitted to sue their employer to challenge its affirmative action policy even though the policy was court-ordered).

## B. Maryland Alleges Multiple Ways in Which Defendants' Conduct Will Invade the State's Legally Protected Interests.

Defendants also argue that the Amended Complaint "has not alleged any 'invasion of a legally protected interest.'" ECF 11-1 at 8. While no one has a "legal entitlement to the ACA's continued validity" if the statute is, in fact, unconstitutional, *id.* at 9, in deciding whether Maryland has standing to ask this Court to settle that constitutional question, the Court must "assume that on the merits the plaintiffs would be successful in their claims," *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (internal quotation marks omitted). The question is whether, assuming the statute is valid, Defendants' refusal to enforce it will cause an injury to Maryland's legally protected interests. As discussed, it surely will, for failing to enforce the ACA would cause injury to Maryland's proprietary, pecuniary, quasi-sovereign, and sovereign interests in multiple ways.

## C. Maryland's Injuries Are Not Speculative.

Defendants also argue that the harms alleged in the Amended Complaint are unduly speculative, relying upon "layer upon layer of conjecture." ECF 11-1 at 10. Not so.

1.  As already discussed, this argument is based in part on a mischaracterization of the Amended Complaint as alleging that Defendants will fail to enforce the ACA only if "the ACA [is] invalidated (in whole or in part) by the federal district court in Texas."  ECF 11-1 at 10.

Moreover, there is nothing speculative in the Amended Complaint's description of the consequences of Defendants' failure to enforce the ACA as written.  *Contra* ECF 11-1 at 10.  For example, Congress enacted the pre-existing conditions provisions because absent compulsive coverage no economically rational insurer would offer individuals with expensive pre-existing conditions health insurance on the same terms as provided to others.  Particularly given the long history of insurers doing exactly what one would expect, it is hardly speculative to anticipate that if that compulsion is removed, insurers will return to their prior practices.  *See, e.g.*, *District of Columbia v. Trump*, 291 F. Supp. 3d at 744 (standing may be founded on "basic economic logic").  Moreover, it is hardly speculative to predict the consequences for individuals with pre-existing conditions – they will newly be at risk of losing coverage, yet continue to have serious medical needs that will be addressed through uncompensated care, often in emergency rooms, just as routinely happened before the ACA was enacted.  *See* 42 U.S.C. § 1395dd (prohibiting emergency rooms from denying service in certain circumstances).[9]  The cost of uncompensated care will inevitably be borne in part by the State under its all-payer system.  *Cf. Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998) (City had standing by virtue of its state law obligation to reimburse State for expenses State incurred).

---

[9] Because many, if not most, are in plans not regulated by the State, there is no prospect that the State could prevent that harm, even if that prospect had any bearing on the standing question here.  *See supra* n.5.

Defendants fail to even address a multitude of other harms described in the Amended Complaint, leaving it to the Court to figure out why, for example, it is speculative for Maryland to claim that non-enforcement of the ACA's pre-existing condition provisions will require reinstituting repealed state protections or restructuring the State's reinsurance program.[10]

Moreover, even if they had tried, Defendants could not dispute that the elimination of federal enforcement of the ACA's pre-existing condition protections would directly injure Maryland residents by depriving them of the protection of federal law and, thereby, directly injure Maryland's quasi-sovereign interest in ensuring the benefits of those protections for its residents. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607-09.  Nor is it speculative to claim that ceasing federal enforcement would immediately and directly injure the State by putting it to the coercive choice of either: (a) having to enforce the law itself (at its own expense), despite its statutory right to leave enforcement to the federal government or (b) lose the benefits of the law for its citizens and suffer the expense and distraction of having to reexamine its own existing regulatory regime, which is premised on continued enforcement of the ACA in full.

2.  Defendants suggest that Maryland has no standing because it is challenging the government's failure to regulate the conduct of third parties, making the injury to the State unduly attenuated. *See* ECF 11-1 at 10-11, 15.  While standing to challenge government action (or inaction) is most easily established when the plaintiff is the 'object of the [government] action," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), others may establish standing to challenge that conduct as well, so long as they can show that the government action "will affect

---

[10] *See Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (Judges "are not like pigs, hunting for truffles buried in the briefs," nor is it the court's "job to wade through the record and make arguments for either party.") (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 1595 (2018).

*them*," *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *see also, e.g.*, *Texas v. United States*, 809 F.3d at 154 (rejecting claim that there is "a presumption that a plaintiff lacks standing to challenge decisions to confer benefits on, or not to prosecute, a third party").

As noted, in *Texas v. United States*, the Fifth Circuit held that Texas had standing to challenge the federal government's non-enforcement of federal immigration laws against third-parties because that policy imposed economic costs on the State.  809 F.3d at 154-57.  In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court similarly held that a group of conventional alfalfa growers had standing to challenge a federal agency's decision to deregulate a variety of genetically engineered alfalfa.  561 U.S. 139, 144, 155 (2010).  The Court recognized that although the plaintiffs were not subject to the regulation (or deregulation), the Government's refusal to regulate the third-parties producing genetically engineered plants injured the plaintiffs and, thereby afforded them standing.  *Id*.  The Court explained that it was enough that the harms were "readily attributable to [the agency's] deregulation decision" and likely to be remedied by a favorable decision.  *Id*.; *see also, e.g.*, *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987) (security broker association had standing to challenge agency's regulation of national banks).  This case is no different.

