# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**STATE OF MARYLAND,**

     **Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE** *et al.*,

     **Defendants.**

Civil Action No. 18-cv-2849 (ELH)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR MOTION TO SUBSTITUTE

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................3

I.    CONSTITUTIONAL AND STATUTORY BACKGROUND ..............................................3

    A.    The Appointments Clause .............................................................................................3

    B.    Federal Vacancy Statutes ..............................................................................................4

II.    FACTUAL AND PROCEDURAL BACKGROUND ...........................................................6

STANDARD OF REVIEW ...........................................................................................................7

ARGUMENT .................................................................................................................................7

I.    THE STATE LACKS STANDING TO SEEK A PRELIMINARY INJUNCTION ............8

    A.    Any alleged harm to the State with respect to DOJ's position on the ACA does not support injury in fact to challenge the designation because there is no invasion of a legally protected interest and the alleged harm is speculative .................9

    B.    Any alleged harm to the State with respect to this litigation does not support injury in fact to challenge the designation because it is speculative and legally baseless. .........................................................................................................................11

    C.    The proper substitution of a named official in an official capacity suit does not support injury in fact to challenge the designation because it is legally immaterial. ......................................................................................................................12

II.    THE STATE HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS. ............................................................................................................................14

    A.    The FVRA authorizes Mr. Whitaker's designation as Acting Attorney General. ........................................................................................................................14

        1.    The FVRA's plain text applies to the Attorney General's vacancy. ................14

        2.    Section 508 operates alongside, and does not displace, the FVRA. ................15

            a.    The FVRA specifies that it is nonexclusive, rather than inapplicable, when statutes like section 508 also apply. ........................15

            b.    Principles of statutory construction preclude the State's interpretation of the FVRA's relationship with section 508. ..............21

            c.    Office-specific vacancy statutes comparable to section 508 have never before been interpreted to displace the FVRA. ................24

B.      The Presidential designation of Mr. Whitaker as Acting Attorney General does not violate the Appointments Clause. ............................................................26

    1.      Several acts of Congress passed in three different centuries have authorized the designation of acting principal officers who are not Senate confirmed.............................................................................27

    2.      The Executive Branch has repeatedly designated acting principal officers who are not Senate confirmed.................................................29

    3.      Supreme Court precedent has ratified the designation of acting principal officers who are not Senate confirmed. ..............................33

    4.      Serious practical consequences and constitutional concerns militate against the State's proposed constitutional rule...................................36

III.    THE STATE'S LACK OF IRREPARABLE HARM, THE BALANCE OF EQUITIES, AND THE PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF..................................................................38

CONCLUSION....................................................................................................................39

## TABLE OF AUTHORITIES

**CASES**

*United States v. Eaton,*
   169 U.S. 331 (1898) ................................................................................................ 34, 35, 36, 37

*Alden v. Maine,*
   527 U.S. 706 (1999) ..............................................................................................................27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..............................................................................................................12

*Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity,*
   950 F.2d 1401 (9th Cir. 1991) ...............................................................................................38

*Auffmordt v. Hedden,*
   137 U.S. 310 (1890) ..............................................................................................................26

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir.), *cert. denied sub nom. Beck v. Shulkin,* 137 S. Ct. 2307 (2017) ..........10

*Benham v. City of Charlotte,*
   635 F.3d 129 (4th Cir. 2011) ...................................................................................................8

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ....................................................................................................................3

*Burrow-Giles Lithographic Co. v. Sarony,*
   111 U.S. 53 (1884) ................................................................................................................27

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................................................8, 9, 10

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ................................................................................................................8

*Detweiler v. Pena,*
   38 F.3d 591 (D.C. Cir. 1994) .................................................................................................22

*Di Biase v. SPX Corp.,*
   872 F.3d 224 (4th Cir. 2017) .................................................................................................38

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
   952 F.2d 802 (4th Cir. 1991) ............................................................................................7, 38

*Doe v. Obama,*
   631 F.3d 157 (4th Cir. 2011) .................................................................................................10

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ........................................................................................13

*Edmond v. United States,*
  520 U.S. 651 (1997) ................................................................................. 35, 36

*English v. Trump,*
  279 F. Supp. 3d 307 (D.D.C. 2018) ..........................................................19, 20, 22

*Golan v. Holder,*
  565 U.S. 302 (2012) ........................................................................................27

*Golden Gate Rest. Ass'n v. City & Cty of S.F.,*
  512 F.3d 1112 (9th Cir. 2008) ..........................................................................39

*Henke v. Dep't of the Interior,*
  842 F. Supp. 2d 54 (D.D.C. 2012) ....................................................................38

*Hooks v. Kitsap Tenant Support Services, Inc.,*
  816 F.3d 550 (9th Cir. 2016) ............................................................................18

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987) ........................................................................................23

*J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l Inc.,*
  534 U.S. 124 (2001) ................................................................................. 21, 22

*James A. Merritt & Sons v. Marsh,*
  791 F.2d 328 (4th Cir. 1986) ............................................................................39

*Kentucky v. Graham,*
  473 U.S. 159 (1985) ........................................................................................13

*Last Best Beef, LLC v. Dudas,*
  506 F.3d 333 (4th Cir. 2007) ............................................................................21

*Lewis v. Clarke,*
  137 S. Ct. 1285 (2017) ....................................................................................13

*Liner v. Fischer,*
  Civ. No. 11-6711, 2013 WL 1832316 (S.D.N.Y. May 2, 2013) ............................7

*Long Term Care Partners, LLC v. United States,*
  516 F.3d 225 (4th Cir. 2008) ............................................................................12

*Lucia v. SEC,*
  138 S. Ct. 2044 (2018) ......................................................................................3

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .................................................................................................... 8, 10, 12

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ............................................................................................................ 7

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990) ........................................................................................................... 22

*Morrison v. Olson,*
  487 U.S. 654 (1988) .................................................................................................... 26, 35

*Morton v. Mancari,*
  417 U.S. 535 (1974) ........................................................................................................ 22

*Murphy v. Smith,*
  138 S. Ct. 784 (2018) ...................................................................................................... 23

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................................ 39

*NLRB v. Noel Canning,*
  134 S. Ct. 2550 (2014) ................................................................................................ 26, 38

*NLRB v. SW General, Inc.,*
  137 S. Ct. 929, (2017) ................................................................................................. 27, 36

*Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of State of Wash. v. United States,*
  279 U.S. 655 (1929) ........................................................................................................ 26

*Omega World Travel, Inc. v. Trans World Airlines,*
  111 F.3d 14 (4th Cir. 1997) ............................................................................................... 7

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011) ........................................................................................................ 22

*Printz v. United States,*
  521 U.S. 898 (1997) ........................................................................................................ 27

*Radzanower v. Touche Ross & Co.,*
  426 U.S. 148 (1976) ........................................................................................................ 22

*Raines v. Byrd,*
  521 U.S. 811 (1997) .......................................................................................................... 8

*Serono Labs. Inc. v. Shalala,*
  158 F.3d 1313 (D.C. Cir. 1998) ...................................................................................... 39

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) ..................................................................................................... 8

*State of Ga. v. Pa. R.R. Co.,*
   324 U.S. 439 (1945) ....................................................................................................... 21

*Steel Co. v. Citizens for Better Env't,*
   523 U.S. 83 (1998) ........................................................................................................... 8

*Susan B. Anthony List v. Driehaus,*
   134 S. Ct. 2334 (2014) ................................................................................................... 10

*Taubman Realty Grp. Ltd. P'ship v. Mineta,*
   320 F.3d 475 (4th Cir. 2003) ........................................................................................... 9

*Taylor v. Resolution Tr. Corp.,*
   56 F.3d 1497, *as amended*, 66 F.3d 1226 (D.C. Cir. 1995) ......................................... 38

*United States v. Blankenship,*
   846 F.3d 663 (4th Cir.), *cert denied*, 138 S. Ct. 315 (2017) ....................................... 22

*United States v. Nixon,*
   418 U.S. 683 (1974) ....................................................................................................... 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) ......................................................................................................... 8

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ....................................................................................................... 39

*Weiss v. United States,*
   510 U.S. 163 (1994) ....................................................................................................... 37

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) .................................................................................................... 9, 10

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................................. 7, 38, 39

## STATUTES

5 U.S.C. app. 1 ................................................................................................................... 24

5 U.S.C. § 105 .................................................................................................................... 14

5 U.S.C. §§ 3345-3349d ....................................................................................................... 5

5 U.S.C. § 3345 ............................................................................................................ *passim*

5 U.S.C. § 3346 ............................................................................................................... 5, 23

5 U.S.C. § 3347 (1994).................................................................................................*passim*

5 U.S.C. § 3347...........................................................................................................*passim*

5 U.S.C. § 3348...........................................................................................................5, 15

5 U.S.C. § 3349c..........................................................................................................*passim*

10 U.S.C. § 132............................................................................................................24

12 U.S.C. § 4512..........................................................................................................28

12 U.S.C. § 5491..........................................................................................................19, 28

15 U.S.C. § 633............................................................................................................24

20 U.S.C. § 3412..........................................................................................................24, 28

21 U.S.C. § 1703..........................................................................................................28

28 U.S.C. § 508............................................................................................................*passim*

28 U.S.C. § 515............................................................................................................11

28 U.S.C. § 530D..........................................................................................................6

28 U.S.C. § 2201..........................................................................................................6

29 U.S.C. § 153............................................................................................................18

29 U.S.C. § 552............................................................................................................24

31 U.S.C. § 301............................................................................................................24

31 U.S.C. § 502............................................................................................................28

38 U.S.C. § 304............................................................................................................28

40 U.S.C. § 302............................................................................................................28

42 U.S.C. § 7132..........................................................................................................24, 28

44 U.S.C. § 2103..........................................................................................................28

49 U.S.C. § 102............................................................................................................28

50 U.S.C. § 3037..........................................................................................................29

Act of May 8, 1792, ch. 27, 1 Stat. 279 .....................................................................4, 27

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.................................................................27

Act of Feb. 20, 1863, ch. 45, 12 Stat. 656........................................................ 4, 28

Act of July 23, 1868, ch. 227, 15 Stat. 168...................................................... 4, 28

Act of June 22, 1870, ch. 150, 16 Stat. 162 .............................................................32

Pub. L. No. 100-398, 102 Stat. 985 (1988) ...................................................... 4, 28

Rev. Stat. § 179 (1st ed. 1875).................................................................................5

Rev. Stat. § 179 (2nd ed. 1878)..........................................................................5, 16

## RULES

Fed. R. Civ. P. 17 ....................................................................................................13

Fed. R. Civ. P. 25 ....................................................................................................13

## REGULATIONS

28 C.F.R. 0.13.........................................................................................................11

28 C.F.R. 0.15.........................................................................................................12

*Providing an Order of Succession Within the Department of Defense,*
   Exec. Order No. 13,394, 70 Fed. Reg. 76,665 (Dec. 22, 2005) ........................25

*Providing an Order of Succession Within the Department of Defense,*
   Exec. Order No. 13,533, 75 Fed. Reg. 10,163 (Mar. 1, 2010) ..........................25

## UNITED STATES CONSTITUTION

U.S. Const. art. II, § 2........................................................................... 3, 31, 34

## OTHER AUTHORITIES

1 *Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors* (Washington, GPO 1868)...................................................... 29, 31

3 *The Diary of James K. Polk During His Presidency, 1845 to 1849,*
   (Milo Milton Quaife ed. 1910)...........................................................................33

144 Cong. Rec. 27496 (Oct. 21, 1998) ....................................................................37

*Acting Attorneys General*, 8 Op. O.L.C. 39 (1984).........................................................................33

