# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | * |  |
| BARRY MICHAELS, | | |
| 43 Diamond Run Street | * | |
| Las Vegas, NV 89148, | | |
| *Plaintiff*, | * | |
|  |  |  |
| v. | * | |
|  |  |  |
| MATTHEW G. WHITAKER, IN HIS | * | |
| OFFICIAL CAPACITY, | | |
| 950 Pennsylvania Avenue, N.W., | * | |
| Washington, D.C. 20530; | | |
|  | * | |
| ROD J. ROSENSTEIN, IN HIS | | |
| OFFICIAL CAPACITY, | * | |
| 950 Pennsylvania Avenue, N.W., | | |
| Washington, D.C. 20530; | * | |
|  |  |  |
| NOEL J. FRANCISCO, IN HIS | * | |
| OFFICIAL CAPACITY, | | |
| 950 Pennsylvania Avenue, N.W., | * | Case No. 18-cv-2906 |
| Washington, D.C. 20530; | | |
| *Defendants*. | * | |
|  |  |  |
| AND | * | |
|  |  |  |
| BARRY MICHAELS, *ex rel.* UNITED | * | |
| STATES OF AMERICA, | | |
| 43 Diamond Run Street | * | |
| Las Vegas, NV 89148, | | |
| *Plaintiff*, | * | |
|  |  |  |
| v. | * | |
|  |  |  |
| MATTHEW G. WHITAKER, IN HIS | * | |
| OFFICIAL CAPACITY, | | |
| 950 Pennsylvania Avenue, N.W., | * | |
| Washington, D.C. 20530, | | |
| *Defendant*. | * | |
|  |  |  |

*   *   *   *   *   *   *   *   *   *   *   *   *

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.    Constitutional and Statutory Framework ................................................................. 2

I.    Factual Background. ................................................................................................. 9

SUMMARY OF THE ARGUMENT ................................................................................ 12

ARGUMENT .................................................................................................................... 15

I.    The President's Designation of Matthew Whitaker Violated the Appointments
      Clause.................................................................................................................... 15

      A.   The President unconstitutionally assigned the Attorney General's responsibilities
           to a non-officer.............................................................................................. 17

      B.   The President's designation of Mr. Whitaker violated the Appointments Clause
           because he is serving as a principal officer.................................................... 21

      C.   The Government's arguments defending Mr. Whitaker's service under the
           Appointments Clause are non-responsive...................................................... 23

II.   Applying the canon of constitutional avoidance, the Vacancies Act is fairly read not
      to give the President the power to appoint a non-confirmed official in these
      circumstances......................................................................................................... 24

      A.   The AG Act automatically designates the Deputy Attorney General as the Acting
           Attorney General............................................................................................ 27

      B.   The Government's contrary arguments are unpersuasive................................. 32

CONCLUSION.................................................................................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Buckley v. Valeo,*
   424 U.S. 1 (1976)..................................................................................... 2, 17

\*Edmond v. United States,*
   520 U.S. 651 (1997),................................................ 2, 4, 17, 21, 22

*English v. Trump,*
   279 F. Supp. 3d 307 (D.D.C. 2018) ........................................... 34

*Freytag v. Comm'r,*
   501 U.S. 868 (1991) ..................................................................... 16

*Hooks v. Kitsap Tenant Support Servs., Inc.,*
   816 F.3d 550 (9th Cir. 2016) ...................................................... 33

\*Lucia v. S.E.C.,*
   138 S. Ct. 2044 (2018)................................................................ 2, 21

*NLRB v. SW Gen., Inc.,*
   137 S. Ct. 929 (2017).................................................................. 25

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) .................................................................... 29

*Shoemaker v. United States,*
   147 U.S. 282 (1892).................................................................... 21

\*United States v. Eaton,*
   169 U.S. 331 (1898).............................................................. 3, 22, 26

*United States v. Peters,*
   No. 6:17-CR-55-REW-HAI-2, 2018 WL 6313534 (E.D. Ky. Dec. 3, 2018).......................... 34

*United States v. Valencia,*
   No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018)........................ 34

*Weiss v. United States,*
   510 U.S. 163 (1994)..................................................................... 18

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ............................................................... 19, 25

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ..................................................... 2, 3

## Statutes

5 U.S.C. § 3345................................................. 3, 8, 12, 13, 20, 22

5 U.S.C. § 3346................................................................... 8

5 U.S.C. § 3347 (1994) .......................................................... 32

5 U.S.C. § 3347 ................................................................................................ 7, 13, 28

5 U.S.C. § 3348 .............................................................................................. 10, 12, 28

5 U.S.C. § 3349 ...................................................................................................... 32

10 U.S.C. § 132(b) ................................................................................................... 7

10 U.S.C. § 154(d) ................................................................................................... 7

15 Stat. 168 .............................................................................................................. 6

28 U.S.C. § 508 ...................................................................................... 7, 12, 22, 27

28 U.S.C. §§ 511-19 .............................................................................................. 27

38 U.S.C. § 304 ...................................................................................................... 30

40 U.S.C. § 302 ...................................................................................................... 30

42 U.S.C. § 902(b)(4) ............................................................................................ 30

50 U.S.C. § 3026(a) ................................................................................................. 7

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415 ............................................................... 5

Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162 ............................................ 6

Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 .................................................. 5

Rev. Stat. § 177 ....................................................................................................... 6

### Other Authorities

144 Cong. Rec. S12813 .......................................................................................... 32

145 Cong. Rec. S33 (Jan. 6, 1999) ........................................................................ 32

*Agency Reporting Requirements Under the Vacancies Reform Act* at 2 n.2 (Mar. 21, 2001) ................................................................................................................... 8

Alexandra Hutzler, *Donald Trump Will Fire Jeff Sessions After Midterms, Republicans Say*, Newsweek (Aug. 24, 2018), http://bit.ly/2rrHQLM ........................................ 10

Ashley Parker & Amy B. Wang, *Trump Criticizes Democrats, 'Russian witch hunt,' and Coastal Elites at Ohio Rally*, Wash. Post (Aug 4, 2018), https://wapo.st/2G7kzJ8; Pamela Brown *et al.*, *Trump Considering Firing Rosenstein to Check Mueller*, CNN Politics (Apr. 10, 2018) ..................................................................................... 10

*Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208, 208 (2007) ................................................................................................................... 9

*Black's Law Dictionary* (10th ed. 2014) ................................................................ 29

Br. of Morton Rosenberg as Amicus Curiae, *Maryland v. United States*, No. 1:18-cv-02849-ELH, ECF 22 (D. Md. Nov. 26, 2018) .................................................... 31

*Designating an Acting Attorney General*, 42 Op. O.L.C. __, at 1 (Nov. 14, 2018), slip op. passim

*Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 121 n.1 (2003) (*OMB O.L.C. Op.*) ........................................................... passim

Devlin Barrett, John Wagner & Seung Min Kim, *Trump and Sessions Feud Over the Direction of the Justice Department*, Wash. Post (Aug. 23, 2018), https://wapo.st/2RHxLWC .................................................................................. 10

Exec. Order No. 13,481 (Dec. 9, 2008) .......................................................................... 9

Exec. Order No. 13,762 (Jan. 13, 2017) ......................................................................... 9

Exec. Order No. 13,787 (Mar. 31, 2017) ........................................................................ 8

*Hearing on Defs.' Mot. to Dismiss & Pl.'s Mot. for Prelim. Inj.*, No. 1:18-cv-02849-ELH (D. Md. Dec. 19, 2018) ............................................................................................ 17

Letter from Thomas Jefferson to the War Department (Feb. 17, 1809), *Founders Online*, National Archives ................................................................................................... 20

## INTRODUCTION

In 1998, Congress enacted a new general vacancies law. Like its predecessors, this statute provides that when a Senate-confirmed officer is unable to serve, the officer's "first assistant"— the second in command—does so automatically. Moreover, the President may displace the first assistant with a Senate-confirmed official. But the 1998 statute also granted the President a new and novel power: the authority to displace the first assistant with a non-confirmed official, including even an ordinary employee.