## III.   THE AMENDED COMPLAINT STATES A CLAIM.

Defendants also assert that the Amended Complaint fails to state a claim because (a) it "relies exclusively on the Declaratory Judgment Act," which provides only a remedy, not a cause of action, ECF 11-1 at 12; and (b) the Amended Complaint does not adequately allege "an actual controversy" as required by the Act, *id.* at 13.  Neither is correct.

### A.  The Amended Complaint Alleges a Cause of Action.

The Amended Complaint alleges an independent cause of action for which the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, may provide supplementary relief.  The Supreme Court

has recognized for generations that by granting federal courts jurisdiction to hear claims in equity, Congress afforded an implicit cause of action to seek equitable relief against federal officials for their violations of federal law.  *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (discussing "long history of judicial review of illegal executive action, tracing back to England," leading to American tradition of implied right of action for equitable relief against "violations of federal law by federal officials," and citing, *e.g., Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (suit to enjoin Postmaster General from withholding mail in violation of federal statute)).[11]

Although the Amended Complaint does not specifically identify this traditional cause of action, *but see* Am. Compl. ¶ 19 (citing the jurisdictional grant from which it is derived), the federal rules do not require plaintiffs to expressly invoke the legal source of their cause of action or plead legal theories.  *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (reversing dismissal of civil rights suit for "failure to invoke 42 U.S.C. § 1983 in [the] complaint"); *id*. at 347 ("Having informed the city of the factual basis for their complaint, [plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim.").

---

[11] Congress may expressly or impliedly limit this traditional cause of action in particular statutes. *Armstrong*, 135 S. Ct. at 1385 (finding congressional intent to preclude equitable cause of action where statute provided alternative enforcement mechanism of withholding funds from states that violated the Act and where the relevant statutory text was "judicially unadministrable"). But there is nothing in the ACA that shows Congress intended to foreclose equitable relief from a federal officer's refusal to enforce the statute based on a mistaken view of the Act's constitutionality.  The statute itself provides no alternative remedy to that problem.  Moreover, Defendants' impending enforcement failure arises from their misguided assessment of the statute's constitutionality, a question the courts are well suited to resolve on the basis of entirely administrable constitutional principles.  Accordingly, Maryland is not asking the courts to second-guess the Administration's prosecutorial discretion with respect to particular cases or otherwise asking the Court to address any question reserved to the Executive.

If necessary, Maryland is prepared to amend the complaint to make the cause of action express.

### B.   The Amended Complaint Alleges an "Actual Controversy."

Defendants acknowledge that their assertion that the Amended Complaint fails to satisfy the Declaratory Judgment Act's "actual controversy" requirement largely repeats the standing arguments addressed above.  ECF 11-1 at 13.  They nonetheless make the meritless assertion that declaratory relief is limited to two common categories of actual controversies.  *See id.* at 14.  But the Supreme Court has held that the "phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III," *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted), not to some subset of such controversies.[12]

In any event, Defendants' invocation of cases awarding declaratory relief in the face of a "'genuine threat of [government] enforcement'" of a federal law, ECF 11-1 at 14 (quoting *MedImmune*, 549 U.S. at 129) (alteration in original), strongly reinforces Maryland's claims here. Defendants cannot contend that the Act applies to prevent injuries arising from the Government's *enforcement* of a law, but not to prevent injuries arising from the Government's *non*-enforcement of a federal statute.  And as discussed, the Amended Complaint compellingly alleges a genuine threat that Defendants will soon end enforcement of a federal law, resulting in serious injury.

---

[12] Even if the Declaratory Judgment Act provided a stricter standard than Article III, failure to satisfy that standard would have no bearing on Maryland's separate request for an injunction. *See* Am. Compl., Prayer for Relief (b); *Armstrong*, 135 S. Ct. at 1384 (recognizing traditional cause of action at equity for injunction against federal officer's violation of federal law).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.  In the alternative, the Court should grant Maryland leave to amend its amended complaint for the reasons set forth above and in the conditional motion for leave to amend filed contemporaneously with this brief.

Dated: December 3, 2018          Respectfully submitted,

THE STATE OF MARYLAND

By:  /s/ Tejinder Singh

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT (BAR NO. 25300)
jbernhardt@oag.state.md.us
STEVEN M. SULLIVAN (BAR NO. 24930)
ssullivan@oag.state.md.us
SARAH W. RICE (BAR NO. 29113)
srice@oag.state.md.us
KIMBERLY S. CAMMARATA (BAR NO. 11997)
kcammarata@oag.state.md.us
Assistant Attorneys General
200 St. Paul Place
Baltimore, Maryland 21202
T: (410) 576-6325
F: (410) 576-6955

THOMAS C. GOLDSTEIN (BAR NO. 13618)
TGoldstein@goldsteinrussell.com
KEVIN K. RUSSELL, *admission pending*
KRussell@goldsteinrussell.com
SARAH E. HARRINGTON, *admission pending*
Sharrington@golsteinrussell.com
TEJINDER SINGH (BAR NO. 17888)
TSingh@goldsteinrussell.com
DANIEL WOOFTER (BAR NO. 20474)
dhwoofter@goldsteinrussell.com
Goldstein & Russell, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0637 (direct)
(800) 574-2033 (fax)

*Attorneys for the State of Maryland*

**CERTIFICATE OF SERVICE**

The undersigned certifies that Plaintiff's Opposition to the Motion to Dismiss was served on all counsel of record via the Court's CM/ECF system on this 3d day of December, 2018.

/s/ Tejinder Singh
Tejinder Singh