Alvin Laroy Duckett, *John Forsyth: Political Tactician* 181 (1962) ..................................31

*Appointment of Consuls*, 7 Op. Att'y Gen. 242 (1855)...................................................................35

*Authority of the President to Name an Acting Attorney General*,
   31 Op. O.L.C. 208 (2007) ..........................................................................................................25

*Biographical Directory of the American Congress, 1774–1971* (1971) ....................... 30, 31

*Designation of Acting Director of the Office of Management and Budget*,
   27 Op. O.L.C. 121 (2003) ..........................................................................................................25

*Guidance on the Application of Federal Vacancies Reform Act of 1998*,
   23 Op. O.L.C. 60 (1999).......................................................................................................23, 24

*In re Asbury Dickins*, 34th Cong., 1st Sess., Rep. C.C. 9 (Ct. Cl. 1856) ............................ 30, 33

*In re Cornelius Boyle*, 34 Cong. Rep. C.C. 44, 1857 WL 4155 (1857) .......................................34

Message from the President of the United States,
   36th Cong., 2d Sess., Exec. Doc. No. 2 (1861)................................................................. 30, 32

*Office and Duties of Atty. Gen.*, 6 Op. Att'y Gen. 326 (1854) ................................................32

S. Rep. No. 105-2 (1998), 1998 WL 404532 .............................................................................16

S. Exec. J., 21st Cong., Special Sess. 8 (Mar. 9, 1829) ...........................................................31

S. Exec. J., 28th Cong., 1st Sess. 349 (June 15, 1844).............................................................31

S. Exec. J., 30th Cong., 1st Sess. 429 (June 15, 1848).............................................................33

*Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287 (1977) ............................36

**INTRODUCTION**

Matthew G. Whitaker is the Acting Attorney General of the United States.  Pursuant to the President's well-settled authority under the Federal Vacancies Reform Act ("FVRA"), and consistent with precedent and history under the Appointments Clause, Mr. Whitaker was validly designated to temporarily perform the functions and duties of the Office of the Attorney General upon the resignation of Jefferson B. Sessions III.  The State of Maryland ("the State") seeks to inject a dispute over the designation's validity into this pending, unrelated lawsuit, filing a motion for a preliminary injunction that asks this Court to take the extraordinary step of unseating the presidentially designated Acting Attorney General and turn over control of the Department of Justice to Deputy Attorney General Rod J. Rosenstein.  But the State's emergency motion rests on a fundamental misreading of the relevant statutes and the U.S. Constitution, as well as on unsupported and speculative assertions of harm from the designation.  Thus, the State is not entitled to this extraordinary remedy, and its motion should be denied.

As a threshold matter, this Court should first resolve Defendants' pending motion to dismiss because if it grants that motion, the State's request for preliminary injunctive relief would be moot.  Alternatively, because the Amended Complaint does not plead any claim challenging Mr. Whitaker's designation, there is no basis for the Court to grant the requested preliminary relief unmoored from any ultimate relief sought in this case.

The State's challenge to Mr. Whitaker's designation ultimately fails for lack of standing.  The State has not identified any certainly impending injury to a legally protected interest that is fairly traceable to the designation.  All that the State has asserted is speculative harm based on the Acting Attorney General's possible future position on the constitutionality and enforceability of the ACA and on his possible supervision of this litigation.  But the Department's litigation position alone cannot cause the State any cognizable harm where the State has no legally protected interest in the continued validity of the Affordable Care Act ("ACA") or in the Department's litigation position in this case.  *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pl.'s Am. Compl., ECF No. 11-1 ("Mot. to

Dismiss").  Nor does the procedural rule that automatically substitutes Attorney General Sessions' successor in this official-capacity lawsuit require determining the validity of Mr. Whitaker's designation.  The whole point of an official-capacity lawsuit, such as this one, is that the real party in interest is not the office-holder, but the office itself.

Even if the Court finds standing, the State's challenge to Mr. Whitaker's designation fails on the merits.  The designation is valid as both a statutory and constitutional matter.  *See* Mem. from Steven A. Engel, Asst. Att'y Gen., to Emmett T. Flood, Counsel to the President, *Designating an Acting Attorney General*, at 2-6 (Nov. 14, 2018) ("OLC Op.") (attached as Ex. A); *see also United States v. Valencia*, No. 5:17-CR-882, ECF No. 175 (W.D. Tex. Nov. 27, 2018) ("*Valencia*, slip op.*")* (holding that the designation is authorized by the FVRA and does not violate the Appointments Clause).

The FVRA authorizes the President to designate acting officials to perform the duties of most Senate-confirmed executive offices during vacancies, and it is generally the "exclusive" means of selecting an acting officer.  *See* 5 U.S.C. §§ 3345, 3347.  The FVRA does not apply to certain offices as expressly articulated in the statue itself, and the office of Attorney General is not one of them.  *See id.* § 3349c.  To be sure, there is another vacancy statute specific to the Attorney General that separately provides a line of succession, starting with the Deputy Attorney General, who "may" serve as Acting Attorney General in the event of a vacancy.  *See* 28 U.S.C. § 508.  But in subsequently enacting the FVRA, Congress made clear that agency-specific vacancy statutes like section 508 do not render the FVRA inapplicable, but rather merely render the FVRA non-exclusive, making both options available.  *See* 5 U.S.C. § 3347(a)(1).  Indeed, in enacting the FVRA, Congress expressly eliminated a provision that had rendered the FVRA's predecessor statute inapplicable to the Attorney General, *compare* 5 U.S.C. § 3347 (1994), *with* 5 U.S.C. §§ 3345, 3347, 3349c, and it retained a provision in 28 U.S.C. § 508(a) specifying that the Deputy Attorney General is the first assistant for purposes of 5 U.S.C. § 3345, which contains the FVRA's designation methods.

Moreover, even if the plain language, structure, and statutory history of the FVRA were not enough to dictate that the FVRA and section 508 operate as alternative designation methods, the result is further confirmed by legislative history, statutory construction canons, executive practice, and

judicial precedent.  Every relevant interpretive principle compels the conclusion that the President may designate an Acting Attorney General under the FVRA.

Similarly, the constitutional validity of Mr. Whitaker's designation is well-established by both practice and precedent from all three branches of government.  Congressional statutes enacted over three different centuries, countless examples of similar presidential designations, and Supreme Court precedent all confirm that the Constitution does not require an acting official who is temporarily authorized to carry out the duties of a principal officer to be confirmed by the Senate.  A contrary holding would not only fly in the face of this longstanding practice and precedent, but also raise serious concerns related to the proper functioning of the Executive Branch.

Finally, the State has failed to meet the other preliminary injunction requirements.  Just as the State's alleged speculative injuries are insufficient to establish an injury in fact, they are insufficient to demonstrate irreparable harm absent injunctive relief.  And rather than maintain the status quo, its proposed relief would upend it, sowing confusion and intruding into core Executive Branch operations, thus harming the Defendants as well as the public interest.

**BACKGROUND**

## I.   CONSTITUTIONAL AND STATUTORY BACKGROUND

### A.  The Appointments Clause

The Appointments Clause of Article II of the U.S. Constitution prescribes the method of appointment for all "officers of the United States" whose appointments are not otherwise provided for in the Constitution.  U.S. Const. art. II, § 2, cl. 2; *see Buckley v. Valeo*, 424 U.S. 1, 125-26, 132 (1976) (per curiam).  "Officers" are those persons who hold a "continuing and permanent" federal position and exercise "significant authority pursuant to the laws of the United States."  *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).  Pursuant to the Clause, the President, with the advice and consent of the Senate, nominates principal officers, such as the Attorney General.  Congress may vest the power to select "inferior Officers," however, "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Neither the Appointments Clause nor any other provision

3

of the Constitution expressly addresses whether and in what circumstances an individual may serve in an acting capacity for a principal officer.

### B.  Federal Vacancy Statutes

In the face of the Constitution's lack of express instruction on the question, Congress has provided, since almost the Founding of this Nation, for the designation of individuals, including those not Senate-confirmed, to serve temporarily as acting principal officers.  In 1792, Congress authorized "any person or persons" to fill certain vacancies in the Departments of State, Treasury, and War, including vacancies in the position of Secretary, until the permanent officer could resume his duties or a successor was appointed.  Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.  In 1863, Congress extended the 1792 Act to all vacancies in the office of "the head of any Executive Department of the Government, or of any officer of either of the said Departments whose appointment is not in the head thereof."  Act of Feb. 20, 1863, ch. 45, § 1, 12 Stat. 656, 656.

Shortly thereafter, Congress enacted the Vacancies Act of 1868, which provided as a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head."  Act of July 23, 1868, ch. 227, § 1, 15 Stat. 168.  The Vacancies Act further authorized the President to bypass the "first assistant" default rule and designate a Senate-confirmed official to fill the vacancy.  *See id.*  Between 1868 and 1988, Congress amended the Vacancies Act to extend the time limits for permissible acting service and include the vast majority of executive offices within its scope of coverage.  *See, e.g.*, Pub. L. No. 100-398, § 7(b), 102 Stat. 985, 988 (1988).

In addition to the Vacancies Act, Congress also enacted myriad agency-specific vacancy statutes.  Of particular relevance here, 28 U.S.C. § 508(a) provides that in the case of a vacancy in the office of Attorney General, "the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 [then the Vacancies Act and now the FVRA] the Deputy Attorney General is the first assistant to the Attorney General."  28 U.S.C. § 508(a).  If the offices of Attorney General and Deputy Attorney General are both vacant, "the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and

4

the Assistant Attorneys General, in further order of succession, to act as Attorney General." 28 U.S.C. § 508(b). Notably, the President's authority in the Vacancies Act to bypass the statute's default rule was expressly made inapplicable "to a vacancy in the office of Attorney General." 5 U.S.C. § 3347 (1994); *see* Rev. Stat. 179 (1st ed. 1875) (harmonizing the Department of Justice's organic statute enacted in 1870 with the Vacancies Act of 1868); Rev. Stat. § 179 (2d ed. 1878) (same).

In 1998, Congress enacted the FVRA, 5 U.S.C. §§ 3345–3349d to replace the Vacancies Act and provide comprehensive procedures for the President to designate an acting official to perform the duties of an executive officer whose appointment is subject to Senate confirmation whenever the incumbent "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). The FVRA provides three options. First, absent any other presidential designation, the "first assistant" to the vacant office shall perform its functions and duties. *Id.* § 3345(a)(1). Second, the President may depart from that default course by directing another Senate-confirmed presidential appointee to perform the vacant office's functions and duties. *Id.* § 3345(a)(2). And third, the President may designate an officer or employee within the same agency to perform the vacant office's functions and duties, provided that he or she has been in the agency for at least 90 days in the 365 days preceding the vacancy, in a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule. *Id.* § 3345(a)(3). This third option is available even where the vacant office is the agency head. *Cf. id.* § 3348(b)(2) (special rule applicable for vacancies other than the agency head). An acting official designated under the FVRA can generally serve no longer than 210 days, subject to certain extensions depending on the Senate calendar and the status of nominations to fill the position. *See id.* § 3346.