In this case, the President used that power to displace a first assistant who was performing the functions of a "principal officer"—*i.e.*, an officer who reports exclusively to the President. No President had ever done that in the Nation's history. The question here is whether it was lawful.

Under the Constitution's Appointments Clause, the answer is: "no." If the first assistant is available to serve during the principal officer's unavailability, the President may not pick some other non-confirmed official to do so.

The Government's contrary position—reflected in an Opinion of the Office of Legal Counsel, reversing the original position of the White House Counsel—is deeply flawed. *See Designating an Acting Attorney General*, 42 Op. O.L.C. __, at 1 (Nov. 14, 2018), slip op. (*Whitaker O.L.C. Op.*), http://bit.ly/2B3ilF8. It requires nullifying the constitutional limits on the President's ability to install his own hand-picked choices to fill principal offices for his own reasons. The Government candidly admits that its view is that the Appointments Clause permits the President to replace any principal officer—the entire cabinet, and many others—with non-confirmed individuals, subject to no restriction whatsoever and when there is no necessity to do so. The President need only label each "designation" as "temporary," in the purely formalistic sense that

the President will someday submit some other permanent nominee for Senate confirmation. The founders could not have intended that result.

But the Court need not even reach that question. Although the 1998 Vacancies Act granted the President this power for the first time, the better view is that the Vacancies Act does not apply here. The Vacancies Act is inapplicable when another statute designates an acting official for a particular office. A federal statute specific to the Attorney General does just that.

## BACKGROUND

### I.    Constitutional and Statutory Framework

1. The Constitution's Appointment's Clause distinguishes "officers" from "employees." An officer is a (1) non-temporary official who (2) exercises significant discretion in administering the laws of the United States. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051-52 (2018) (citing *Buckley v. Valeo*, 424 U.S. 1 (1976)). Employees can be hired. But the Constitution requires that officers be "appointed." U.S. Const. art. II, § 2, cl. 2.

In turn, there are two types of officers—principal and inferior—which can require two different forms of appointment. "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond v. United States*, 520 U.S. 651, 662 (1997). Principal officers are those who only report directly to the President. *Id.* "The Attorney General is plainly a principal officer," given that office's "broad and continuing authority over the federal government's law-enforcement, litigation, and other legal functions" and the fact that "[t]here is no officer below the President who supervises the Attorney General." *Whitaker O.L.C. Op.* 9.

The appointment of principal officers requires nomination by the President and confirmation by the Senate. By contrast, for inferior officers, Congress has a choice: it can either

require Senate confirmation or it can instead permit the President, courts, or heads of executive departments to appoint them directly. U.S. Const. art. II, § 2, cl. 2.

2. By statute, every principal officer has a second in command, who is known in appointments law as a "first assistant." That subordinate's defined job responsibilities include *automatically* filling in *whenever* the principal is unavailable to serve—for example, when the principal is ill or away, or even if the office is vacant. *E.g.*, 5 U.S.C. § 3345(a)(1).

The Constitution does not require that a first assistant be confirmed, because the first assistant is an inferior, not a principal, officer—including during a time when the first assistant steps in for a principal officer who is, for example, sick. *United States v. Eaton*, 169 U.S. 331 (1898) (addressing "vice consuls" appointed by the Secretary of State, who served while consuls-general were sick, absent, or dead). The first assistant remains an inferior officer because the job is defined from the outset to require the temporary performance of the principal's duties, after which the first assistant automatically reverts to the role of reporting to the principal. The principal, in turn, may reverse any decisions the first assistant made in the interim. Those requirements "so limit the period of duty to be performed . . . and thereby deprive them of the character of [principal officers] in the broader and more permanent sense of the word." *Id.* at 343. Indeed, under any other rule, it would be impossible to delegate a principal officer's responsibilities. *Id.*

The first assistant remains an inferior officer despite the prospect that there will be a temporary period in which the office of the principal is vacant altogether, so that there actually is no supervisor for a time. The first assistant remains a subordinate because the first assistant's job is to perform the responsibilities of the principal officer automatically at *any* time, including in what is essentially an exigency—"for a limited time *and* under special and temporary conditions" in order to ensure the "unbroken performance of [the principal officer's] duties." *Id.* (emphasis

3

added). Despite the prospect that there will be no principal officer for some period, first assistants are not converted into a principal officer, because a first assistant still "[g]enerally speaking" has a supervisor. *Edmond*, 520 U.S. at 662.

3. The Supreme Court's understanding precisely tracks appointments practices in early American history. The second in command to various department heads regularly performed the principal's duties during periods of unavailability. Presidents understood that they could not temporarily assign the duties of principal officers to other non-confirmed officials, unless the first assistant was unavailable as well.

The first Congress created the original first assistant—known as the "Chief Clerk"—in several departments. Congress explicitly defined the position as an inferior officer. *See Edmond*, 620 U.S. at 663-64. The Chief Clerk was appointed by the department head. *Id.*

There are records of more than 100 instances in the period between the founding and 1873 (the year that temporary service by first assistants was explicitly codified, *see infra* at 6) in which a cabinet official or Postmaster General was ill or away. Consistently, either the Chief Clerk fulfilled the Secretary's responsibilities automatically or the President formally designated the Chief Clerk to serve. There also appear to have been three instances in which, because the Chief Clerk was himself unavailable, the President designated the Chief Clerk's subordinate. There was apparently only a single instance in all those formative decades in which the first assistant was available and the President nonetheless appointed a non-confirmed official of his own choice from outside that chain of command.

Moreover, Chief Clerks—but not other non-confirmed officials—exercised the same responsibility not only when the Secretary was ill or away, but also when the Office of the Secretary was vacant altogether. Without objection, Presidents repeatedly designated the Chief

Clerk—sometimes for the entire period until a confirmed Secretary took office. With only a single brief exception, a President never bypassed the first assistant to designate some other non-confirmed official of his own choosing to fill a vacancy in the Office of the Secretary.

The history is the same with respect to the Office of the Attorney General, specifically. In that early period in the Nation's history, there was no Department of Justice. The Assistant to the Attorney General was the equivalent of the first assistant. That official repeatedly stepped in when the Attorney General was ill or away; no other official did. *Whitaker O.L.C. Op.* 16-17.

There were also a number of periods in which the Office of the Attorney General was vacant. The President named a Senate-confirmed official or left the office vacant—once for seven months—rather than appointing a non-confirmed official. In 1866, the President finally named a non-confirmed official to fill a vacancy for the first time: the Assistant to the Attorney General.

4. Early congressional enactments similarly reflect the understanding that the President may not displace a first assistant with a non-confirmed official—including with respect to the Attorney General. The original statutes—adopted in 1792 and 1795—did not expressly provide that a first assistant or a Senate-confirmed official would automatically serve in the case of the principal's unavailability. Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281; Act of Feb. 13, 1795, ch. 21, 1 Stat. 415. But Congress was not thereby authorizing the President to install anyone who he wanted—for example, the personal assistant to the Secretary of State or the mail clerk. The statutes did not purport to duplicate the requirements of the Appointments Clause. They moreover had to accommodate the prospect that the first assistant could himself be unavailable or the President might designate a Senate-confirmed official instead. The critical point is that, as discussed, in applying those statutes, Presidents consistently understood that they could not bypass the Chief Clerk to appoint another non-confirmed official. *See supra* at 4.

In 1870, Congress established the Department of Justice. That statute created the Office of the Solicitor General, designated that official as the Department's second in command, and—unlike most other first assistants—required that the Solicitor General be Senate confirmed. Consistent with the historical treatment of first assistants, the statute specified that the Solicitor General would serve in the event of the Attorney General's unavailability. Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162. That provision is the predecessor to the current Attorney General Succession Act (AG Act).