The FVRA also contains a short list of specific offices to which it does not apply. *Id.* § 3349c. The office of Attorney General is not one of those offices. Indeed, in enacting the FVRA, Congress eliminated the previous exception that existed for the office of Attorney General in the Vacancies Act, *see id.*, but retained section 508's preexisting "first assistant" designation for purposes of section 3345, *see* 28 U.S.C. § 508(a). Finally, the FVRA is by default the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office [requiring Senate confirmation] of

5

an Executive agency." 5 U.S.C. § 3347(a).  The FVRA is not exclusive, however, where there is a relevant office-specific vacancy statute, such as section 508.  *Id.* § 3347(a)(1).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On September 13, 2018, Maryland brought suit against Defendants, including then-Attorney General Sessions in his official capacity, asserting a single count under the Declaratory Judgment Act, 28 U.S.C. § 2201.  The State seeks a declaration that the entirety of the ACA remains constitutional and enforceable after the Tax Cuts and Jobs Act ("TCJA") reduced the tax penalty for violating the ACA's individual mandate to zero, or in the alternative, that the relevant portion of the TCJA is unconstitutional.  Am. Compl. at 34, ECF No. 8.  The requested declaration conflicts in part with the litigation position taken by DOJ in a lawsuit filed in a Texas federal district court, as set forth in the June 7, 2018 letter from Attorney General Sessions under 28 U.S.C. § 530D notifying Congress of the position.  Am. Compl. ¶ 10.

On November 7, 2018, Attorney General Sessions resigned from office.  Pursuant to section 3345(a)(3) of the FVRA, the President designated Matthew G. Whitaker, Chief of Staff and Senior Counselor to the Attorney General, to act temporarily as Attorney General.  On November 13, 2018, the State moved to preliminarily enjoin Mr. Whitaker from appearing in this litigation in his official capacity as Acting Attorney General or, alternatively, to require the substitution of Deputy Attorney General Rod J. Rosenstein as Acting Attorney General.  Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. or Mot. to Substitute, ECF No. 6-1 ("Mot.").  The State then amended the Original Complaint, removing Mr. Sessions from the caption and adding Mr. Whitaker and Mr. Rosenstein in their official capacities.  *See generally* Am. Compl.  The State did not add a claim concerning Mr. Whitaker's designation.

On November 16, 2018, Defendants moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.  Mot. to Dismiss.  On November 19, this Court issued an order expediting the briefing of Defendants' motion to dismiss on the basis that the motion has "raise[d] a standing issue that may have an impact on the pending Motion for Preliminary Injunction."  Order, at 2, ECF No. 13.

6

## STANDARD OF REVIEW

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (internal quotation marks omitted); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).   A plaintiff seeking this extraordinary remedy "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

The Court should deny the State's motion for preliminary injunction on both threshold and substantive grounds.   As an initial matter, a grant of preliminary injunctive relief is improper because the State's Amended Complaint does not assert a claim challenging Mr. Whitaker's designation.   As the Fourth Circuit has explained, "[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997).   The Amended Complaint seeks only a declaration of the ACA's constitutionality and enforceability on the basis that the State otherwise would be harmed by the uncertainty of the ACA's validity and its possible elimination.   The validity of Mr. Whitaker's designation is irrelevant to that ultimate relief and its resolution cannot change the past challenged conduct upon which the Amended Complaint is based.   *Liner v. Fischer*, Civ. No. 11-6711, 2013 WL 1832316, at *5 (S.D.N.Y. May 2, 2013) (explaining that in evaluating a motion for preliminary injunction, "a court must analyze the claims the plaintiff made and the facts asserted in the complaint, not the claims made or facts asserted, for the first time, on the motion for a preliminary injunction") (citation omitted).   And in any event, for the reasons detailed at length below, the State's challenge to the designation fails for lack of standing and on the merits, and it does not warrant extraordinary equitable relief.

## I.      THE STATE LACKS STANDING TO SEEK A PRELIMINARY INJUNCTION.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted).  A core element of Article III's case-or-controversy requirement is that a plaintiff must establish his or her standing to sue.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  The State must demonstrate "(1) an 'injury in fact'; (2) a 'causal connection between the injury and the conduct complained of,' such that the injury is 'fairly traceable' to the defendant's actions; and (3) a likelihood that the injury 'will be redressed by a favorable decision.'" *Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011) (quoting *Lujan,* 504 U.S. at 560-61).  Injury in fact is "the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)), *as revised* (May 24, 2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560).  Adherence to these standing requirements "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action[,]" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982), and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

The State's motion describes three broad concerns: (1) that it may be harmed by Mr. Whitaker's control over DOJ's position on the ACA's constitutionality and enforceability, whether in the *Texas* litigation or elsewhere; (2) that it may be harmed by Mr. Whitaker's supervision of this

lawsuit itself; and (3) that it is harmed because it does not know who to identify and treat as the defendant in this litigation to ensure that "any interim orders and ultimate judgment issue to the correct official."  Mot. at 2, 28-30.  None of these alleged harms suffices to meet the Article III standing requirements.

### A. Any alleged harm to the State with respect to DOJ's position on the ACA does not support injury in fact to challenge the designation because there is no invasion of a legally protected interest and the alleged harm is speculative.

The State speculates that it might be harmed by Mr. Whitaker's designation because he might either change DOJ's position on the ACA in an adverse manner or maintain DOJ's current position when another Acting or Senate-confirmed Attorney General might change it in a favorable manner. But the State's conjecture about Mr. Whitaker's involvement in the ACA litigation—and whether that involvement might harm it—cannot establish injury in fact for at least two reasons: it identifies no invasion of any legally protected interest and it is inherently speculative.

Where there is no invasion of a legally protected interest, there can be no injury in fact.  *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003).  As Defendants explained in their motion to dismiss, the State has not shown that it has any legally cognizable interest in either the continued validity and enforceability of the ACA or in any particular litigation position DOJ might take concerning the ACA.  *See* Mot. to Dismiss at 8-9.  Equally importantly, DOJ's mere litigation position concerning the ACA cannot *itself be the cause* of any alleged injury to the State, which would flow instead from the judgment of the district court in Texas or elsewhere about the TCJA's effect on the ACA.  *See id.*  Therefore, the State cannot show that any hypothetical effect that Mr. Whitaker might have on DOJ's litigation position on the ACA would cause it a cognizable injury.

Wholly apart from that threshold flaw, it is entirely speculative whether Mr. Whitaker's designation would even have an effect on DOJ's litigation position that would be allegedly injurious to the State, and this also forecloses the State from satisfying the injury-in-fact requirement. "[A]llegations of possible future injury . . . are not sufficient" for standing.  *Clapper*, 568 U.S. at 409 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  An allegation of future injury "may suffice if

the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper*, 568 U.S. at 409, 414 & n.5). "[A]n injury-in-fact must be concrete in both a qualitative and temporal sense." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir.), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017) (internal citations omitted). "[T]he Supreme Court has 'insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.'" *Doe v. Obama*, 631 F.3d 157, 163 (4th Cir. 2011) (quoting *Lujan*, 504 U.S. at 564 n.2). The alleged injury must be "distinct and palpable as opposed to merely [a]bstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore*, 495 U.S. at 155 (internal citations omitted).

That standard is not satisfied here. First, because the State already dislikes DOJ's current position concerning the ACA, it principally objects to Mr. Whitaker's designation on the ground that Mr. Rosenstein, as Acting Attorney General, might adopt a more favorable position. Mot. at 2. That is bald speculation as to both Mr. Whitaker and Mr. Rosenstein. Second, the State worries that Mr. Whitaker might take a "more extreme" position on the ACA. Mot. at 30. Again, this is rank speculation. Third, underscoring the speculative nature of its claim, the State concedes that it is possible instead that Mr. Whitaker could theoretically himself adopt the position the State prefers (and that Mr. Rosenstein would not have), which would actually *benefit* the State by mooting this lawsuit. Mot. at 29.

Adding to the layers of speculation is the State's further attempt to compare Mr. Whitaker's hypothetical position on the ACA with that of a "different Attorney General," who may or may not be Mr. Rosenstein. Mot. at 2. The State's injury argument suffers even further because the State fails to allege that any of these speculative changes to the DOJ's position on the ACA are imminent. The State simply does not and cannot provide plausible factual allegations that any particular outcome, whether favorable or adverse to its interests, is more or less likely based on who holds the position of Acting or Senate-confirmed Attorney General. Ultimately, the State's speculation on the full range of positions that Mr. Whitaker or his eventual successor could take, at some indefinite point in the future, is a textbook "conjectural or hypothetical injury." Indeed, perhaps it is not even an injury at all; it is

impossible to say at this time.  None of this suffices to establish the concrete injury in fact necessary to demonstrate standing.

**B. Any alleged harm to the State with respect to this litigation does not support injury in fact to challenge the designation because it is speculative and legally baseless.**

The State next speculates that if Mr. Whitaker's designation is invalid, his involvement in this litigation might harm the State because it would "call[] into question every position taken by [the] defendants." Mot. at 29.  This cannot suffice to show injury in fact.

To begin with, the State cannot show injury merely by suggesting that the alleged invalidity of the Acting Attorney General's designation somehow affects DOJ's litigating authority in this case. The State has sued the Federal Government to declare an act of Congress constitutional and enforceable.  Its entitlement to relief turns on whether this Court agrees that it has standing to sue and has stated a meritorious claim, not on what DOJ says in response to that claim.  Simply put, DOJ's litigating position here imposes no cognizable injury on the State.

In any event, even if Mr. Whitaker's designation were invalid, it would have no effect on DOJ's litigating authority here.  "Each Assistant Attorney General and Deputy Assistant Attorney General is authorized to exercise the [litigation] authority of the Attorney General under 28 U.S.C. 515(a) in, cases assigned to, conducted, handled, or supervised by such official."  28 C.F.R. 0.13(a).  Such delegations remain valid and binding until revoked or amended by the Attorney General.  *See United States v. Nixon*, 418 U.S. 683, 695-96 (1974) (reaffirming principle that "[s]o long as [a] regulation" delegating certain powers of the Attorney General to subordinate officials "is extant[,] it has the force of law," even if the Attorney General could reassert his authority by "amend[ing] or revok[ing] the regulation").  Since DOJ's defense of this litigation requires no Attorney General or Acting Attorney General authorization, the validity of the Acting Attorney General's designation is simply irrelevant. *Cf. Valencia*, slip op. at 18-19 (reaching analogous conclusion for a criminal prosecution brought by a United States Attorney).

Additionally, the Deputy Attorney General—the precise Senate-confirmed officer who the State claims should be Acting Attorney General—already is in the chain of command for the

11

supervision of this litigation.  The Deputy Attorney General is "authorized to exercise all the power and authority of the Attorney General, unless any such power or authority is required by law to be exercised by the Attorney General personally."  28 C.F.R. 0.15(a).  The Deputy Attorney General therefore enjoys the same supervisory authority over litigation by the Department as the Attorney General himself.

Notably, the State does not allege that Mr. Whitaker has personally participated in or otherwise affected the conduct or supervision of this litigation or that he will do so in the future, let alone in a manner that injures the State compared to what Mr. Rosenstein would have done as Acting Attorney General rather than Deputy Attorney General.  Nor could the State make such an allegation on any basis other than rank speculation, which is wholly inadequate to establish standing.  *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a litigant's "well-pleaded factual allegations" must "plausibly give rise to an entitlement to relief" in order to survive dismissal); *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 241 (4th Cir. 2008) (confirming that the plaintiff's burden to establish the elements of standing corresponds to the increased evidentiary burdens at each of the "successive stages of the litigation") (quoting *Lujan*, 504 U.S. at 561).

And whether or not Mr. Whitaker assumes some active role in the supervision of this litigation, this Court will be the final arbiter of whether that position is correct as a matter of law.  Accordingly, the State has not met its burden to demonstrate injury in fact from Mr. Whitaker's designation with respect to the present litigation.