When federal law was finally codified soon after—in 1873—it made the role of first assistants in executive departments express and mandatory. The statute recognized the position of "first or sole assistant" in every "executive department of the government," with the responsibility to fill in automatically whenever a Senate-confirmed officer was unable to serve. Rev. Stat. § 177. The President could displace the first assistant only by designating a Senate-confirmed officer; he could not designate any non-confirmed officer, much less an ordinary employee. *Id.* § 179. If the office was vacant, acting service was limited to ten days. *Id.* § 180; *see also* 15 Stat. 168 (uncodified version first adopted in 1868).

The law provided that no temporary appointment could be made under any other statute. Rev. Stat. § 181. To avoid confusion, the codifier of federal laws (the Secretary of State) added a provision—not adopted by Congress—expressly excluding the Attorney General. *Id.*

5. The AG Act and the Vacancies Act were subject to intervening amendments that are immaterial here. The relevant provisions of the statutes were adopted in 1966 and 1998, respectively.

The AG Act now makes the Deputy Attorney General the automatic successor in the event of the Attorney General's unavailability. 28 U.S.C. § 508(a). The statute continues to define the Deputy Attorney General as the "first assistant" for purposes of the Vacancies Act. *Id.*

But the AG Act importantly also specifies a further order of succession of Senate-confirmed officers. The Associate Attorney General comes next, followed by other officials in the order determined by the Attorney General. The statute does not permit the President to deviate from that chain of succession, even to appoint the Senate-confirmed head of another department. *Id.* § 508(b).

The current Vacancies Act is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [Senate-confirmed] office of an Executive Agency . . . unless" one of several exceptions applies. 5 U.S.C. § 3347(a). One exception is that "a statutory provision expressly . . . *designates* an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(B) (emphasis added).

The Government acknowledges that the AG Act is such a statute. *Whitaker O.L.C. Op.* 6. There are several dozen others. Similar provisions apply to, for example, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Director of National Intelligence. *See* 10 U.S.C. § 132(b) (Deputy Secretary of Defense serves automatically); 10 U.S.C. § 154(d) (Vice Chairman of Joint Chiefs of Staff); 50 U.S.C. § 3026(a) (Principal Deputy Director of National Intelligence). There is no such office-specific statute for more than 1,200 other Senate-confirmed positions, which are instead governed by the general provisions of the Vacancies Act.

When the Vacancies Act does apply, if a Senate-confirmed officer is "unable to perform the duties and functions of the office," "the first assistant to the office of such officer shall perform

the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). But the President may displace the first assistant. "[N]otwithstanding paragraph (1), the President . . . may direct" another person to perform those responsibilities under either of two provisions, subject to various time restrictions and other constraints. *See id.* §§ 3345, 3346. The President may designate another Senate-confirmed official. *Id.* § 3345(a)(2). Relevant here, the President also may "direct" that the official's duties be performed by a departmental "officer or employee" who has served for at least 90 days at the pay grade of at least GS-15. *Id.* 3345(a)(3). The latter provision for the first time in history granted the President the express authority to displace the first assistant with a non-confirmed officer or employee.

The Executive Branch first addressed the relationship between the Vacancies Act and the AG Act in a 2001 memorandum of the White House Counsel. That memorandum reconciled the statutes. It concluded that Vacancies Act only applies when the AG Act does not "designate" an acting official. The Vacancies Act thus "does not apply to the position of the Attorney General unless there is no official serving in any of the positions designated by section 508 to act as attorney general in the case of a vacancy." Memorandum for the Heads of Federal Executive Departments and Agencies and Units of the Executive Office of the President, from Alberto R. Gonzales, Counsel to the President, *Re: Agency Reporting Requirements Under the Vacancies Reform Act* at 2 n.2 (Mar. 21, 2001), http://bit.ly/2EDmAdC. Subsequently, Presidents have reconciled the statutes in the same way. They have adopted Executive Orders governing vacancies in the Office of the Attorney General under which the officials specified in the AG Act serve automatically. If none of those officials are available, then other officials designated under the Vacancies Act will serve. Exec. Order No. 13,787 (Mar. 31, 2017) (Trump), http://bit.ly/2BVYNnw; Exec. Order No.

8

13,762 (Jan. 13, 2017) (Obama), http://bit.ly/2A9DlKK; Exec. Order No. 13,481 (Dec. 9, 2008) (W. Bush), http://bit.ly/2Crbozh.

6. Presidential designations under the Vacancies Act and these Executive Orders conformed to historical tradition. Presidents continued to treat office-specific statutes as controlling over the generic provisions of the Vacancies Act. Also, when a principal officer was unable to serve, Presidents never displaced available first assistants with non-confirmed officials.

That slowly began to change in 2003. That year, the Office of Legal Counsel asserted in a footnote that the President could select an acting official in the Office of Management and Budget using either the Vacancies Act or a specific statute authorizing such a choice with respect to that office. *See Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 121 n.1 (2003) (*OMB O.L.C. Op.*). Next, in 2007, the top three offices of the Department of Justice—including the Deputy Attorney General—were vacant. The Office of Legal Counsel opined that the President could use the Vacancies Act to appoint a Senate-confirmed official who was different from the one who had been designated by the Attorney General to serve under the AG Act. *See Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208, 208 (2007).

But no previous designation took the radical step embodied in President Trump's designation of Matthew Whitaker. This is the first time in American history that a President displaced an available first assistant to a principal officer with a non-confirmed official.

## I.      Factual Background.

In 2017, the President nominated and the Senate confirmed Jefferson Sessions III as the Attorney General. Based on guidance from ethics officials, Mr. Sessions promptly recused himself from the Department of Justice's investigation into whether the President and the President's campaign colluded with Russia and obstructed justice.

Under the AG Act, the recusal automatically made the Deputy Attorney General—Rod Rosenstein—the Acting Attorney General with respect to that investigation. With respect to his other responsibilities, Mr. Rosenstein remained in his subordinate role as the Deputy. The Department of Justice seemingly understood that this procedure was automatic under the AG Act. The President apparently was not consulted on whether to designate a department employee under the Vacancies Act instead.

For months, the President harshly criticized Mr. Sessions in deeply personal terms for recusing himself, despite Mr. Sessions' plain obligation to do so. The President then forced Mr. Sessions out the day after the 2018 midterm elections, executing a widely previewed plan that had been developed well in advance.[1]

As soon as the Office of the Attorney General became vacant, Mr. Rosenstein automatically filled in again—this time with respect to all of the Attorney General's duties—as required by the pre-defined job responsibilities of the Deputy Attorney General. 28 U.S.C. 508(a). That once again occurred automatically as a matter of law; the President did not do anything. *Id.*

The President has been harshly critical of Mr. Rosenstein's own failure to limit the Russia investigation.[2] One day after Mr. Sessions resigned and Mr. Rosenstein automatically began serving as Acting Attorney General, the President formally intervened. Invoking the Vacancies Act, the President displaced the Deputy Attorney General and "directed" a Department of Justice

---

[1] *See, e.g.*, Devlin Barrett, John Wagner & Seung Min Kim, *Trump and Sessions Feud Over the Direction of the Justice Department*, Wash. Post (Aug. 23, 2018), https://wapo.st/2RHxLWC; Alexandra Hutzler, *Donald Trump Will Fire Jeff Sessions After Midterms, Republicans Say*, Newsweek (Aug. 24, 2018), http://bit.ly/2rrHQLM.

[2] *See, e.g.*, Ashley Parker & Amy B. Wang, *Trump Criticizes Democrats, 'Russian witch hunt,' and Coastal Elites at Ohio Rally*, Wash. Post (Aug 4, 2018), https://wapo.st/2G7kzJ8; Pamela Brown *et al.*, *Trump Considering Firing Rosenstein to Check Mueller*, CNN Politics (Apr. 10, 2018), https://cnn.it/2C4RhGZ.

employee—the Chief of Staff, Matthew Whitaker—to "perform the functions and duties of the Office of the Attorney General." The Chief of Staff of course "was not the first assistant to the Attorney General." *Whitaker O.L.C. Op.* 4.