### C. The proper substitution of a named official in an official capacity suit does not support injury in fact to challenge the designation because it is legally immaterial.

The State's final concern is that it has suffered harm because it does not know whose name to use as the Attorney General in this official capacity suit.  That concern is unfounded, and certainly suggests no injury in fact.

"In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself.  This is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation.  The

real party in interest is the government entity, not the named official." *Lewis v. Clarke*, 137 S. Ct. 1285, 1291-92 (2017) (citing *Edelman v. Jordan*, 415 U.S. 651, 663-65 (1974)); *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Because the real party in interest is the sovereign, the automatic substitution of a public official for his or her departed predecessor is "merely a procedural device" and "does not affect any substantive issues which may be involved in the action."  Fed. R. Civ. P. 25 advisory committee notes to 1961 amendment.  Indeed, an official-capacity defendant need not be identified by name at all.  *See* Fed. R. Civ. P. 17(d) ("A public officer who sues or is sued in an official capacity may be designated by official title rather than by name").

Whether the substituted official is properly identified is thus of no consequence to the State, given that any error in identification would not deprive DOJ of notice of the litigation, relieve it from being bound by the judgment, affect the scope or operation of any relief, or have any other substantive effect on the parties or the litigation.  *See* Fed. R. Civ. P. 25(d) ("any misnomer not affecting the parties' substantial rights must be disregarded."); *cf. Graham*, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  The office of the Attorney General is properly named in the litigation and any interim orders and ultimate judgment will bind DOJ.  Therefore, no further remedy is necessary.[1]

Further, the State also argues that it needs to know the official to name in the suit because it "needs to know whom it is litigating against and negotiating with" in this case.  Mot. at 29.  But even if this could be a cognizable injury, the signature block in Defendants' filings already includes DOJ counsel of record and the chain-of-command through the Senate-confirmed Assistant Attorney General supervising the Civil Division.  The State thus has all the information it needs.

---

[1] Even under the State's logic, Deputy Attorney General Rosenstein would be the properly named official on this suit, but no remedy would be necessary to correct the filings because the Amended Complaint already names him as a defendant in his official capacity.  *See* Am. Compl.

The State provides no concrete, non-speculative allegations of actual or imminent harm to any legally protected interest.  Accordingly, the Court should deny its motion for a preliminary injunction or substitution for failure to establish any injury in fact.

## II.      THE STATE HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS.

Lack of standing aside, the State's argument fails on the merits.  The President lawfully exercised his authority under the FVRA and Article II of the Constitution to designate Mr. Whitaker to serve temporarily as Acting Attorney General upon the resignation of former Attorney General Sessions.  That conclusion is compelled by the plain text and structure of the FVRA's applicability and exclusivity provisions, 5 U.S.C. §§ 3347, 3349c.  It is also confirmed by every relevant canon of statutory construction and the long and unbroken history of applying the FVRA to the many other agency-specific statutes that, like section 508, authorize a deputy to act in a vacant office.  Finally, the designation does not violate the Appointments Clause because longstanding practice and precedent from all three branches of government confirm that temporary service as Acting Attorney General is not a principal office requiring Senate confirmation.  The sole court to have considered these questions concluded that Mr. Whitaker's designation is valid.  *See Valencia*, slip op. at 5-18.

### A. The FVRA authorizes Mr. Whitaker's designation as Acting Attorney General.

#### 1. The FVRA's plain text applies to the Attorney General's vacancy.

The FVRA on its face applies to vacancies in the office of Attorney General.  It expressly authorizes the President to fill a vacancy arising by "resignation" in a covered Senate-confirmed position by designating, among other individuals, "an officer or employee" within the same agency "to perform the functions and duties of the vacant office," provided that he or she has been in the agency for at least 90 days in the 365-day period preceding the resignation, in a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule.  5 U.S.C. § 3345(a)(3).  The Senate-confirmed positions covered by the FVRA generally include those positions at all "Executive agenc[ies]."  *Id.* § 3345(a); *see id.* § 105 (defining "Executive agency").  And the FVRA

expressly contemplates that the vacant office may be the agency head.  *Cf. id.* § 3348(b)(2) (special rule applicable for vacancies other than the agency head).

Moreover, where Congress intended to exclude an office from the FVRA's scope, it said so expressly, delineating a short list of particular offices in particular agencies to which the FVRA "shall not apply."  *Id.* § 3349c.  The Attorney General is not among those few offices, and the President may thus rely on the FVRA to fill an Attorney General vacancy.  Indeed, the FVRA eliminated altogether the Vacancies Act's exclusion of the office of Attorney General, while retaining section 508's specification that the Deputy Attorney General is the "first assistant" under section 3345, the operative FVRA section here.  And under the FVRA's plain terms, Mr. Whitaker's designation falls squarely within 5 U.S.C. § 3345(a)(3), as he satisfies all of the eligibility criteria.  *See* Mot. at 11.

### 2.  Section 508 operates alongside, and does not displace, the FVRA.

The State contends that Congress made the FVRA inapplicable to the office of the Attorney General by virtue of 28 U.S.C. § 508.  That statute provides that when there is "a vacancy in the office of Attorney General . . . the Deputy Attorney General *may* exercise all the duties of that office."  28 U.S.C. § 508(a) (emphasis added).  According to the State, this provision, which long predates the FVRA, deprives the President of his FVRA authority to select someone other than the Deputy Attorney General to serve as Acting Attorney General.  The State's position is contrary to the FVRA's plain text and well-settled principles of statutory interpretation.

### a.  The FVRA specifies that it is nonexclusive, rather than inapplicable, when statutes like section 508 also apply.

**i.**  In enacting the FVRA, Congress recognized the existence of office-specific vacancy statutes, and prescribed how these statutes intersect with the FVRA.  By default, the FVRA is the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office [requiring Senate confirmation] of an Executive agency."  5 U.S.C. § 3347(a) (emphasis added).  But where "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," such as section 508, Congress provided that the FVRA is not "exclusive."  *Id.* § 3347(a)(1)(B).  In other words, section

3347 makes an exception for, and leaves in effect, office-specific statutes such as section 508, which are then treated as exceptions from the FVRA's generally exclusive applicability, and not as provisions that supersede or displace the FVRA in whole or in part.

The structure of the statute further corroborates Defendants' interpretation of the statutory text. Section 3347's proviso that the FVRA is not the "exclusive" means of addressing vacancies stands in marked contrast with section 3349c, which provides that the FVRA "shall not apply" to specified offices. Had Congress wanted to make the FVRA inapplicable to offices for which an office-specific statute designated an acting official, it would have listed such statutes in section 3349c (entitled "Exclusion of certain offices"), not section 3347 (entitled "Exclusivity"). Neither section 508 nor the office of Attorney General appear in section 3349c.

**ii.** This conclusion is confirmed by the FVRA's statutory history. Under the Vacancies Act of 1868 (the FVRA's predecessor), the first assistant was also the default choice for filling a vacant Senate-confirmed position, and the President was generally able to depart from that default by selecting another Senate-confirmed officer. 5 U.S.C. § 3347 (1994). That additional presidential authority contemplated in the Vacancies Act was expressly made inapplicable "to a vacancy in the office of Attorney General." *Id.*; *see also* Rev. Stat. § 179 (2d ed. 1878). That provision—not section 508—made the prior Vacancies Act inapplicable to the office of the Attorney General; indeed, that provision would have been superfluous if section 508 itself made other vacancy statutes inapplicable, as the State now contends.

Notably, in the process of drafting the FVRA, Congress considered whether the office of Attorney General would also be excluded from the additional authorities vested in the President by the FVRA. An earlier provision in the FVRA, as reported in the Senate Committee Report accompanying the bill that was the basis for the FVRA, would have provided that "[w]ith respect to the office of the Attorney General . . . the provisions of section 508 of title 28 shall be applicable," *see* S. Rep. No. 105-250, at 15 (1998), 1998 WL 404532, at 25 ("Senate Report"), which the Report stated would have limited the President's authority to designate a person to perform the functions and duties of the Attorney General via the FVRA, see *id.* at 13. But Congress omitted that provision from the

16

final version of the Act and indeed did away altogether with the Vacancies Act's exclusion for the office of Attorney General.  *See* 5 U.S.C.  §§ 3345, 3347, 3349c.  Nothing in the FVRA bars the President from designating someone to act as Acting Attorney General under that law.

**iii.**  The FVRA's legislative history underscores that statutes like section 508 have long been understood to work in conjunction with—not displace—the FVRA.  The Senate Committee Report expressly disavows the view that, where an office-specific vacancy statute is available, the FVRA is no longer an option.  Senate Report at 17.  Accompanying the bill that was the basis for the FVRA, the Senate Report provided a list of then-existing, office-specific vacancy statutes, including section 508, that the FVRA would "retain."  *Id.*  With respect to these statutes, the Report makes clear that the FVRA "would continue to provide an *alternative* procedure for temporarily occupying the office."  *Id.* (emphasis added).

The State asserts that this explanation in the Senate Report pertained to a different provision in the bill, which Congress did not enact, stating that the FVRA would be applicable unless "another statutory provision expressly provides that the such [sic] provision supersedes sections 3345 and 3346."  Senate Report at 26 (proposed 5 U.S.C. 3347(a)(1)); Mot. at 18.  But that provision would have covered only statutes that "expressly" supersede Sections 3345 and 3346, and none of the preexisting statutes listed in the Senate Report did so.  Instead, the Senate Report's statement that the preexisting statutes would be retained was plainly relying on the provision in the proposed bill addressing agency-specific statutes that expressly authorize the President to designate an officer to perform the functions and duties of the vacant office, and those that expressly provide for the performance of those duties by a particular officer.  Senate Report at 26 (proposed 5 U.S.C. 3347(a)(2)(A) and (B)).  That provision parallels the exact language ultimately enacted as subparagraphs (A) and (B) of 5 U.S.C. 3347(a)(1). The Senate Report thus confirms that the FVRA and the listed statutes would be available as alternative mechanisms for addressing a vacancy in a covered office.

**iv.**  In light of the FVRA's text, structure, and statutory and legislative history, the courts that have addressed the question have unsurprisingly concluded that office-specific vacancy statutes do not displace the President's FVRA authority.  In *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d

550 (9th Cir. 2016), the Ninth Circuit rejected the argument that the FVRA was inapplicable because an office-specific statute "provide[d] the exclusive means for the President to appoint an Acting General Counsel" of the National Labor Relations Board ("NLRB").  *Id.* at 555-56 (discussing 29 U.S.C. § 153(d)).  The court concluded that "the text of the respective statutes" "belied" any such argument.  *Id.* at 555.  Examining the FVRA's exclusivity provision, 5 U.S.C. § 3347, it concluded that the National Labor Relations Act qualified as "another statute [that] expressly provides a means for filling" a vacancy within the meaning of that provision.  *Id.* at 556.  In addition to the text, the court relied on the FVRA's Senate Report to conclude "that the FVRA retains the vacancy-filling mechanisms in forty different [office-specific vacancy] statutes."  *Id.* at 556 (citing Senate Report at 17).  Therefore, "neither the FVRA nor the [National Labor Relations Act] is the *exclusive* means of appointing an Acting General Counsel of the NLRB."  *Id.*  Both statutes are available to fill the vacancy.

The State argues that *Hooks* is not persuasive because it relied on legislative history of a bill never passed.  But the State ignores the fact that the Ninth Circuit first considered the FVRA's text to reach its decision.  *See id.* at 555.  And, in any event, the court's reliance on the Senate Report was entirely proper because the Report's understanding of the FVRA's coexistence with other office-specific vacancy statutes is well grounded in the language and structure of section 3347 as enacted.