Previously, Mr. Whitaker was best known for his vocal, public protestations on television that the Russia investigation should be narrowed or terminated.[3] Once Mr. Whitaker took over as Acting Attorney General, he hired his own Chief of Staff from outside the Department of Justice. Notwithstanding his prior vocal criticism of the investigation and close relationship with an important witness, Mr. Whitaker—contrary to the suggestions of career ethics officials—has refused to recuse himself. He therefore exercises ultimate authority over the investigation.[4]

The President's designation of Mr. Whitaker expressly lasts only "until the position is filled by appointment or subsequent designation." The Chief of Staff's authority to perform the role of Attorney General thus will terminate automatically. Subsequent to the vacancy—just as before it—he will be categorically forbidden from performing the Attorney General's functions and duties, as a matter of law.

Mr. Sessions' resignation illustrates how the AG Act and the Vacancies Act differ significantly. As soon as the Office became vacant: the AG Act automatically deemed Rod Rosenstein as the Acting Attorney General; the Vacancies Act gave the President the option to put in place a non-confirmed officer or employee, or a Senate-confirmed official. Once Mr. Rosenstein began serving: the AG Act provided that he would automatically be succeeded by the Associate

---

[3] *See, e.g.*, Matthew Whitaker, *Mueller's Investigation of Trump is Going Too Far*, CNN Opinion (Aug. 6. 2017), https://cnn.it/2QEa9ol.

[4] *See* Devlin Barrett & Matt Zapotosky, *Ethics Officials Said Whitaker Should Recuse from the Mueller Probe, But His Advisers Told Him Not To, Officials Say*, Wash. Post (Dec. 20, 2018), https://wapo.st/2EGlsXH.

Attorney General; the Vacancies Act both provided that the President could displace him and designate someone else, and mandated that in the absence of that designation the office would remain vacant. 28 U.S.C. § 508; 5 U.S.C. §§ 3345(a), 3348(b).

## SUMMARY OF THE ARGUMENT

I. This case presents a critical question: May the President displace a first assistant to direct a non-confirmed employee to temporarily perform the duties of a principal officer? Under the Appointments Clause, the answer to that question is "no."

The designation is unconstitutional for two independent reasons. *First*, only an officer, not an employee such as the Chief of Staff, may exercise the powers of a principal officer. But the Vacancies Act does not authorize the President to appoint an employee as an officer. That statute only provides that the President may temporarily direct the employee to exercise the responsibilities of an officer. Even if the President *could have* appointed Mr. Whitaker as an officer, he unequivocally did not do so.

*Second*, even if a designation under the Vacancies Act were construed as an appointment of an officer, the appointee is a principal—not inferior—officer. So Senate confirmation is required. In stark contrast to a first assistant, Mr. Whitaker is a principal officer because during his "appointment" he will never act in a subordinate position to the Attorney General. The entire time, he *is* the Attorney General. He regains his subordinate status only after the appointment ends.

Mr. Whitaker's status contrasts with that of a first assistant, who is properly appointed as an inferior officer. The first assistant is always an officer and always a subordinate. The first assistant is appointed by either the President directly or the department head. Throughout the first assistant's appointment, they are tasked with filling in when the principal is unavailable. The Supreme Court has held that first assistants may do so even when the office is vacant, because that

is a "temporary and special condition" requiring the first assistant to serve in order to maintain the office's unbroken operations. But there is no such exigency—and no need to appoint some other non-confirmed official—when the first assistant is available and steps in. That is most obvious when, as here, the first assistant is itself a Senate-confirmed position.

II. This Court can and should avoid the great doubt that the President's designation of Mr. Whitaker complies with the Appointments Clause. The Vacancies Act easily can be fairly read not to apply to this particular vacancy in the Office of the Attorney General. In fact, that is the better reading for an array of reasons.

First and foremost is the statutory text. Under the AG Act, the Deputy Attorney General automatically serves as the Acting Attorney General. The President has no power to displace the Deputy. Rather, the Associate Attorney General follows in the order of succession, followed by other officials. These facts illustrate the statute in operation. When Attorney General Sessions first recused from the Russia investigation, and later "resigned" at the request of the President, the Deputy Attorney General served automatically under the AG Act.

The Vacancies Act does not change that result. The Vacancies Act is "exclusive . . . unless" another statute "designates"—*i.e.*, selects—the acting official. 5 U.S.C. § 3347(a)(1). The Government focuses on the word "exclusive" in isolation. But statutes are read as a whole, and this one takes this form: "The Vacancies Act is the exclusive means to designate an acting official, unless another statute designates the acting official." The plain and ordinary meaning of that provision is that the other statute chooses the official. It is not fairly understood to mean that the President can choose between the statutes as he sees fit.

The Vacancies Act is "non-exclusive" not in the sense that the President can choose, but instead because there are *other* circumstances in which the Vacancies Act does apply to the Office

of the Attorney General. In this instance, of course, the AG Act does designate an Acting Attorney General. But that will not be true when the successors specified by the AG Act are themselves unavailable—for example, in presidential transitions—in which case the Vacancies Act applies. That interpretation—under which the Vacancies Act does apply to certain vacancies in the Office of the Attorney General but not this one—reconciles all of the relevant statutory language. It is also the interpretation that Presidents—including this one—previously adopted.

Plaintiff's reading is strongly reinforced by the obvious absence of a provision granting the President the power to choose between the Vacancies Act or a statute that designates an acting official. Congress did give the President similar powers in multiple statutes, but *not* this one. So too, there conspicuously is no provision that would determine which statute applies if the President makes no choice at all. In fact, the Government does not even take its own argument seriously: generally, the President is not even asked to choose between the provisions, including apparently when Mr. Rosenstein took over the Russia investigation.

The Government's reading is also highly disfavored because it amounts to an implied repeal of not only the AG Act but also dozens of similar statutes governing other principal officers. Congress enacted those statutes to mandate that the department's second in command serve in the event of the principal's unavailability. The statutes ensure the departments' orderly operations and strip the President of the power to select someone else out of self-interest. That purpose is most obvious with respect to the AG Act, which designates not only the first assistant but *also* multiple Senate-confirmed successors to the Deputy Attorney General. The Government's position negates the effect of those substantial limitations on the President, turning them into inexplicable additional options from which he may choose.

The Government's interpretation also inverts the purpose of the Vacancies Act itself. Congress adopted that statute in 1998 precisely to *prevent* the President from choosing between the general vacancies law and office-specific statutory schemes.

Then there is the unbroken history of Presidents never displacing an available first assistant to designate a non-confirmed official to perform the functions of a principal officer. If Congress intended to depart so radically from that settled tradition—rendering dozens of office-specific statutes such as the AG Act essentially ineffective—that intention would be reflected in the legislative record. But the legislative history unequivocally states the opposite: that the Vacancies Act does not apply when—as here—another statute designates an acting official.

## ARGUMENT

### I.     The President's Designation of Matthew Whitaker Violated the Appointments Clause.

In assessing whether Mr. Whitaker's service as Acting Attorney General is constitutional, one preliminary point bears emphasis. The Government's reading of the Appointments Clause renders it a dead letter. The Office of Legal Counsel asserts, "Although an Attorney General is a principal officer requiring Senate confirmation, someone who temporarily performs his duties is not." *Whitaker O.L.C. Op.* 1-2. By "temporary," the Government means only that the acting official is not presently being submitted for confirmation. *Id.*

That position is breathtaking. It would mean that the Constitution allows the President to fire any Senate-confirmed principal officer—indeed, the entire Cabinet and every ambassador— and replace each of them with a hand-picked, unqualified, non-confirmed employee, or with more than 1,000 Senate-confirmed inferior officers. The President could execute the same maneuver to replace all those confirmed inferior officers with employees as well. The President need only formalistically slap the label "temporary" on each Vacancies Act "designation." On that view,

every designation of someone to a Senate-confirmed position is automatically constitutional: it is either "temporary" by *ipse dixit*; or it is "permanent" because the official is confirmed.