The State also attempts to distinguish *Hooks* on the ground that the NLRB statute merely authorized the presidential designation of a particular acting official, whereas section 508 directly designates such an official and does not permit a presidential designation.  But the Ninth Circuit's reasoning in no way turned on the State's proposed direction.  The FVRA's exclusivity provision expressly covers both types of office-specific vacancy provisions: authorization provisions in section 3347(a)(1)(A), and designation provisions in section 3347(a)(1)(B).  And the State's proposed distinction fails on its own terms because section 508 does *not* designate that the Deputy Attorney General "must" or "shall" serve as Acting Attorney General, only that he "may" do so, and thus it is not distinguishable from the permissive NLRB statute at issue in *Hooks*.  Again, if Congress intended designation provisions, such as section 508, to render the FVRA inapplicable, it would have included

them in section 3349c's exceptions to applicability rather than section 3347(a)(1)(B)'s exception to exclusivity.

An analogous attempt to distinguish *Hooks* was recently rejected by the U.S. District Court for the District of Columbia, which upheld the FVRA's coexistence with a designation provision in an office-specific vacancy statute. *See English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018). In *English*, the court rejected the argument that the FVRA is displaced by an office-specific statute (there, a provision in the Dodd-Frank Act relating to the Consumer Financial Protection Bureau ("CFPB")). *Id.* at 331. Indeed, the CFPB-specific statute, which post-dated the FVRA, provides that the CFPB Deputy Director "*shall* . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5) (emphasis added). The court nevertheless held that this mandatory, newer language coexists with, and is implicitly qualified by, the FVRA's permissive language providing that the President also "*may* direct" certain eligible officials to serve in an acting capacity. *English*, 279 F. Supp. 3d at 317, 323-24 (emphasis added). The court correctly concluded that the President could invoke its authority to designate someone to serve as Acting CFPB Director pursuant to the FVRA. *Id.* at 333.

Seeking to distinguish *English,* the State cites a passage in the decision noting that it was unclear "whether the Deputy Director provision even covers a vacancy created by [the Director's] resignation" because Congress used the terms "absence or unavailability," rather than "vacancy" or "resignation." *English*, 279 F. Supp. 3d at 322; Mot. at 21. But this attempted distinction is foreclosed by the court's conclusion that the words "absence or unavailability" could also "reasonably be read to include the vacancy created by [the Director's] resignation" and that "even assuming that a vacancy created by a resignation is an 'absence or [un]availability'" under the CFPB statute, Congress intended the statute to supplement, not displace, the FVRA. *English*, 279 F. Supp. 3d at 322.

The State further tries to distinguish *English* on the basis that the CFPB-specific statute in that case (the Dodd-Frank Act) contained a provision not found in section 508, providing that certain pre-existing federal statutory law (including the FVRA) applied unless the statute "expressly" provided otherwise. But that argument lacks merit for three reasons. First, the court's reasoning in *English* did

not turn on the existence of that provision. Rather, the holding is premised mainly on the plain text and structure of the FVRA. Thus, the Dodd-Frank Act provision simply lent additional support to the court's analysis with respect to the applicability of the FVRA. Second, the statute at issue here contains a comparable provision. Congress intended section 508 to operate alongside the FVRA because it retained the provision in section 508 designating the Deputy Attorney General the "first assistant" for purposes of section 3345 of the FVRA. *See* 28 U.S.C. § 508(a). Third, unlike the Dodd-Frank Act, section 508 long predates the enactment of the FVRA, and thus it is even clearer that it is to coexist with the FVRA pursuant to the FVRA's exclusivity proviso. 5 U.S.C. § 3347(a)(1).

Indeed, *English* held that the President could designate an acting Director under the FVRA *notwithstanding* that the CFPB Deputy Director provision both contained mandatory language (*i.e.*, "shall") and post-dated the FVRA. The State does not address these reasons why this is an *a fortiori* case. Instead, it erroneously argues that section 508 *requires* the Deputy Attorney General to be the acting Attorney General, notwithstanding that section 508 says nothing about the President's authority to designate an acting officer, and says only the Deputy Attorney General "may" serve in that role.

The State also argues that *English* listed section 508 as an example of a statute that displaces the FVRA. But it misreads *English*. No office-specific vacancy statute has been found to displace the FVRA. The court only listed section 508 as an example of a statute that explicitly refers to a "vacancy." *English*, 279 F. Supp. 3d at 322. Notably, it is listed next to the NLRB General Counsel statute at issue in *Hooks*, which *English* acknowledges as an example of a statute that coexists with, rather than displaces, the FVRA. *Id.* If anything, *English* recognizes that section 508 is on equal footing with the NLRB statute.

**v.** Moreover, the availability of an incumbent Deputy Attorney General who may serve as Acting Attorney General under section 508(a) does not affect the President's authority to designate someone else under sections 3345(a)(2)-(3). The President's authority in section 3345(a)(2) and (a)(3) to designate an acting officer other than the first assistant who would otherwise temporarily fill a vacancy by operation of section 3345(a)(1) does not depend, by the statute's plain terms, on whether there is currently a first assistant. *See* 5 U.S.C. § 3345(a)(2), (3) (authorizing designations

"[n]otwithstanding paragraph (1)").  The FVRA leaves to the President the choice to designate someone other than the first assistant.  Likewise, nothing in section 508 suggests that the FVRA's authorization to designate someone other than the first assistant does not apply when there is an incumbent official in the line of succession available to fill the vacancy.  To the contrary, when Congress amended the FVRA, it left in place section 508's express statement that the Deputy Attorney General is the "first assistant to the Attorney General" for purposes of 5 U.S.C. § 3345, which is the first section of the FVRA.  28 U.S.C. § 508(a).  And again, section 508 further provides that the Deputy Attorney General "may" serve as Acting Attorney General, not that he "must," underscoring that the FVRA remains an alternative means for the designation of an acting officer.

In conclusion, where one of the section 3347(a) exceptions applies—such as here, where section 3347(a)(1)(B) applies by virtue of section 508—the FVRA is no longer the "exclusive means" of designating an acting officer, but it remains an "applicable" option under sections 3345 and 3349c. There are thus two available options for addressing a vacancy in the office of the Attorney General: (1) the FVRA's designation methods in section 3345; and (2) the line of succession in section 508.

### b.   Principles of statutory construction preclude the State's interpretation of the FVRA's relationship with section 508.

Multiple canons of statutory construction confirm the foregoing textual analysis.  First, the harmonious-reading canon favors Defendants' interpretation here.  The State tries to drum up a conflict between section 508's permissive language that the Deputy Attorney General "may" serve as Acting Attorney General and the FVRA's permissive language that the President also "may direct" certain eligible officials to serve in an acting capacity.  But no real conflict exists between these statutes, let alone an "irreconcilable" one, as the State must show.  *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l Inc.*, 534 U.S. 124, 141-142 (2001); *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 339 (4th Cir. 2007) (holding that an irreconcilable conflict occurs when there is a "clear repugnancy between the old law and the new") (quoting *State of Ga. v. Pa. R.R. Co.*, 324 U.S. 439, 457 (1945)).

The State simply says that only one of the two statutes can apply because each rule produces a different result.  *See* Mot. at 11 (explaining that under section 508, Deputy Attorney General

21

Rosenstein is the Acting Attorney General, and under the FVRA, Mr. Whitaker is the Acting Attorney General). But "[i]t is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem. Rather, 'when two statutes are capable of co-existence, it is the duty of the courts … to regard each as effective.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) ("[I]f by any fair course of reasoning the two [statutes] can be reconciled, both *shall* stand.") (emphasis added).

The foregoing textual analysis demonstrates that section 508 and the FVRA's designation options are far more than simply "capable of coexistence" and thus the Court must "regard each as effective." *J.E.M. Ag. Supply*, 534 U.S. at 143-44. To be clear, the FVRA itself speaks in mandatory terms. It provides that the first assistant to a vacant office covered by the FVRA "*shall* perform the functions and duties of the office temporarily in an acting capacity" but that the President "may" direct certain other persons to perform those functions and duties, "notwithstanding" that rule. 5 U.S.C. § 3345(a) (emphasis added). Given this unequivocal language, the FVRA and section 508 should be construed to operate alongside each other.

Nor does the principle that the specific governs the general, upon which the State places so much weight, support the State's position. This principle is "not appropriately invoked in this case" because it applies "only in the face of irreconcilably conflicting statutes." *English*, 279 F. Supp. 3d at 325 (quoting *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994)). As shown above, there is no such conflict here.

Further, the related statutory-construction principle "that Congress is aware of existing law when it passes legislation" further undermines any argument that the FVRA is inapplicable to a vacancy in the office of Attorney General. *United States v. Blankenship*, 846 F.3d 663, 674 (4th Cir.), *cert. denied*, 138 S. Ct. 315 (2017) (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)). Congress knew that certain authorities in the Vacancies Act were expressly made inapplicable "to a vacancy in the office of Attorney General," 5 U.S.C. § 3347 (1994), and even contemplated in an earlier bill that the Attorney General would continue to be excluded from the additional authorities vested in the

President by the FVRA, *see* Senate Report at 25.  Nonetheless, Congress eliminated the exclusion altogether and rejected the proposed limitation to the President's authority to designate an Acting Attorney General.  *See id.* at 26.  The deletion of that limitation means that the office of Attorney General is within the category of offices referred to in 5 U.S.C. 3347(a)(1)(A) and (B) for which the FVRA is an alternative to the agency-specific statute.  Indeed, as discussed above, 28 U.S.C. 508 was included in the Senate Report's list of then-existing agency-specific statutes retained by the FVRA and that Congress intended to operate alongside each other.  *See* Senate Report at 16.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987) (citation omitted).  Because the FVRA omitted—and therefore eliminated—the prior limitation of the Vacancies Act, Congress's choice not to limit the President's authority to designate an Acting Attorney General must be given effect as written in the FVRA.  *See e.g.*, *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018) (giving effect to Congress's purposeful omission of prior statutory language).

Finally, the FVRA's application to the office of the Attorney General does not render section 508 superfluous, as the State appears to suggest.  Rather, section 508 would serve at least three purposes not served by section 3345(a)(1) of the FVRA.  First, it would allow the Deputy Attorney General to serve as Acting Attorney General beyond the FVRA's time limitations.  *See* 5 U.S.C. § 3346; Senate Report at 17 ("Most of these retained statutes[, including section 508,] do not place time restrictions on the length of [service of] an acting officer.").  Second, it would allow the Deputy Attorney General (and others in the line of succession) to fill a vacancy in situations where the FVRA itself would not authorize it.  *See* 5 U.S.C. § 3345(b).  Third, it eliminates potential confusion over who the "first assistant" is in DOJ for purposes of the FVRA's default rule in section 3345(a)(1).  *See Guidance on the Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 63 (1999) ("*FVRA Guidance*") (noting that the FVRA "does not define the term 'first assistant'" and indicating some cause for doubt that an official "not designated by statute or regulation" could "qualify as first assistants").

Because the State argues that section 508 exclusively governs the mechanism for filling a vacancy in the office of Attorney General, the State has no option but to say that the phrase "first assistant" in section 508 serves no purpose. According to the State, in enacting the FVRA, "Congress simply neglected to delete the no-longer-necessary reference to the Deputy Attorney General as the 'first assistant.'" Mot. at 19. Not so. The reference is important, if not necessary, for purposes of the FVRA's default rule. *See FVRA Guidance*, 23 Op. O.L.C. at 63. The reference shows that Congress understood the statute to operate alongside the FVRA. The State's proposed interpretation renders language in section 508 superfluous and therefore must be rejected.