The framers did not intend that the Constitution would be evaded by such artifices. The Senate's role under the Appointments Clause is vital to the separation of powers. *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991). "Advice and Consent . . . . serves both to curb Executive abuses of the appointment power and 'to promote a judicious choice of [persons] for filling the offices of the union.'" *Edmond*, 520 U.S. at 659-60 (quoting *The Federalist No. 76*, at 386-87, internal citations omitted).

Indeed, Mr. Whitaker's designation demonstrates precisely why the founders adopted the Appointments Clause. "The 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power, because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." *Freytag*, 501 U.S. at 883 (quoting G. Wood, *The Creation of the American Republic 1776-1787*, at 79 (1969)).

Here, the President removed the Senate-confirmed Attorney General, after bitterly criticizing his failure to limit or end an investigation into the President and his campaign. The investigation was overseen by the Senate-confirmed Deputy Attorney General. But the President fiercely attacked him too, for the same reason. The President then displaced the Deputy Attorney General, designating an Acting Attorney General who the Senate would be very unlikely to confirm, and who was previously best known as a television commentator who argued emphatically that the investigation should be narrowed or closed. The Appointments Clause exists *precisely* to prevent such self-interested maneuvers by the President.

The President's designation of Mr. Whitaker specifically violated the Appointments Clause for two independent reasons: (1) only an officer may serve as Acting Attorney General, but Mr. Whitaker is only an employee and the President's direction to him under the Vacancies Act to perform the duties of the Attorney General did not appoint him an officer who can do so; and (2) the non-confirmed subordinate who may perform the duties of a principal officer is the "first assistant," and so long as the first assistant is available to serve there are no "special and temporary conditions" authorizing the President to designate some other non-confirmed official instead.

### A.     The President unconstitutionally assigned the Attorney General's responsibilities to a non-officer.

After Mr. Sessions "resigned" and Deputy Attorney General Rosenstein automatically began to serve as the Acting Attorney General, the President wrote a memorandum that "directed" Matthew Whitaker "to perform the functions and duties of the office of Attorney General, until the position is filled by appointment or subsequent designation." The Chief of Staff is an employee. The President's memorandum accordingly assigned an employee to temporarily perform the functions of an officer. That is forbidden by the Constitution.

An Acting Attorney General is an officer of the United States. Whatever the "acting" label, that person exercises the authority of the United States; only an officer may do that. *Buckley v. Valeo*, 424 U.S. 1, 124-32 (1976); *OMB O.L.C. Op.* at 124-25. That is why the Constitution would not permit the President to assign the responsibilities of the Attorney General to the Attorney General's personal assistant or a mail room clerk.

The Government concedes that the Chief of Staff to the Attorney General is an employee, not an officer. *E.g.*, *Hearing on Defs.' Mot. to Dismiss & Pl.'s Mot. for Prelim. Inj.*, No. 1:18-cv-02849-ELH (D. Md. Dec. 19, 2018). The Chief of Staff is, for present purposes, one of roughly 7,000 individuals in the Department of Justice who hold at least the GS-15 pay grade who can be

appointed under the Vacancies Act. Those employees do not hold that pay grade because it reflects their suitability to serve as Acting Attorney General. Rather, it reflects the competitive reality that they otherwise would be sorely tempted to quit to go work for private sector law firms instead.

By tradition, the Chief of Staff does not hold a substantive portfolio or direct authority over any material number of the Department's 110,000-plus employees. Indeed, the Chief of Staff does not have any *de jure* responsibility to administer the laws at all. So far as can be determined, although the Attorney General overwhelmingly delegates his substantive responsibilities—large and small—to other officers, Mr. Sessions did not do so with respect to Mr. Whitaker. *See, e.g.*, 28 C.F.R. §§ 0.15, 0.20, 0.25 (delegations from the Attorney General to, for example, the Deputy Attorney General, the Solicitor General, and the Assistant Attorney General for the Office of Legal Counsel); *see also, e.g., id.* §§ 0.30, 0.35, 0.76 (delegations from the Attorney General to, for example, the Director of the Community Relations Service, the Pardon Attorney, and the Assistant Attorney General for Administration).

Critically, the Vacancies Act does not provide for the President to appoint an employee as an officer. Rather, it leaves the Senate-confirmed office vacant. The employee who is directed under the Act to perform the job responsibilities of the absent official continues to serve in the employee's original position. Indeed, the Office of Legal Counsel expressly recognizes that the President merely "designated [the Chief of Staff] to perform additional duties." *Whitaker O.L.C. Opinion* 9. The Supreme Court squarely held in *Weiss v. United States*, 510 U.S. 163, 172 (1994), that such a designation is not an "appointment" under the Constitution. *See id.* ("Congress repeatedly and consistently distinguished between an office that would require a separate appointment and a position or duty to which one could be 'assigned' or 'detailed' by a superior officer.").

That is unconstitutional. Surprisingly, the Office of Legal Counsel's Opinion asserting that Mr. Whitaker's appointment is consistent with the Appointments Clause does not address this issue. But a prior Opinion did. *See OMB O.L.C. Op.* 124-25. It is unpersuasive. The Opinion "acknowledge[s] that the Supreme Court's decision in *Weiss* placed considerable stress on Congress's use of the terms 'detail' and 'assign' in statutes governing military officers when it held that Congress had not required a separate appointment for military judges to serve on courts martial." *Id.* at 124. But the Opinion invokes the principle of constitutional avoidance to conclude "that the 'directs' language of the Vacancies Reform Act should be understood to provide the means for an appointment of an employee as an acting officer." *Id.* at 125. Otherwise, it reasons, the statute would be unconstitutional. *Id.*

That is not an acceptable—or even serious—application of the "canon of constitutional avoidance," which requires that the statute can be "fairly" read to avoid the constitutional infirmity. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). The Office of Legal Counsel is instead invoking a non-existent "canon of constitutional *ipse dixit*"—*viz.*, the statute is constitutional because otherwise it would be unconstitutional.

The relevant legal question is whether the Vacancies Act follows the formal procedure required to appoint a constitutional officer. It does not. That conclusion cannot be avoided by saying "we will just pretend that it does." If that were sufficient, the Government would have succeeded in making this requirement of the Appointments Clause meaningless too, because the exact same reasoning could be used to transform every non-appointment into an appointment.

The Office of Legal Counsel also refused to follow the Supreme Court's decision in *Weiss* on the ground that *Weiss* "was in the context of . . . the appointment of military judges." *OMB O.L.C. Op.* 125. But that fact had nothing to do with the Supreme Court's reasoning. The Vacancies

Act, and Presidential designations under the Act, draw the same contrast between directing an existing official to perform a function and actually making an appointment. The statute applies to the unavailability of an officer "whose appointment to office" requires Senate confirmation, and it permits the President to "direct" someone to perform that officer's duties. It permits the President to make that direction to "an officer or employee" in the department or another officer "who serves in an office for which appointment is required" with Senate confirmation. 5 U.S.C. § 3345(a). In turn, the President's memorandum to Mr. Whitaker expressly contrasts what Mr. Whitaker is "directed" to do with an "appointment or subsequent designation."

Historically as well, Presidents have directed either first assistants or Senate-confirmed officials to perform the functions of an officer. Those have not been regarded as independent "appointments" of those officials to entirely new positions. Rather, they were temporary assignments of job responsibilities. Presidents "authorized" officials to perform the additional responsibilities, distinguishing that service from an actual appointment. *See, e.g.*, Letter from Thomas Jefferson to the War Department (Feb. 17, 1809), *Founders Online*, National Archives, http://bit.ly/2PT2TRi ("Whereas, by the resignation of Henry Dearborn, late Secretary at War, that office is become vacant.  I therefore do hereby authorize John Smith, chief clerk of the office of the Department of War, to perform the duties of the said office, until a successor be appointed.").