### c.  Office-specific vacancy statutes comparable to section 508 have never before been interpreted to displace the FVRA.

The Attorney General is simply one of many heads of departments forming the President's Cabinet (along with other cabinet-rank officials) who is subject to an office-specific vacancy statute providing that its deputy (and others in the Department) "may" or "shall" serve as the acting head in the event of a vacancy. 28 U.S.C. § 508.[2] None of these statutes has ever been thought to remove the offices they cover from the scope of the FVRA, even though they all unambiguously address vacancies. The State cites no authority to the contrary.

Presidents have consistently and explicitly invoked their FVRA authority to make acting-officer designations that would be barred if the office-specific statutes were to set out exclusive, mandatory succession plans, as the State suggests. Using their FVRA authority, multiple presidents have long provided for orders of succession for offices covered by office-specific statutes and individually designated someone other than the deputy designated in an office-specific statute to serve

---

[2] *See, e.g.*, 5 U.S.C. app. 1, Reorganization Plan No. 1 of 1953 § 2 (Health and Human Services); 5 U.S.C. app. 1, Reorganization Plan No. 3 of 1970 § 1(c) (Environmental Protection Agency); 10 U.S.C. § 132(b) (Secretary of Defense); 15 U.S.C. § 633(b)(1) (Small Business Administration); 20 U.S.C. § 3412(a)(1) (Education); 29 U.S.C. § 552 (Labor); 31 U.S.C. § 301(c)(2) (Treasury); 42 U.S.C. § 7132(a) (Energy).

as the acting agency head.[3]  Notably, such FVRA designations have even bypassed the extant deputy designated in the office-specific statute.[4]  Of particular relevance to this case, the President designated the Assistant Attorney General for the Civil Division in 2007 to act as Attorney General, even though the Solicitor General was available under the section 508 succession order.  *See Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208, 208 (2007) (2007 OLC Op.).  At no point have these office-specific statutes been read to preclude such presidential designations.

This record of executive practice is consistent with the Office of Legal Counsel's longstanding and publicly expressed interpretation of the FVRA.  *See, e.g.*, OLC Op.; Mem. from Steven A. Engel, Asst. Att'y Gen., to Donald F. McGahn II, Counsel to the President, *Designating an Acting Director of the Bureau of Consumer Financial Protection*, at 4-8 & nn. 2-3 (Nov. 25, 2017); 2007 OLC Op.; *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 121 n.1 (2003).  On four occasions in the past fifteen years, OLC has formally opined in published opinions that office-specific statutes regarding an acting officer provide a route to designate an acting officer without displacing the President's FVRA options.  OLC's conclusion that section 508 does not preclude the President's

---

[3] *See, e.g.*, *Providing an Order of Succession Within the Department of Defense*, Exec. Order No. 13,394, 70 Fed. Reg. 76,665 (Dec. 22, 2005); *Providing an Order of Succession Within the Department of Defense*, Exec. Order No. 13,533, 75 Fed. Reg. 10,163 (Mar. 1, 2010); 5 U.S.C. § 3345 note (listing succession plans established under the FVRA for the Departments of Labor, Treasury, Health and Human Services, the Environmental Protection Agency, the Office of Personnel Management, the Office of the Director of National Intelligence, and the National Archives and Records Administration); *see also* Presidential Designations of John Whitmore (Small Business Administration, Feb. 2, 2001), Marianne Horinko (Environmental Protection Agency, July 11, 2003, effective July 12, 2003), James Lambright (Export-Import Bank, July 14, 2005, effective July 21, 2005), Beth Cobert (Office of Personnel Management, July 10, 2015), Joseph Loddo (Small Business Administration, Jan. 17, 2017, effective Jan. 20, 2017), Grace Bochenek (Energy, Jan. 17, 2017, effective Jan. 20, 2017), Norris Cochran (Health and Human Services, Jan. 17, 2017, effective Jan. 20, 2017), Edward Hugler (Labor, effective Jan. 20, 2017), Adam Szubin (Treasury, Jan. 17, 2017, effective Jan. 20, 2017), John "Mick" Mulvaney (CFPB, Nov. 24, 2017, effective Nov. 25, 2017).

[4] For example, on August 11, 2008, the President designated Michael Hager, Assistant Secretary of Veterans Affairs, to serve as Acting Director of the Office of Personnel Management, notwithstanding that Howard Weizmann was Deputy Director.  Similarly, on August 13, 2008, the President designated Santanu Baruah, Assistant Secretary of Commerce for Economic Development, as Acting Administrator of the Small Business Administration, notwithstanding that Joyita Carranza was Deputy Administrator.

authority to designate Mr. Whitaker under the FVRA is firmly rooted in that office's well-established precedent, including its 2007 opinion on the President's authority to name an Acting Attorney General.

In conclusion, section 508 and the FVRA are best read in harmony, not in tension, and to allow the President to designate an Acting Attorney General. The President validly exercised that authority here and Mr. Whitaker is a permissible designee under the terms of the FVRA.

### B. The Presidential designation of Mr. Whitaker as Acting Attorney General does not violate the Appointments Clause.

The State argues that the President's "appointment" of Mr. Whitaker as Acting Attorney General violates the Appointments Clause, because the clause requires a Senate-confirmed individual to perform the functions of Attorney General, even temporarily. Mot. at 23. That is incorrect.

The State's position begins and ends with the undisputed propositions that the Appointments Clause requires principal officers to be Senate-confirmed and "that the Attorney General is a principal officer" because he holds a continuing office and reports only to the President. Mot. at 23. But none of that answers the question presented here, because it does not inevitably follow that an individual who *temporarily* performs the functions of a principal office in an *acting* capacity is also a principal officer. Given the absence of any express instruction in the Appointments Clause, "historical practice" on this question implicating the separation of powers is entitled to "significant weight." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014); *see also Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of State of Wash. v. United States*, 279 U.S. 655, 689 (1929). And here, there is ample—indeed, decisive—historical practice and precedent from *all three* branches of government that temporary designation as an acting agency head does not require the Senate's advice and consent because the individual does not thereby become a principal officer.[5]

---

[5] This Court need only decide that an acting principal officer is not himself a principal officer. It is unnecessary to further decide whether the temporary nature of the position renders it an inferior office (*cf. Morrison v. Olson*, 487 U.S. 654, 672 (1988)); or not an office at all (*cf. Auffmordt v. Hedden*, 137 U.S. 310, 326-27 (1890)), because the State does not dispute that the President's designation of Mr. Whitaker satisfies the Appointments Clause's requirements for an inferior officer.

**1.   Several acts of Congress passed in three different centuries have authorized the designation of acting principal officers who are not Senate confirmed.**

Starting almost immediately after the Founding, Congress repeatedly has "authoriz[ed] the President to direct certain officials to temporarily carry out the duties of a vacant PAS office [*i.e.*, one requiring Presidential Appointment and Senate confirmation] in an acting capacity, without Senate confirmation." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 934, (2017).  The first of these statutes was enacted in 1792 when Congress "authorized the appointment of 'any person or persons' to fill specific vacancies in the Departments of State, Treasury, and War." *Id.* at 935 (quoting Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281).  The statute expressly applied to vacancies in the position of Secretary in these three Departments—indisputably principal officers.  *See* Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.  And it authorized the President to choose "any person" to fill such a vacancy—regardless of whether the "person" had been Senate-confirmed or even held any federal office—"until the permanent officeholder could resume his duties or a successor was appointed." *SW General*, 137 S. Ct. at 935.

The Act of May 8, 1792 is of special importance, as "early congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'" *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (quoting *Printz v. United States*, 521 U.S. 898, 905 (1997)).  "[T]he 'construction placed upon the Constitution'" by the Second Congress in the 1792 Act, "'many of whom were members of the convention which framed it, is of itself entitled to very great weight.'" *Golan v. Holder*, 565 U.S. 302, 321 (2012) (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884)).  Here, the Second Congress's enactment of the 1792 Act reflects a clear understanding that the Constitution does not compel Senate confirmation for persons who are merely authorized to temporarily carry out the duties of a vacant principal office in an acting capacity.

Congress has consistently followed that understanding to this day.  In 1795, Congress amended the 1792 Act to "impose[ ] a six-month limit on acting service," *SW General*, 137 S. Ct. at 935 (citing Act of Feb. 13, 1795, ch. 21, 1 Stat. 415), and in 1863, Congress extended the act to all vacancies in the office of "the head of any Executive Department of the Government, or of any officer

of either of the said Departments whose appointment is not in the head thereof," Act of Feb. 20, 1863, ch. 45, § 1, 12 Stat. 656, 656.

In 1868, Congress enacted the Vacancies Act, which provided that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head." Act of July 23, 1868, ch. 227, § 1, 15 Stat. 168; *see also id.* § 3, 15 Stat. at 168 (specifying a ten-day time limit in cases of death or resignation). Although the Vacancies Act further authorized the President to bypass the "first assistant" default rule and designate any Senate-confirmed official to fill the vacancy, *see id.*, the statute's default rule preserved the possibility that a non-Senate-confirmed "first assistant" would act as head of an Executive Department.

Over the next 120 years, Congress repeatedly amended the Vacancies Act to extend the time limits for acting service, but never eliminated the possibility that non-Senate-confirmed first assistants could serve as acting agency heads. In fact, in 1988, Congress amended the statute to cover principal offices that are not in "Departments" and thus are less likely to have Senate-confirmed first assistants. Pub. L. No. 100-398, § 7(b), 102 Stat. 985, 988 (1988).

As discussed, in 1998, Congress replaced the Vacancies Act with the FVRA, which applies to nearly all executive Senate-confirmed offices, including agency heads. *See* 5 U.S.C. § 3345(a); *see id.* § 3349c(1)-(3) (excluding only certain members of multi-member boards, commissions, or similar entities). Out of the three designation methods in the FVRA, two of them unambiguously authorize non-Senate-confirmed individuals to serve as acting principal officers: (1) non-Senate-confirmed first assistants under section 3345(a)(1); and (2) "officer[s] or employee[s]" under section 3345(a)(3). And in addition to the FVRA, Congress has enacted multiple statutes that enable the temporary service of non-Senate-confirmed individuals when the office of a Senate-confirmed agency head is vacant.[6] For

---

[6] *See, e.g.*, 12 U.S.C. § 4512(f) (Federal Housing Finance Agency); *id.* § 5491(b)(5) (CFPB); 20 U.S.C. § 3412(a)(1) (Education); 21 U.S.C. § 1703(a)(3) (Office of National Drug Control Policy); 31 U.S.C. § 502(f) (Office of Management and Budget); 38 U.S.C. § 304 (Veterans Affairs); 40 U.S.C. § 302(b) (General Services Administration); 42 U.S.C. § 7132(a) (Energy); 44 U.S.C. § 2103(c) (Archives); 49 U.S.C. § 102(e) (Transportation). .

example, consider the example of the CIA.  Despite the State's erroneous assertion (Mot. 3, 4, 12-13), the CIA's Deputy Director is not Senate confirmed.  *See* 50 U.S.C. § 3037(a).  Thus, when the CIA Director was sworn-in as the Secretary of State on April 26, 2018, the Deputy Director (who had been appointed by President Trump, without the Senate's advice and consent) assumed the role of Acting Director.  She continued to perform as Acting Director until May 21, 2018, when she was sworn-in as Director after Senate confirmation and appointment.  *See* https://www.cia.gov/news-information/press-releases-statements/2018-press-releases-statements/gina-haspel-assumes-role-of-acting-director-of-cia.html;  https://www.cia.gov/news-information/blog/2018/gina-haspel-sworn-in-as-first-female-cia-director.html

The uninterrupted legislative practice of authorizing acting officers to perform the duties associated with a temporarily vacant principal office and not limiting the pool of eligible individuals to those who already have Senate-confirmed offices strongly supports the constitutionality of Mr. Whitaker's designation as Acting Attorney General.  Indeed, if the State were correct that only Senate-confirmed officers could temporarily serve as *acting* principal officers, then Congress's continuous legislative practice at least from 1792 until 2010 would have violated the Constitution.