The conclusion that Mr. Whitaker was not appointed as an officer follows from the rule that a "temporary" direction to do something is not an "appointment." The Office of Legal Counsel conspicuously declined to address that issue at all. *OBM O.L.C. Op.* 124 n.6. The Government stresses repeatedly that the President's designation of the Chief of Staff is only temporary, as its basis for concluding that he is only an inferior—not a principal—officer. *See, e.g.*, *Whitaker OLC Op.* 1, 3, 5, 9, 22, 26-27. But the Constitution does not permit a "temporary" appointment of an

officer; the job must be permanent. *See Lucia*, 138 S. Ct. at 2051 (citing *United States v. Germaine*, 99 U.S. 508, 511-12 (1878)). That requirement is closely bound up with the rule that a designation is not an appointment at all: a designation is by definition temporary. *Whitaker O.L.C. Op.* at 20-21; *OMB O.L.C. Op.* at 123 n.5.

There is, of course, an appointed officer permanently assigned by law to fill in for the principal officer: the first assistant. As required by the Constitution, the first assistant is appointed as an inferior officer by either the President or the department head. When that first assistant automatically exercises the responsibilities of the principal officer, no further appointments issue arises. The first assistant need not be appointed again to fulfill the principal officer's responsibilities, because those responsibilities are germane to—indeed, are a part of—their original job. *Shoemaker v. United States*, 147 U.S. 282, 301 (1892).

The President's temporary direction to the Chief of Staff as an employee to perform the functions of an officer of the United States therefore violated the Appointments Clause.

**B.    The President's designation of Mr. Whitaker violated the Appointments Clause because he is serving as a principal officer.**

Even assuming contrary to the foregoing that under the Vacancies Act the President makes an "appointment," that would make Mr. Whitaker an "officer." But it would not make the appointment constitutional. The President would be appointing a "principal officer" who must be confirmed, not a "subordinate." The President's appointment gave Mr. Whitaker a new set of powers and responsibilities—those of the Attorney General. As a matter of law, the Chief of Staff did not have any of those powers before the designation, and he will surrender all of them after.

Thus, in the course of his service as Acting Attorney General, Mr. Whitaker does not "generally" have a relationship with a superior officer. *Edmond*, 520 U.S. at 662. Indeed, he does not *ever* have that relationship. He will never report to the Attorney General. During every single

day of the appointment, he *is* the Attorney General. He even now has his own Chief of Staff. Later, when a permanent Attorney General is confirmed, the appointment—including all of the responsibilities of the Attorney General—will end.

Contrast Mr. Whitaker with the Deputy Attorney General. Unlike Mr. Whitaker, he is an inferior officer as the first assistant, 28 U.S.C. § 508(a); 5 U.S.C. § 3345(a)(1), because he holds the subordinate role of filling in whenever the Attorney General is unavailable. *Eaton*, 169 U.S. at 343. That official, in the ordinary course of the job to which the Deputy was appointed, "[g]enerally speaking" has "a relationship with [the] higher ranking officer." *Edmond*, 520 U.S. at 662.

That remains true when the office is vacant altogether. The Supreme Court has held that the first assistant remains a subordinate—without being subject to mandatory confirmation—because of the need to maintain the unbroken operations of the office. The vacancy is a "special and temporary condition[]"—essentially, an exigency—necessitating an inferior officer stepping into the principal's role temporarily. *Eaton*, 169 U.S. at 343. By contrast, when the first assistant *is* available to serve, there is no such exigency. And departing from the statutory chain of succession—as in this case—affirmatively breaks the office's ordinary operations.

That conclusion is strongest with respect to the Office of the Attorney General, for two reasons. *First*, the AG Act has its own further order of succession after the first assistant. Under the Vacancies Act, the President can displace the first assistant with certain officers, employees, and Senate-confirmed officials. But the AG Act mandates that the Associate Attorney General serve next, followed by still other Senate-confirmed officers. 28 U.S.C. § 508(b). There is accordingly no need to disrupt the Department's chain of command by substituting another employee.

*Second*, all the officials in that chain of command under the AG Act are themselves Senate-confirmed positions. By electing to make the provision subject to confirmation, Congress specifically prevented the President from installing a person of his choosing.

Thus, even assuming that the President "appointed" Mr. Whitaker to the position of Acting Attorney General, his service violates the Appointments Clause because the Constitution requires that the Senate confirm him as a principal officer.

### C.    The Government's arguments defending Mr. Whitaker's service under the Appointments Clause are non-responsive.

The Government's arguments why Mr. Whitaker's service complies with the Appointments Clause are directed at a straw man. The Government acts as if the principal objection to Mr. Whitaker's appointment is that he is a non-confirmed official. It responds to that point by showing, based on precedent and history, that there are circumstances in which a non-confirmed official may temporarily perform the functions of a principal officer. *Whitaker OLC Op.* 12-16. The Government then leaps wildly from the premise that there is *one* category of non-confirmed official who may serve, to the insupportable conclusion that the President may appoint *any* non-confirmed official, even though that would make the Appointments Clause a dead letter.

The Office of Legal Counsel's explanation for why the President's designation of Mr. Whitaker "was not completely novel" is thus that "clerks, who were not Senate-confirmed, were routinely authorized to serve as acting officers under the 1792 and 1795 statutes." *Whitaker O.L.C. Op.* at 24. The President's current authority thus supposedly "echo[es] the movement in the early nineteenth century to chief clerks rather than Senate-confirmed officials from other departments." *Id.* at 24 n.16. In other words, the Government would extrapolate from the historical service of one very specific official—the Chief Clerk—to the conclusion that the service of any official is indistinguishable.

The actual question is: *which* non-confirmed official may perform the functions of a principal officer? The answer is: the "first assistant," who is best able to maintain the unbroken operations of the office and who steps in automatically as a matter of law. By contrast, the President may not make an *ad hoc* choice that would negate the Appointments Clause and endanger the department's orderly operations. Another non-confirmed official may serve only if the first assistant is unavailable.

The Government also goes to great lengths to identify a handful of times in American history when a non-confirmed official served as long as has Mr. Whitaker. *Whitaker OLC Op.* 13-14, 16-18. But that is no excuse, because the length of time is not the issue. The Appointments Clause has no exception for short violations of its requirements and near misses; it does not contemplate the phrase "good enough for government work." The President may not unconstitutionally appoint an Acting Attorney General for two hours, two days, or two months-- whether in the hope that he would permanently shut down an investigation, or just out of personal preference.

In sum, Mr. Whitaker's service as Acting Attorney General violates the Appointments Clause because he (1) is an employee temporarily serving as an officer, and in any event (2) is serving as a principal officer who must be confirmed by the Senate.

## II. Applying the canon of constitutional avoidance, the Vacancies Act is fairly read not to give the President the power to appoint a non-confirmed official in these circumstances.

In considering how to interpret the relevant statutes—as with the Appointments Clause— it is useful to begin with the implausible implications of the Government's position. According to the Government, Congress enacted the Vacancies Act in 1998 to permit the President to replace every Senate-confirmed officer (including every principal officer) with almost any GS-15 or above in the department, as well as any of the more-than 1,000 Senate-confirmed officials in other

departments. To take just the Department of Justice: more than 6,000 lawyers have that pay grade. According to the Government, Congress adopted the statute to give the President the same power—and override office-specific succession provisions—with respect to the Secretary of Defense, Chairman of the Joint Chiefs of Staff, Director of National Intelligence, and more than 30 other principal officers.

A statute granting the President such sweeping authority would risk havoc, gut the Senate's advice and consent role, and overturn succession rules that have been set forth in statutes specifically tailored to those offices for over a century. The essential, distinctive feature of these statutes is that they depart from the general vacancies law and do not grant the President the authority to appoint his own choice when a deputy—generally, one who is Senate-confirmed—is available. If Congress intended the 1998 statute to make such a radical change, obviously it would have debated and discussed the issue. But the Government's reading is not reflected in one whisper, by any member, anywhere, ever—regarding legislation that went through multiple iterations, hearings, floor statements, and reports. That is not plausible.