## 2. The Executive Branch has repeatedly designated acting principal officers who are not Senate confirmed.

The Executive Branch has repeatedly exercised its authority under the statutes enacted by Congress to fill vacancies in principal offices with individuals other than Senate-confirmed officers. In fact, in a historical "non-exhaustive survey," OLC identified "over 160 occasions between 1809 and 1860 in which non-Senate-confirmed persons served temporarily as an acting or ad interim principal officer in the Cabinet."  OLC Op. at 10.[7]  In 1809, for example, President Jefferson

---

[7] Most of the 161 examples identified in the OLC opinion were listed in the evidence that was admitted during the impeachment trial of President Andrew Johnson.  See 1 *Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors* 575-88 (Washington, GPO 1868).  Although that evidence included more than 161 uses of the statutes, OLC did not include instances that involved persons who already held another Senate-confirmed office, such as Commissioner of Indian Affairs,

designated John Smith, a non-Senate-confirmed chief clerk of the Department of War, to serve in his Cabinet as ad interim Secretary of War.  OLC Op. at 13 (citing *Biographical Directory of the American Congress, 1774–1971*, at 14 (1971)).  Non-Senate-confirmed chief clerks served temporarily as acting or ad interim Secretary of State (on fifty-one occasions), Secretary of the Treasury (on thirty-six occasions), Secretary of War (on twenty-two occasions), Secretary of the Navy (on twenty-one occasions), and Secretary of the Interior (on two occasions).  *See id.* at 13-14.  And non-Senate-confirmed Assistant Secretaries were authorized at least twenty-one times to serve as acting Secretary of the Treasury and four times as ad interim Postmaster General.  *See id.* at 14, 15.  As President Buchanan stated in 1861, the "perfect lawfulness" of these temporary designations—where "[s]ometimes, the temporary officer was the commissioned head of another department," and "*sometimes a subordinate in the same department*"—"ha[d] never, to [his] knowledge, been questioned or denied."  Message from the President of the United States, 36th Cong., 2d Sess., Exec. Doc. No. 2, at 2 (1861) (Buchanan's 1861 Message) (emphasis added).

Some of the temporary designations in the nineteenth-century lasted only a day or a few days, but others lasted for weeks or even months.  For example, after the resignation of Henry Dearborn, John Smith served as Secretary of War for a 50-day period in 1809.  *See Biographical Directory* at 14.  During the Madison and Monroe Administrations, George Graham, another chief clerk of the Department of War, served as ad interim Secretary of War for more than a year—from October 1816 until December 1817.  *Id.* at 15.  Asbury Dickins, the chief clerk in the Department of the Treasury, served as ad interim Secretary of the Treasury for 48 days in 1831.  *Id.* at 16; *In re Asbury Dickins*, 34th Cong., 1st Sess., Rep. C.C. 9, at 4 (Cl. 1856).  And McClintock Young, another chief clerk in the Department of the Treasury, served as ad interim Secretary of the Treasury for more than two months after the resignation of Secretary John C. Spencer in 1844.  *See Biographical Directory* at 17.  Similarly, periods of *acting* service—that is, those that occurred while the principal officeholder was ill or away from Washington—sometimes lasted several weeks or months.  For instance, Asbury Dickins served

---

officer in the Army or Navy, Assistant Secretary of State, or Assistant Secretary of the Treasury (after that position became subject to Senate confirmation in March 1857).

three separate stints of more than 40 days as acting Secretary of State in 1835 and 1836.  *In re Asbury Dickins*, Rep. C.C. 9, at 5.  During at least two of those stints, the incumbent Secretary of State was visiting his home state of Georgia.  *See* Alvin Laroy Duckett, *John Forsyth: Political Tactician* 181, 197 (1962).  At such times, there was no material difference, for purposes of the constitutional analysis, between an acting and an ad interim Secretary.  In either case, there was no principal officer available to supervise how the temporary designee carried out the functions and duties of the office.  Indeed, if the principal were available, there would not have been a need to designate somebody for a temporary period.

Moreover, even when such temporary designations occurred during a recess of the Senate, it is clear that they were not being seen as being appointments under the Recess Appointments Clause. They were not phrased as lasting until "the End of [the Senate's] next Session," as would be the case with a recess appointment.  U.S. Const. art. II, § 2, cl. 3.  Instead, they were described as lasting only until the appointment or arrival of a successor or until the principal's period of unavailability ended.[8] Indeed, George Graham's October 1816 appointment by President Madison as ad interim Secretary of War occurred during a recess of the Senate, but it was evidently not treated as a recess appointment, because he continued to serve for several months after two entire sessions of the Senate had come and gone.[9]  In addition, when the next permanent appointee was nominated, the position was generally either described as being "vacant," or as being in the place of the previous permanent officeholder rather than the ad interim one.[10]  Thus, President Buchanan was on solid ground when he explained

---

[8] *See, e.g.*, 1 *Trial of Andrew Johnson* at 574-76 (reprinting or paraphrasing orders for Aaron O. Dayton (June 28, 1837), Jacob L. Martin (Oct. 16, 1837), John Boyle (May 12, 1831), and Asbury Dickins (June 21, 1831)).

[9] *See* 1 *Trial of Andrew Johnson* at 594-95 (listing dates of intervening Senate sessions).  John C. Calhoun was recess-appointed as Secretary of War in October 1817, but he did not enter upon the duties of the office until December 10, 1817, ten days into the *third* Senate session after Graham's appointment. *See id.* at 594; *Biographical Directory* at 15.

[10] When Navy Chief Clerk Charles Hay was serving as ad interim Secretary of the Navy at the beginning of the Jackson Administration, *see Biographical Directory* at 16, President Jackson's nomination of John Branch described the position of Secretary as "being now vacant."  S. Exec. J., 21st Cong., Special Sess. 8 (Mar. 9, 1829).  When Secretary of the Treasury Spencer resigned on May 2, 1844, President Tyler appointed McClintock Young to perform the duties of the Secretary until a successor could be

that Presidents had used their statutory authority to name temporary officials "whether in a vacation or during the session of Congress." Buchanan's 1861 Message at 2.

More recent examples in which non-Senate-confirmed officers have been designated to act in the place of principal officers include: (1) the Comptroller General's authority to "designate an employee" of the General Accounting Office to be Acting Comptroller General, OLC Op. at 22 (citation omitted); (2) ten memoranda by Presidents George W. Bush and Barack Obama placing Chiefs of Staff in the lines of succession to be acting heads of agencies, and three executive orders by President Obama placing a Chief of Staff above at least one confirmed officer within the same department, *see id.* at 22-23 & nn.13-14; and (3) nine presidential designations over the past three administrations of non-confirmed officials, including a Chief of Staff, serving as acting principal officers, *see id.* at 23 n.15.

The office of Attorney General, while historically unusual in some practical respects, presents no unique features suggesting any different constitutional treatment. Unlike some of the other members of the President's Cabinet, the Attorney General did not supervise an "executive department" until 1870 when the Department of Justice was established. *See* Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162. And because the Attorney General was not head of an "executive department," his office was not subject to the terms of the 1792, 1795, or 1863 statutes, or the Vacancies Act of 1868. Nonetheless, in 1854, Attorney General Cushing noted that the President had made "temporary appointment[s]" to the office of Attorney General. *Office and Duties of Atty. Gen.*, 6 Op. Att'y Gen. 326, 352 (1854). And although it was "questionable" whether the President had the statutory authority, Attorney General Cushing opined that perhaps "the power to make such temporary appointment is a constitutional one." *Id.* He recommended that Congress enact a vacancy statute specific to the office of Attorney General, which Congress eventually did when it enacted the predecessor of section 508 as part of the Department of Justice's 1870 organic statute.

---

appointed and qualified. *See Trial of Andrew Johnson* at 579. When Tyler nominated George M. Bibb, more than six weeks later, to be the Secretary, he specified that Bibb was being nominated "vice John C. Spencer, resigned"—not in place of Young. *See* S. Exec. J., 28th Cong., 1st Sess. 349 (June 15, 1844).

In fact, Presidents designated Acting Attorneys General both before and after the 1854 Cushing opinion and some of those designations included non-Senate-confirmed individuals. In July 1866, for example, non-Senate-confirmed Assistant Attorney General J. Hubley Ashton served as ad interim Attorney General following Attorney General Speed's resignation. *See* OLC Op. at 17 (citing *Acting Attorneys General*, 8 Op. O.L.C. 39, 41 (1984)).[11] In addition, between 1859 and 1868, non-Senate-confirmed Assistant Attorneys General signed several formal legal opinions as "Acting Attorney General" in instances when the incumbent Attorney General apparently was absent or unavailable. *See id.* at 17-18 & n. 11. Because the Vacancies Act of 1868 did not authorize the presidential designation of a non-Senate-confirmed Acting Attorney General, *see* 5 U.S.C. § 3347 (1994), there is no Attorney General-specific practice of non-Senate-confirmed officials serving in an acting capacity under that statute.

Ultimately, the office of Attorney General is not constitutionally different from other principal offices, particularly those in the Cabinet and other executive departments. These principal offices have been subject to the longstanding and consistent executive practice of authorizing their functions to be temporarily performed by non-Senate-confirmed persons, including numerous chief clerks and chiefs of staff. Again, for the State to establish a likelihood of success on the merits, this Court would have to conclude that all of these presidential designations dating back to 1809 were unconstitutional.

### 3. Supreme Court precedent has ratified the designation of acting principal officers who are not Senate confirmed.

---

[11] As with the other Cabinet positions discussed in the preceding footnote, ad interim Attorneys General were not seen as filling the actual position of Attorney General. The next permanent Attorneys General were described as being nominated in place of the Attorneys General who had resigned, not of the ad interim Attorneys General. *See* S. Exec. J., 30th Cong., 1st Sess. 429 (June 15, 1848) (nominating Isaac Toucey "to be Attorney-General of the United States, in the place of Nathan Clifford, resigned"); 3 *The Diary of James K. Polk During His Presidency, 1845 to 1849*, at 393 (Milo Milton Quaife ed. 1910) (diary entry for Mar. 20, 1848, noting appointment of Secretary of the Navy John Y. Mason as "Acting Atto. Gen'l of the U. S. *ad interim*"); S. Exec. J., 39th Cong., 1st Sess. 994 (July 20, 1866) (nominating Henry Stanbery "to be Attorney General of the United States, to fill the vacancy occasioned by the resignation of James Speed," even though Assistant Attorney General Ashton had been serving as ad interim Attorney General since July 17).

In the nineteenth century, courts recognized the well-settled legislative and executive practice of authorizing unconfirmed chief clerks to act as heads of departments by approving their entitlement to payment for their temporary services as acting principal officers.  *See, e.g.*, *In re Asbury Dickins*, 34th Cong., 1st Sess., Rep. C.C. 9, at 17, 1856 WL 4042, at *3 (Ct. Cl. 1856) (finding that chief clerk was entitled to additional compensation for services "as acting Secretary of the Treasury and as acting Secretary of State").