At the very least, the President's unprecedented appointment of a departmental employee as an acting principal officer is the subject of great constitutional doubt. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring) ("Appointing principal officers under the [Vacancies Act], however, raises grave constitutional concerns because the Appointments Clause forbids the President to appoint principal officers without the advice and consent of the Senate."). The Court can avoid that doubt by holding that it was not authorized by statute. It is a "cardinal principle" of statutory construction that, because it is "fairly possible" to read the Vacancies Act in a way that avoids that constitutional question, the court must reject the Government's interpretation. *Zadvydas*, 533 U.S. at 689.

Specifically, the Court should read the Vacancies Act and the AG Act in a manner that reconciles them in the way that is most consistent with the Appointments Clause. The Government reads them as in conflict. On its view, when the Attorney General is available to serve, the AG Act and the Vacancies Act produce conflicting results. Indeed, if the Government's argument that both statutes apply here were taken seriously, there would now be two Acting Attorneys General: Rod Rosenstein and Matthew Whitaker.

But the statutes can and should be read to work together. Whenever the AG Act "designates" the Acting Attorney General, its provisions control and the Vacancies Act does not. But there will be important instances in which the AG Act does not make a designation, because the officials it specifies are unavailable. In those instances, then the President may designate an Acting Attorney General. That is precisely how Presidents previously construed the statutes. *See supra* at 8-9.[5]

---

[5] Because the Deputy Attorney General was able to serve (and indeed did serve temporarily) when Mr. Sessions "resigned," this case does not present the question whether the Presidents' Executive Orders are constitutional. They surely are, because the Executive Orders designate Senate-confirmed officials as Acting Attorney General. But the Constitution would likely be satisfied even if they were not confirmed, because of the exigency that the officials designated by the AG Act are unavailable. That circumstance arose in the Nation's early history. In several instances, when the first assistant was apparently unavailable, the President designated a non-confirmed subordinate to the first assistant or other senior department officer without objection. Similarly, the Supreme Court in *Eaton* cited the Attorney General's approval of a circumstance in which a consul died when no vice consul was in office, and the consul's son performed the office's functions temporarily. 169 U.S. at 344. The Attorney General explained that "[t]he public interest requires that the duties of the office should be discharged by someone" and in such a circumstance "I do not perceive why he should not be recognized as consul." *Id.* (quoting 2 Op. Att'y Gen. 523, 524 (1832)).

## A.     The AG Act automatically designates the Deputy Attorney General as the Acting Attorney General.

1. Under the AG Act, the Deputy Attorney General automatically serves in the event of the Attorney General's unavailability. 28 U.S.C. § 508(a). In turn, the statute specifies that the Associate Attorney General is the Deputy's successor. *Id.* § 508(b). The AG Act does not permit the President either to choose someone other than the Deputy in the first instance or to displace the Deputy and substitute another official later.

This case is an illustration. When Mr. Sessions "resigned," Rod Rosenstein automatically became Acting Attorney General. If he was unavailable, the Associate Attorney General would have served. The President could not lawfully displace Mr. Rosenstein in favor of the Chief of Staff, Mr. Whitaker.

Although Congress adopted general vacancies statutes beginning in 1792, it never applied those provisions to the Attorney General. Congress instead made a judgment beginning in the 1800s, from which it has never deviated, that other senior Department of Justice officials who might succeed to the role of Acting Attorney General must themselves be subject to Senate confirmation.  Understandably, Congress was not satisfied that the same type of low-level Senate-confirmed official in any executive department or a GS-15 level employee in the Department of Justice who could temporarily act on behalf of an ordinary official—in more than 1,200 positions—was thereby *ipso facto* qualified to take on the profoundly weighty role of the Attorney General of the United States.

The reasons for this regime are obvious and illustrated by the facts of this case.  The Attorney General exercises vast authority over, for example, criminal and national security matters.  28 U.S.C. §§ 511-19.  The role calls for the highest levels of integrity and personal

judgment, prerequisites safeguarded by the Constitution's command that principal officers be subject to the oversight and check provided by Senate confirmation.

Indeed, the Attorney General plays a particularly vital role with respect to the separation of powers.   Except in cases of recusal, the Attorney General has the power to control an investigation of the President himself.  28 C.F.R. Part 600.  Absent the AG Act, the President could fire the Attorney General (or demand his resignation), then appoint a hand-picked junior Senate-confirmed officer from an entirely different agency, or a carefully selected senior employee who he was confident would terminate or otherwise severely limit the investigation.   Indeed, the President could appoint and then remove a series of hand-picked individuals as Acting Attorney General until one finally acceded to the President's demands, with the Senate left powerless to intercede.   The AG Act makes that impossible; without it, the possibility seems far from theoretical.

The AG Act also ensures that the President cannot allow an appointment to lapse, thereby leaving the vital position of Attorney General empty.  The President would have to remove at least a half-dozen Senate-confirmed senior Department of Justice officials before the line of automatic succession was exhausted.  By contrast, under the general provisions of the Vacancies Act, the President may force a vacancy by either terminating any interim appointee or allowing the time limit on the appointment to expire.  5 U.S.C. § 3348(b).

2. The Vacancies Act does not override the AG Act and permit the President to displace the Deputy Attorney General in favor of a Department of Justice employee. The Vacancies Act applies when a Senate-confirmed officer is unable to serve "unless" another statute "designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a). The Government's contrary reading of the Vacancies Act

looks only to the word "exclusive" in isolation. But statutes of course are read as a whole. When the AG Act applies, the text of the Vacancies Act not only says that is not "exclusive" but it further specifies what occurs: another statute "designates" the acting official. To "designate" is to "choose (someone or something) for a particular job or purpose." *Black's Law Dictionary* 541 (10th ed. 2014). The Government concedes that the AG Act designates—*i.e.*, selects—the Acting Attorney General. The Vacancies Act—including the President's authority to appoint a departmental employee—is accordingly inapplicable.

The form of the relevant provision of the Vacancies Act is thus: "The Vacancies Act is the exclusive means to designate an acting official, unless another statute designates the acting official." The plain and ordinary meaning of that provision is that, when it applies, the other statute chooses the official—not that the President can choose between the statutes. Or take a parallel formulation: "Motions to dismiss, motions for summary judgment, and trials are the exclusive means to resolve a case, unless the judge designates the means to resolve the case." That does not create a choice. Rather, the second "designation" clause recognizes a single, controlling option.

The Government's argument that the President may choose because Vacancies Act is non-exclusive is in any event a *non sequitur*. If two statutes apply to a set of facts and (as here) they produce conflicting results, the more specific statute controls. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (citation and brackets omitted). The AG Act is the more specific provision.  It is directed to one particular office, whereas the Vacancies Act applies to more than 1,000 positions.  The AG Act also identifies precisely the Senate-confirmed officials who will serve in an acting role, whereas the Vacancies Act permits the President to appoint any established agency employee who is at least a GS-15, as well as Senate-confirmed officers from other agencies

whose functions have nothing at all to do with those of the Attorney General (for example, the Department of Veterans Affairs), and who were not confirmed with the slightest thought by the Senate that the President might pluck them from that position to serve as the Nation's chief law enforcement official.

The Government's argument could be correct only if the Vacancies Act included two other provisions: (1) one giving the President a choice, and (2) another specifying which applies if (as is generally true) the President does nothing when the officer is unavailable to serve. Notably, Congress included those provisions in several other statutes addressing vacancies. *See, e.g.*, 38 U.S.C. § 304 (President may override succession by Deputy Secretary of Veterans Affairs); 40 U.S.C. § 302 (Deputy Administrator of General Services); 42 U.S.C. § 902(b)(4) (Deputy Commissioner of Social Security). But since the day it created the Department of Justice in 1870, Congress has never permitted a President to override the order of succession of Senate-confirmed officials as Acting Attorney General.