These decisions sometimes considered Appointments Clause issues.  In *In re Cornelius Boyle*, the Court of Claims held that a non-confirmed chief clerk of the Navy had properly served as Acting Secretary of the Navy and that, under the Constitution, there was a difference between the office of Secretary and that of Acting Secretary because of the latter's "temporary" character.  34 Cong. Rep. C.C. 44, at 8, 1857 WL 4155, at *1-*3 (1857).  For that reason, the *Boyle* Court concluded, the presidential designation of a non-confirmed "Secretary *ad interim*" to perform the functions of that principal office was "in perfect consistency with the Constitution of the United States." *Id.*

In 1898, the Supreme Court in *United States v. Eaton* likewise considered whether the Appointments Clause permits the designation of a non-confirmed subordinate officer "charged with the duty of temporarily performing the functions" of a principal officer.  169 U.S. 331, 343 (1898).  In that case, Lewis Eaton, a missionary who was not employed by the federal government, was appointed as vice-consul-general and directed to take over the consulate after the consul-general's departure.  *Id.* at 331-32.  Eaton then took charge of the consulate as "acting consul general of the United States at Bangkok" for almost a year.  *Id.* at 332-33.  In a dispute over salary payments, the constitutionality of Eaton's appointment was challenged and the Court upheld both Eaton's appointment and the underlying statutory scheme providing for his appointment.  *Id.* at 334-35, 352.  Specifically, the Supreme Court concluded that, although "Consuls" are principal officers requiring Senate confirmation, U.S. Const. art. II, § 2, cl. 2, Eaton's "performance of the duty of the superior for a limited time, and under special and temporary conditions" did "not thereby transform[ ] [him] into the superior and permanent official." *Eaton*, 169 U.S. at 343.

The State attempts to limit the holding of *Eaton* to the facts presented, arguing that *Eaton* only applies to cases involving true "exigent circumstances," such as having to "temporarily fill the vacancy of a consular post on the other side of the world."  Mot. at 25.  But there are a number of problems with the State's contention.

First, *Eaton* itself made clear that its holding was not limited to the exigencies of Eaton's particular appointment.  Rather, the Supreme Court stated that if non-confirmed inferior officers were "transformed" into principal officers by virtue of their temporary service, such a holding "would render void any and every delegation of power to an inferior to perform *under any circumstances or exigency* . . . and the discharge of administrative duties would be seriously hindered."  *Eaton*, 169 U.S. at 343 (emphasis added).

Second, the reasoning of *Eaton* extended well beyond the particular facts presented in that case.  The *Eaton* Court explained that Congress's "manifest purpose" in distinguishing between consuls and vice-consuls was to "limit the period of duty to be performed by the vice-consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word."  169 U.S. at 343.  Thus, the "special and temporary conditions" recognized in *Eaton* were not the particular exigency presented in that case, but the limits of the then-regulatory scheme, which permitted service in any case of "the absence or the temporary inability of the consul," whatever the cause.  *Id.* at 342-43; *see also id.* at 341.  In view of the long history of appointments providing for the temporary performance of a principal office, *Eaton* simply confirmed the general rule that such appointments do not "transform[ ]" the acting official "into the superior and permanent official" requiring the Senate's confirmation.  169 U.S. at 343-44 (relying on Attorney General Cushing's 1855 opinion regarding the longstanding practice on the appointment of consular officials) (citing *Appointment of Consuls*, 7 Op. Att'y Gen. 242, 262 (1855)).  In other words, the *Eaton* Court reached the same conclusion as the *Boyle* court—that temporarily performing the duties of a principal office is not the same as holding the office itself.  And this general rule has applied historically to all sorts of principal offices, not just Consuls exercising foreign policy authority or facing exigent circumstances, as the State claims.

Third, the Supreme Court's subsequent decisions have not read *Eaton* so narrowly. Instead, they have cited it repeatedly for the proposition that temporarily performing the duties of a principal office does not make one a principal officer. *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 661-63 (1997); *Morrison v. Olson*, 487 U.S. 654, 672-73 (1988).

Finally, the State is incorrect that Justice Thomas's concurrence in *SW General* suggests that *Eaton* "must be confined to truly-exigent, and time-limited, circumstances." Mot. at 26 (citing *SW General*, 137 S. Ct. at 949 & n.1 (Thomas, J., concurring)). Justice Thomas distinguished *Eaton* on the ground that the acting designation in *SW General* was not "special and temporary" because it had remained in place "for more than three years in an office limited by statute to a 4-year term." *SW General*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring). At no point did Justice Thomas assert the need for a particular "emergency" to justify the invocation of *Eaton*. Rather, his observation is consistent with Defendants' view that a presidential designation of an acting principal officer "should not continue beyond a reasonable time." *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287, 289-90 (1977). Indeed, *Eaton* upheld the constitutionality of a designation that lasted 310 days. 169 U.S. at 332-33. By comparison, Mr. Whitaker's designation under the FVRA is unquestionably valid, as it is not even a month old and is subject to section 3346(a)(1)'s 210-day time limitation, subject to potential statutorily permitted extensions, absent the confirmation of a permanent successor.

In conclusion, the general rule confirmed by *Eaton*, and quoted with approval in subsequent Supreme Court decisions, forecloses the State's contrary position here.

### 4. Serious practical consequences and constitutional concerns militate against the State's proposed constitutional rule.

The State's position that acting service in a principal office requires a Senate-confirmed officer despite its temporary nature raises several concerns. Although Senate confirmation undoubtedly serves an important constitutional check on the President's selection of individuals to assist him in faithfully executing the laws, *see Edmond*, 520 U.S. at 659, the more-than-two-century-long tradition of temporary service by acting agency heads without Senate confirmation reflects agreement between the

political branches that this practice is not only permissible, but in fact essential to overcome the frequent and unavoidable delays inherent in the confirmation process.

If the State were correct that the Constitution requires Senate confirmation for acting officials serving temporarily in principal offices, the proper functioning of the Executive Branch and the President's constitutional responsibility to "take care" that the laws are faithfully executed would be seriously compromised. *Eaton*, 169 U.S. at 343 (explaining that a holding that an acting consul is a principal officer would "seriously hinder[ ]" "the discharge of administrative duties"). As the State concedes, "during transitions between presidential administrations" there are often few, if any, "Senate-confirmed official[s]" available to serve, Mot. at 15-16 n.1, which is precisely one of the reasons why Congress chose to authorize the President to designate non-confirmed individuals as acting principal officers. 144 Cong. Rec. 27496 (Oct. 21, 1998) (statement of Sen. Thompson). Moreover, the problems with the State's proposed constitutional rule extend beyond the beginning of a new presidential administrations. In contrast to the Department of Justice, which is staffed by multiple Senate-confirmed officials, many federal agencies are staffed with only one. If the State were correct in its interpretation of the Appointments Clause, then it is certainly possible that, when a vacancy in the top spot of an agency arises, such agency could remain without a head or be forced to rely upon reinforcements from confirmed appointees from other agencies. Indeed, the CFPB is such an agency, and yet, in the recent litigation concerning whether the President permissibly invoked his FVRA authority to designate as Acting CFPB Director OMB Director Mulvaney rather than Deputy CFPB Director English, neither any party nor any court suggested that Ms. English's service would be unconstitutional because she, unlike Mulvaney, was not Senate-confirmed.

Appointing an outside (and perhaps unfamiliar) Senate-confirmed officer could interfere with the efficiency of the agency's operations, thereby evoking Congress's concern "about designating too many Senate-confirmed persons from other offices to serve as acting officers in additional positions." 144 Cong. Rec. 27496 (Oct. 21, 1998) (statement of Sen. Thompson). It is also questionable why designation of an individual confirmed by the Senate to some *other* office, particularly in a *different* agency, would satisfy the purported requirement of Senate confirmation as acting agency head, at least

absent some sort of "germaneness" requirement (*cf. Weiss v. United States*, 510 U.S. 163, 174-75 (1994)), that would again significantly narrow the pool of possible acting officers.

The inapplicability of these concerns to current DOJ circumstances is irrelevant. The availability of potential Senate-confirmed alternatives does not disable Congress from providing the President the discretion to pursue a different alternative as an acting agency head. Nothing in the text or history of the Appointments Clause suggests that the President may designate a non-confirmed individual as a temporary acting principal officer if, *but only if*, there is no Senate-confirmed officer available. Nor do the text or history of the Appointments Clause differentiate the office of Attorney General from other principal offices. Thus, because the State's position must apply to *all* principal offices, its proposed constitutional rule would undermine the President's ability to ensure the faithful execution of the law, especially given the limited availability of recess appointments. *See Noel Canning*, 134 S. Ct. at 2566-67 (President may presumptively use recess-appointment power only during Senate recess of 10 days or longer). In the face of a 200-year understanding between Congress and the President—one repeatedly confirmed by the Supreme Court—the Court should conclude that historical practice and precedent confirm the constitutionality of the President's designation.

## III. THE STATE'S LACK OF IRREPARABLE HARM, THE BALANCE OF EQUITIES, AND THE PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF.

Apart from likelihood of success on the merits, the State must show that it faces "irreparable harm" absent a preliminary injunction, that any alleged harm to it outweighs countervailing harms to the Government, and that the injunction sought is in the public interest. *Winter*, 555 U.S. at 20. The State cannot make those required showings.

To satisfy the irreparable harm element, the State must show harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel*, 952 F.2d at 812. And it must be "*likely* in the absence of an injunction," not merely possible. *Winter*, 555 U.S. at 22. Moreover, the purpose of injunctive relief is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The irreparable harm standard

"erects a very high bar for a movant," *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012), with a threshold well above the injury required for Article III standing.  *See, e.g., Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1508, *amended*, 66 F.3d 1226 (D.C. Cir. 1995); *Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).

For the same reasons it cannot establish injury in fact sufficient to confer Article III standing, the State cannot establish irreparable harm.  The harms it has alleged concerning the Department's conduct of this lawsuit and its litigation position concerning the ACA are both speculative and legally baseless.  Moreover, were any of them to come to fruition, this Court could address them at that time.

Likewise, the State fails to show that any alleged harm outweighs the harm a preliminary injunction would cause the Government, or that "an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These factors merge where, as here, the Government is the opposing party.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 331 (4th Cir. 1986) (noting that "the public interest and the potential harm to the government [may] coincide").  In analyzing the factors, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).  And where Congress has legislated based on its considered view of the public interest, a court's "consideration of the public interest is constrained . . . for the responsible public officials . . . have already considered that interest."  *Golden Gate Rest. Ass'n v. City & Cty of S.F.*, 512 F.3d 1112, 1126-27 (9th Cir. 2008); *see also Serono Labs. Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (the public interest is "inextricably linked" to the congressional purpose).  Here, the equities and public interest weigh heavily against the extraordinary relief of setting aside the President's designation of an Acting Attorney General, which was undertaken pursuant to a statutory scheme established by Congress and consistent with the longstanding practice and precedent of all three branches of government.

## **CONCLUSION**

For the reasons set forth above, the Court should deny the State's motion for preliminary injunction or substitution.

Dated: December 3, 2018                                         Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

HASHIM M. MOOPPAN
BRETT A. SHUMATE
Deputy Assistant Attorneys General

JENNIFER D. RICKETTS
Branch Director

JEAN LIN
Acting Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

/s/ *Tamra T. Moore*
TAMRA T. MOORE
CESAR A. LOPEZ-MORALES
REBECCA CUTRI-KOHART
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel:
Email:

*Counsel for Defendants*