Indeed, deeming the Vacancies Act controlling here would render the AG Act and the congressional judgments it embodies a nullity as a practical matter. Statutes are, of course, read to avoid that result. The very point of the AG Act is to ensure that the Nation's highest law enforcement official is a Senate-confirmed officer within the chain of command of the Department of Justice—one whom the Senate has already considered with the possibility of such performance of the Attorney General's functions in mind—and to forbid the President from appointing a hand-picked employee to that role. Put another way, the AG Act represents a congressional judgment to *reject* the President's discretion to make *ad hoc* appointments in favor of a specified line of succession that the Senate has vetted in advance.

The choice that the Government attributes to the Vacancies Act is thus a profoundly strange and illogical one. Why would Congress allow the President to choose between that statute and the AG Act? The latter designates the same default official—the Deputy Attorney General, who is the first assistant. The most distinctive thing the AG Act accomplishes is to limit the President's authority. But by making the AG Act "optional," the Government negates the statute's effectiveness. So there is no serious reason Congress would want to permit the President to choose it—or more importantly, to choose not to follow it.

The Government's reading also inverts the very purpose for which Congress adopted the Vacancies Act. Congress enacted it to reject the Office of Legal Counsel's position that the President could appoint officials in the Department of Justice under either the Vacancies Act or the Department's own organic statute. Specifically, it had asserted that an acting official could be appointed by delegating a Senate-confirmed officer's authority to someone else. On the Government's reading here, for the single most important office in the Department of Justice, Congress did the exact opposite and empowered the President to choose between the two statutory schemes. *See generally* Br. of Morton Rosenberg as Amicus Curiae, *Maryland v. United States*, No. 1:18-cv-02849-ELH, ECF 22 (D. Md. Nov. 26, 2018).

Congress ultimately chose the word "exclusive" rather than "applicable to" because the latter would not have made clear that the Vacancies Act prohibits the President from relying on general provisions allowing the responsibilities of a Senate-confirmed officer to be delegated to someone else. The change was not intended to turn the officer-specific statutes into alternatives at the President's whim. That is clear from on-point legislative history, which the Government ignores. The Senate sponsor, Senator Thompson, explained:

> The phrase "applicable to" is replaced by "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" in § 3347(a)

to ensure that the Vacancies Act provides the sole means by which temporary officers may be appointed *unless contrary statutory language as set forth by this legislation creates an explicit exception.*

144 Cong. Rec. S12813 (emphasis added); *see also* 145 Cong. Rec. S33 (Jan. 6, 1999) (Sen. Thompson) ("[Section 3347(a)(1)] statutes provid[e] for the filling of a specific vacant position that the law retains in lieu of the procedures contained in the Federal Vacancies Reform Act.") (emphasis added). Senator Byrd similarly addressed "the question of the exclusivity of the Act" and explained that "*unless other statutory provisions explicitly authorize the temporary filling of vacancies* in executive positions requiring Senate confirmation, or unless such provisions are enacted in the future, Sections 3345-3349d are to be the exclusive statutory means for filling vacant advice-and-consent positions in the executive branch." *Id.* at S12824 (emphasis added).

**B.     The Government's contrary arguments are unpersuasive.**

The Government argues that three provisions related to the Vacancies Act show that the statute is not mutually exclusive with the AG Act—*i.e.*, that there are instances that the Vacancies Act can apply to the Office of the Attorney General. A provision of the Vacancies Act categorically excludes certain multi-member bodies, but not the Attorney General. 5 U.S.C. § 3349. The prior vacancies act categorically excluded the Attorney General. 5 U.S.C. § 3347 (1994). So did the first draft of the Senate bill that became the Vacancies Act. S. 2176, sec. 2, § 3345(c).

Those arguments are weak for numerous reasons, but in any event they all attack a straw man. Plaintiff does not argue that the Vacancies Act never applies to the Office of the Attorney General. Rather, it applies when the AG Act does not "designate" the Acting Attorney General. *See supra* at 13-14, 26. Excluding the Attorney General altogether would not have made sense.

The Government next argues that a provision of the AG Act generally "underscore[s] that the Vacancies Reform Act remains an alternative means of appointment." *Whitaker O.L.C. Op.* 7. The AG Act designates the Deputy Attorney General as the "first assistant" under the Vacancies

Act. 5 U.S.C. § 508(a). Critically, the Government agrees that the Deputy Attorney General's service as Acting Attorney General under this provision—which predates the 1998 statutes—is *not* subject to the Vacancies Act. Rather the Government is arguing that the provision generally suggests that the AG Act and Vacancies Act work together. But Plaintiff's position is entirely consistent with that position. It reinforces that the Deputy Attorney General occupies a position that the President throughout history has never displaced with a non-confirmed employee.

The Government next argues that the text of the AG Act refutes the proposition "that the Vacancies Reform Act does not apply when the Deputy Attorney General can serve." *Whitaker O.L.C. Op.* 6-7. The statute provides that the Deputy "may" serve, and if the Deputy does not the Associate "shall." Importantly, the Government concedes that the AG Act is self-executing and mandatory—if the Attorney General is unavailable, the Deputy serves automatically. It moreover agrees that when the Deputy serves under the AG Act, that service is not subject to the time restrictions of the Vacancies Act—notwithstanding the AG Act's reference to the "first assistant."

The Government correctly states that the AG Act uses the word "may" simply to acknowledge that the Deputy "will not necessarily serve in the case of a vacancy." *Whitaker O.L.C. Op.* 7 n.7. The AG Act then specifies who "shall" serve if the Deputy does not: the Associate Attorney General. The statute essentially answers the question "Who will be Acting Attorney General?" by providing: "The Deputy Attorney General may serve, and if not the Associate Attorney General shall."

The Office of Legal Counsel opined that its conclusion was supported by two decisions. In *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555-56 (9th Cir. 2016), the President named the Acting General Counsel of the National Labor Relations Board. The court stated in brief dictum that the Vacancies Act is "non-exclusive." But in that case, the relevant office did not

have a pre-designated "first assistant," and Congress had not designated any official to serve in an acting capacity. Thus, not only did the statute at issue grant appointment powers to the same person, the President, but it was not a required or automatic succession statute like the AG Act. *Id.* ("[T]he NLRA states that the President may temporarily fill a vacancy." (citing 29 U.S.C. § 153(d))).

In *English v. Trump*, 279 F. Supp. 3d 307, 323-24 (D.D.C. 2018), the President named the Acting Director of the Consumer Financial Protection Board. Those circumstances were extremely unusual, because the Director named a second on command on the day he resigned, precisely in order to prevent the President from nominating a successor. The court further relied on the presence of an express-statement requirement in the CFPB act, which does not exist in the AG Act. The court explained that its decision was supported by the President's own constitutional authority to participate in selecting principal officers. But the court in any event expressly distinguished the AG Act as a statute that would displace the Vacancies Act.[6]

## CONCLUSION

The Court should grant Plaintiff's Motion for Partial Summary Judgment.

---

[6] Plaintiff acknowledges that two district courts have sustained Mr. Whitaker's designation in dictum. But the courts issued those rulings based on briefing that was *far* less thorough that in this case. *See United States v. Peters*, No. 6:17-CR-55-REW-HAI-2, 2018 WL 6313534, at *1 (E.D. Ky. Dec. 3, 2018); *United States v. Valencia*, No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018).

Dated: December 21, 2018

Respectfully submitted,

By:  /s/ Thomas C. Goldstein

Thomas C. Goldstein (Bar No. 458365)
TGoldstein@goldsteinrussell.com
Eric Citron (*pro hac vice*)
ecitron@goldsteinrussell.com
Daniel Woofter (*pro hac vice*)
dhwoofter@goldsteinrussell.com
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636

Michael E. Zapin (*pro hac vice*)
michaelezapin@gmail.com
20283 State Rd. 7
Suite 400
Boca Raton, FL 33498
(561) 367-1444

*Attorneys for Plaintiff Barry Michaels*