FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND 2019 FEB -1  AM 11: 10

THE STATE OF MARYLAND,
    *Plaintiff*,

v.

THE UNITED STATES OF
AMERICA *et al.*,
    *Defendants*.

Civil Action No. ELH-18-2849

## MEMORANDUM OPINION

The State of Maryland filed a declaratory and injunctive action, seeking, among other things, a declaration as to the constitutionality and enforceability of the Patient Protection and Affordable Care Act, Pub. L. No. 111–148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, 124 Stat. 1029 (Mar. 30, 2010) (collectively, the "Affordable Care Act," the "ACA," or the "Act'). In 2017, the ACA was further amended by the Tax Cuts and Jobs Act of 2017 (the "TCJA"), Pub. L. 115–97, 131 Stat. 2054 (2017). The State explains that, in filing suit, it is "seeking to head off the myriad of serious harms that will befall the State and its residents if the Trump Administration . . . ceases [to] enforc[e] the ACA in whole or in part." ECF 27 at 7.

In its initial Complaint (ECF 1), filed on September 13, 2018, the State sued the United States of America; the United States Department of Justice ("DOJ"); Jefferson B. Sessions, III, in his official capacity as Attorney General; the United States Department of Health and Human Services ("HHS"); Alex M. Azar, II, in his official capacity as Secretary of HHS; the United States Internal Revenue Service ("IRS"); and Charles P. Rettig, in his official capacity as Commissioner of the IRS. The State has since amended its Complaint (ECF 8, "Amended Complaint"), adding additional defendants.

On November 7, 2018, before the government's response to the suit was even due, Attorney General Sessions resigned. ECF 6-1 at 4.[1] Almost immediately thereafter, President Trump, relying on the Federal Vacancies Reform Act ("FVRA"), 28 U.S.C. §§ 3345 *et seq.*, appointed Matthew G. Whitaker as Acting Attorney General.[2] Mr. Whitaker had served as Chief of Staff to Mr. Sessions. In that capacity, he was not employed in a Senate-confirmed position. In contrast, Rod J. Rosenstein, the Deputy Attorney General, has been confirmed by the U.S. Senate.

President Trump has since nominated William P. Barr to serve as Attorney General.[3] The Senate Judiciary Committee held confirmation hearings on January 15, 2019, and January 16, 2019. Barr's nomination is pending in the U.S. Senate.

On November 11, 2018, in response to the appointment of Mr. Whitaker, the State filed a "Motion for Preliminary Injunction and to Substitute Defendant" (ECF 6), supported by a memorandum of law. ECF 6-1 (collectively, "Motion for Preliminary Injunction" or "P.I. Motion"). According to the State, the appointment of Mr. Whitaker violates the Attorney General Succession Act, 28 U.S.C. § 508, as well as the Appointments Clause of the United States Constitution, U.S. CONST. art. II, § 2. ECF 6. Accordingly, the State seeks to enjoin Mr. Whitaker from appearing in this case as the Acting Attorney General. *Id.* at 1. Alternatively, under Fed. R. Civ. P. 25, the State seeks "to substitute Deputy Attorney General Rosenstein as Acting Attorney General in his official capacity." ECF 6-1, ¶ 3.

---

[1] *See* Letter from Jefferson B. Sessions, III to Paul D. Ryan, speaker of the U.S. House of Representatives, *https://assets.documentcloud.org/documents/5029851/Read-Jeff-Sessions-letter-of-resignation.pdf* (Nov. 7, 2018).

[2] Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 7, 2018, 11:44 AM), https://twitter.com/realDonaldTrump/status/1060256619383193601.

[3] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 7, 2018, 8:18 AM), https://twitter.com/realDonaldTrump/status/1071076519584268288 (ellipsis in original).

Soon after moving for a preliminary injunction, the State filed its Amended Complaint. ECF 8. It asserts the same allegations against defendants that were alleged in the Complaint. *See id.* However, the State added Mr. Rosenstein and Mr. Whitaker as defendants, both in their official capacities. *Id.* ¶ 15. I shall sometimes refer to the defendants collectively as the "government."

Defendants have moved to dismiss the Amended Complaint, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction, and under Rule 12(b)(6), for failure to state a claim (ECF 11), supported by a memorandum of law. ECF 11-1 (collectively, "Motion to Dismiss"). According to defendants, the State lacks standing to pursue its claims because it has merely asserted speculative harm. *Id.* at 8. Further, defendants maintain: "Even if the State of Maryland is able to overcome these jurisdictional obstacles, its single Declaratory Judgment Act claim fails to state a claim because the State has failed to identify a cause of action for this suit." *Id.*

Defendants also oppose the Motion for Preliminary Injunction. ECF 28. According to the government, the "State's challenge to Mr. Whitaker's designation ultimately fails for lack of standing . . . ." *Id.* Defendants also argue that, as a threshold matter, the Court must first resolve their Motion to Dismiss because, if the Court grants that motion, "the State's request for preliminary injunctive relief would be moot." *Id.* at 11. In any event, the government maintains that Whitaker's appointment is lawful under the FVRA.

The State opposes the Motion to Dismiss. ECF 27. It has also replied to the opposition to its P.I. Motion. ECF 31. And, defendants replied to the State's opposition to their Motion to Dismiss. ECF 33.

In addition, pursuant to Rule 15(a)(2), the State has filed a "Motion for Leave to File Second Amended Complaint" (ECF 29), supported by a memorandum of law. ECF 29-1 (collectively, "Motion for Leave"). The Motion for Leave "set[s] forth the amendments Maryland

3

would propose to make to its Amended Complaint if the Court [i]s inclined to grant" the defendants' Motion to Dismiss. *See* ECF 27 at 8. The proposed Second Amended Complaint is docketed at ECF 29-3 ("Second Amended Complaint" or "SAC").

The battle lines in this ACA case have arguably been impacted by a decision issued on Friday, December 14, 2018, by United States District Judge Reed O'Connor of the Northern District of Texas, declaring the Individual Mandate of the ACA unconstitutional and the remaining provisions of the ACA inseverable and thus invalid. *See Texas v. United States*, No. 4:18-cv-00167-O, ECF 211, 340 F. Supp. 3d 579 (N.D. Tex. 2018) (hereinafter, *Texas* or the "*Texas* Case").[4] In the wake of the decision in *Texas*, I held a telephone conference with counsel on Monday, December 17, 2018, and directed counsel to submit supplemental briefing addressing the effect of the *Texas* Case, if any, on the State's standing to pursue its requests for declaratory and injunctive relief. *See* Docket.

The State submitted a supplemental brief on December 18, 2018 (ECF 40), contending that the *Texas* Case strengthens its standing to secure declaratory and injunctive relief. The government's supplemental brief is docketed at ECF 41. It adheres to its position that the State lacks standing. Moreover, it points out that HHS, the agency charged with enforcing the ACA, "has expressed its commitment to continue to enforce the ACA until there is a final decision or other judicial order directing otherwise." *Id.*

Several amici curiae also filed memoranda. They focused largely on the State's P.I. Motion concerning the lawfulness of the appointment of Matthew Whitaker.[5]

----

[4] The State of Maryland did not join the *Texas* Case, although many states were either plaintiffs or intervenor defendants.

[5] The amici are as follows. Judicial Watch, which describes itself as "a non-partisan, educational foundation," opposes plaintiff's P.I. Motion, ECF 14; Erwin Chemerinsky, Jon D.

Thereafter, on December 19, 2018, the Court held a lengthy motions hearing, at which argument was presented. ECF 42.

Then, on December 31, 2018, Judge O'Connor stayed his ruling of December 14, 2018. *See Texas*, No. 4:18-cv-00167-O, ECF 223. In light of Judge O'Connor's stay, this Court issued an Order on January 2, 2019 (ECF 45), inviting counsel to submit memoranda addressing the impact of the stay on the State's standing to bring suit in the instant case.

The government's response is docketed at ECF 50. It maintains that "the stay issued by Judge O'Connor confirms that the State of Maryland has neither standing nor a cause of action to sue on the basis that the State will be harmed by Defendants' alleged non-enforcement of the ACA." *Id.* at 1. Conversely, the State claims in its memorandum (ECF 51) that the stay in the *Texas* Case "does not eliminate Maryland's standing to pursue its claims regarding the continuing validity of the [ACA]." *Id.* at 1.

For the reasons that follow, I shall grant the State's Motion for Leave (ECF 29). And, I shall construe the government's Motion to Dismiss (ECF 11) as a motion lodged against the Second Amended Complaint. I shall also grant the Motion to Dismiss, without prejudice. Therefore, I shall deny, as moot, the State's Motion for Preliminary Injunction (ECF 6) and the State's Motion to Substitute (ECF 6).

Michaels, Alan B. Morrison, Victoria Nourse, Peter M. Shane, Jed Handelsman Shugerman, and Laurence H. Tribe, who describe themselves as "eminent constitutional scholars," support the P.I. Motion, ECF 16; Citizens for Responsibility and Ethics in Washington ("CREW"), a non-profit, non-partisan corporation that claims it "include[s] former government ethics officials with decades of experience applying ethics laws and regulations," support the P.I. Motion, ECF 17; Morton Rosenberg, who was involved in the drafting of the Federal Vacancies Reform Act, and who claims that he is considered the leading authority on the Federal Vacancies Reform Act, supports the P.I. Motion, ECF 24; the District of Columbia, as well as the States of Connecticut, Delaware, Hawaii, Illinois, Maine, New Mexico, New York, North Carolina, Oregon, Rhode Island, and Washington, along with the Commonwealths of Virginia, Pennsylvania, and Massachusetts, jointly filed a memorandum supporting the P.I. Motion, ECF 26.

5

## I.     Motion For Leave

As noted, the government has moved to dismiss the Amended Complaint under Rule 12(b)(1), on the basis that the State lacks "standing to pursue its declaratory relief claim." ECF 11-1 at 8.   Alternatively, the government has moved to dismiss the State's Declaratory Judgment Act claim, pursuant to Rule 12(b)(6), claiming that "the State has failed to identify a cause of action for this suit." *Id*.

In response, the State maintains that, based on the allegations of the Amended Complaint, it has standing to bring suit.  However, if the Court deems the allegations presented in the Amended Complaint deficient, Maryland seeks leave to file the Second Amended Complaint.  ECF 29; ECF 29-3.  The proposed SAC "adds allegations to respond to several arguments raised" in the government's Motion to Dismiss.  ECF 29, ¶ 3.

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings.  Under Rule 15(a)(1)(A), "[a] party may amend its pleading once as a matter of course," if done within 21 days after serving the pleading.  Or, "if the pleading is one to which a responsive pleading is required," a party may amend once as a matter of course, provided that it does so within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  FED. R. CIV. P. 15(a)(1)(B).  Rule 15(a)(2) provides that, "[i]n all other cases," a party wishing to amend its pleading must obtain "the opposing party's written consent or the court's leave."  Notably, Rule 15(a)(2) states, in part: "The court should freely give leave [to amend] when justice so requires." *Id.*

There are three circumstances when it is appropriate to deny leave to amend: "(1) 'the amendment would be prejudicial to the opposing party;' (2) 'there has been bad faith on the part of the moving party;' or (3) 'the amendment would have been futile.'" *Scott v. Family Dollar*

6

*Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th

Cir. 2006)).   An amendment is futile "when the proposed amendment is clearly insufficient or

frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).

Certainly, the government would not be prejudiced by allowing the State to file the SAC.

And, the State has not acted in bad faith.   Although I ultimately conclude that the proposed SAC

proves futile in regard to standing, that conclusion is apparent only after an analysis of the standing

issue.   Therefore, I shall grant the State's Motion for Leave and consider the allegations in the

proposed Second Amended Complaint.   Moreover, to avoid any further delay, I shall construe the

Motion to Dismiss as if it were lodged against the SAC.

## II.   Background[6]

### A.   The Affordable Care Act

The Affordable Care Act, enacted by Congress in 2010, was one of President Barack

Obama's signature legislative accomplishments.   The Act, sometimes called "ObamaCare," sought

"to increase the number of Americans covered by health insurance and decrease the cost of

healthcare." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("*NFIB*").   In over

900 pages of text, Congress endeavored to provide the opportunity for "near-universal" health-

insurance coverage and to reduce health insurance premiums through the "creation of effective

health insurance markets" and new statutory requirements for individuals and insurance

companies. *See, e.g.*, 42 U.S.C. §§ 18091(2)(D), (2)(F), and (2)(I).

The ACA ushered in its seminal changes to the United States healthcare system through a

series of provisions that created new requirements for individuals, employers, healthcare

---

[6] As discussed, *infra*, at this juncture the facts alleged in the suit are taken as true. *See* Fed. R. Civ. P. 12(b)(1); *see, e.g., Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

providers, and insurance companies. ECF 29-3, ¶ 21. Among these changes, the ACA adopted "three key reforms." *King v. Burwell,* 576 U.S. ___, 135 S. Ct. 2480, 2482 (2015).

First, the Act includes the "guaranteed-issue" and "community-rating" provisions to address "the problem of those who cannot obtain insurance coverage because of preexisting conditions or other health issues." *NFIB,* 567 U.S. at 547; *see* 42 U.S.C. § 18091(2)(I); *id.* § 300gg-1. Together, the guaranteed-issue and community-rating provisions "prohibit insurance companies from denying coverage to those with [preexisting] conditions or charging unhealthy individuals higher premiums than healthy individuals." *NFIB,* 567 U.S. at 548 (citing 42 U.S.C. §§ 300gg, 300gg-1, 300gg-3, 300gg-4).

In particular, the guaranteed issue provision requires insurers "offering coverage in an individual and group market in a State" to "accept every employer and individual in the State that applies for such coverage." 42 U.S.C. § 300gg-1(a). And, as a corollary, an insurer "offering group or individual health insurance coverage may not" exclude coverage based on a preexisting condition. *Id.* § 300gg-3(a). The community-rating provision was enacted to prevent insurers from varying premiums within a geographic area based on "certain narrow factors," including race, age, gender, sexual orientation, occupation, health status, claims history, and several others. *Id.* § 300gg.

The second key reform concerns 26 U.S.C. § 5000A, which is titled "Requirement to maintain minimum essential coverage." This provision of the Act is commonly known as the "Individual Mandate." Pursuant to the "Individual Mandate," individuals are generally required to maintain minimal essential health insurance. *Id.* § 5000A(a). The provision represented "an effort 'plainly designed to expand health insurance coverage.'" ECF 29-3, ¶ 23 (citing *NFIB,* 567 U.S. at 574).

8

To compel compliance, Congress imposed a financial penalty on individuals who were subject to the requirement but failed to purchase insurance. 26 U.S.C. § 5000A(b); *see also NFIB*, 567 U.S. at 574. However, this penalty, known as the "shared responsibility payment," did not apply to those for whom "the cost of buying insurance would exceed eight percent of that individual's income." *Burwell*, 135 S. Ct. at 2482; *see* 26 U.S.C. § 5000A(b) ("shared responsibility payment"); *id.* § 5000A(e)(1) (exempting "individuals who cannot afford coverage").[7]

Third, "to make insurance more affordable," *Burwell*, 135 S. Ct. at 2487, the Act provides tax credits, or subsidies, to purchase health insurance for individuals making between 100% and 400% of the federal poverty line. 42 U.S.C. §§ 18031, 18041.

The Act contains many other vital provisions. For example, it creates and subsidizes a health exchange in each state, *i.e.*, "a marketplace that allows people to compare and purchase insurance plans." *Burwell*, 135 S. Ct. at 2482; *see* 42 U.S.C. §§ 18031-44. "The Act gives each state the opportunity to establish its own Exchange, but provides that the Federal Government will establish 'such Exchange' if the State does not." *Burwell*, 135 S. Ct. at 2482 (citing 42 U.S.C. §§ 18031, 18041). The tax credits provided under 26 U.S.C. § 36B "can be used to pay insurance premiums in advance through an exchange." ECF 29-3, ¶ 24 (citing 42 U.S.C. § 18082).

Further, the ACA expands "Medicaid, which the States administer, to make additional segments of the population eligible to receive coverage." ECF 29-3, ¶ 26 (citing 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14)(I)(i)). Under the Act, the federal government must cover

---

[7] The ACA also exempts some groups from the Individual Mandate and shared responsibility payment, 26 U.S.C. § 5000A(d)(2)-(4), and exempts others only from the shared responsibility payment. *Id.* § 5000A(e)(2)-(5).

a significant portion of the expansion cost: 100% in 2014-2016, 95% in 2017, 94% in 2018, 93% in 2019, and 90% in 2020 and each subsequent year thereafter. 42 U.S.C. § 1396(d)(y)(1)(A)-(E).

In addition, the ACA contains a provision allowing dependent children to remain on their parents' health insurance until age 26. 42 U.S.C. § 300gg-14(a). The ACA also implemented an employer mandate and an employer-responsibility assessment. These provisions require employers with at least fifty full-time employees to pay the federal government a penalty if they fail to provide their employees with ACA-compliant health-plan options. *See* 26 U.S.C. § 4980H.

**B.    *National Federation of Independent Businesses v. Sebelius***

Since its passage, the Affordable Care Act has generated intense controversy. As Judge O'Connor observed in the *Texas* Case, "[h]ealth-insurance policy is . . . a politically charged affair — inflaming emotions and testing civility." 340 F. Supp. 3d 579, 585. Indeed, shortly after President Obama signed the Act into law, thirteen states filed suit, challenging the constitutionality of the provisions concerning minimum coverage and Medicaid expansion. And, an additional thirteen states and several individuals and organizations, including the National Federation of Independent Businesses, joined plaintiffs in the action.[8]

On June 19, 2012, the United States Supreme Court issued its landmark decision in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012). By a 5-4 vote, the Court upheld the constitutionality of the Individual Mandate and the shared responsibility payment under 26 U.S.C. § 5000A as a valid exercise of Congress's taxing power. *NFIB*, 567 U.S. at 544-46; *see also* ECF 29-3, ¶ 57 (summarizing *NFIB*).

---

[8] *See* Michael J. Graetz & Jerry L. Mashaw, *Constitutional Uncertainty and the Design of Social Insurance: Reflections on the Obamacare Case*, 7 HARV. L. POL'Y REV. 343, 344 (2013); Comment, *National Federation of Independent Business v. Sebelius: The Patient Protection and Affordable Care Act*, 126 HARV. L. REV. 72, 73 (2012).

The majority opinion, authored by Chief Justice Roberts, rejected the contention that the Individual Mandate was a lawful exercise of Congress's power to regulate interstate commerce. *NFIB*, 567 U.S. at 562. But, the Court observed that, despite the Act's reference to the payment of a "penalty," not a "tax," *see* 26 U.S.C. § 5000A, it "looks like a tax in many respects." *NFIB*, 567 U.S. at 563.

In this regard, the Court noted first that the payment obligation "is found in the Internal Revenue Code and enforced by the IRS, which . . . must assess and collect it in the same manner as taxes." *Id.* at 564 (quotation marks and citation omitted). "This process yields the essential feature of any tax: It produces at least some revenue for the Government." *Id.* (citation omitted). "Although the payment will raise considerable revenue," the Supreme Court noted, "it is plainly designed to expand health insurance coverage." *Id.* at 567. And, observed the Court, "taxes that seek to influence conduct are nothing new." *Id.*

Second, the price of the payment is "far less than the price of insurance, and by statute, it can be no more." *Id.* at 566. Unlike a prohibitory penalty, "[i]t may often be a reasonable financial decision to make the payment rather than purchase insurance." *Id.* Third, "the individual mandate contains no scienter requirement," which is "typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law.'" *Id.* Finally, "the payment is collected solely by the IRS through the normal means of taxation . . . ." *Id.*

For these reasons, the Supreme Court upheld the financial penalty under the taxing power of Congress. *Id.* at 575. It concluded: "[I]t is only because we have a duty to construe a statute to save it, if fairly possible, that § 5000A can be interpreted as a tax." *Id.* However, the Supreme Court found unconstitutional 42 U.S.C. § 1396c, a provision under the Act that coerced states to comply with the Act's expansion by threatening to "tak[e] away their existing Medicaid funding."

*Id.* at 584. "[F]or that constitutional violation," the *NFIB* Court determined that the appropriate remedy was "to preclude the Government from imposing such a sanction," but this did "not require striking down other portions of the Affordable Care Act." *Id.* at 588.

In the wake of the Supreme Court's decision in *NFIB*, "Maryland finalized its implementation of the Affordable Care Act . . . ." ECF 29-3, ¶ 6.  In particular, it enacted "a procedure to eliminate its state-operated risk pool; establish[ed] a funding stream for its fledgling independent agency, the Maryland Health Benefit Exchange; and expand[ed] Medicaid eligibility." *Id.* (citing Maryland Health Progress Act of 2013, 2013 Md. Laws ch. 139).

According to plaintiff, the *NFIB* decision did not put an end to the challenges to the ACA. Indeed, since the decision in *NFIB*, "members of Congress have attempted to repeal" the Act "an estimated 70 times." ECF 29-3, ¶ 7.  *See, e.g.,* H.R. 3762, 114th Cong. (2015); H.R. 45, 113th Cong. (2013); H.R. 6079, 112th Cong. (2012).[9]

### C.    The Tax Cuts and Jobs Act

As a candidate for President of the United States, Donald Trump repeatedly expressed his fervent opposition to the ACA.  On January 20, 2017, just hours after President Trump was sworn into office, he signed Executive Order 13765, titled "Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal." ECF 29-3, ¶ 35; *see* Exec. Order No. 13765, 82 Fed. Reg. 8351 (Jan. 20, 2017). The Executive Order instructed HHS to "exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the

---

[9] For the complete list, plaintiff cites the following, ECF 29-3, ¶ 7 n.2: C. STEPHEN REDHEAD & JANET KINZER, CONG. RESEARCH SERV., R43289, LEGISLATIVE ACTIONS IN THE 112TH, 113TH, AND 114TH CONGRESSES TO REPEAL, DEFUND, OR DELAY THE AFFORDABLE CARE ACT (2017), https://fas.org/sgp/crs/misc/R43289.pdf.

implementation of any provision or requirement of the [Affordable Care] Act that would impose a fiscal burden on any State . . . ." *Id.*

The Second Amended Complaint alleges that "the President has continued his campaign to undermine the enforcement of [the ACA], by launching a series of measures that include suspending cost-sharing reduction payments; directing his agencies to implement statutorily unauthorized rules disrupting enforcement of nondiscrimination provisions and disrupting individual and small group market reforms; and curtailing funding for the federally-facilitated exchanges." ECF 29-3, ¶ 11.

For example, on October 12, 2017, "the President announced that his Administration was reversing course on a longstanding policy of the Secretaries of Health and Human Services and Treasury to make cost-sharing reduction (one way the Act subsidizes individual purchase of health insurance) payments ('CSR payments') each month under the authority provided to them by the Affordable Care Act's permanent appropriation." *Id.* ¶ 36. In a statement "issued by the White House Press Secretary," the Trump Administration stated that HHS "had concluded" that the Act's "permanent appropriation [did] not apply to CSR payments." *Id.* Early the next day, DOJ "made a court filing including a copy of a new opinion by the Attorney General addressing the purported legal basis for the Administration's action." *Id.* Also on October 13, 2017, the President tweeted, *id.*: "The Democrats ObamaCare is imploding. Massive subsidy payments to their pet insurance companies has stopped. Dems should call me to fix!"[10]

About two months later, on December 22, 2017, President Trump signed into law the TCJA, the most sweeping tax reform legislation in recent history. Of relevance here, "as part of a

---

[10] Donald J. Trump (@realDonaldTrump), TWITTER (Oct. 13, 2017, 2:36 AM), https://twitter.com/realDonaldTrump/status/918772522983874561.

larger revision of federal income tax laws," Congress amended the tax code by reducing to zero

the shared responsibility payment of the ACA, 26 U.S.C. § 5000A(b), "for individuals failing to

demonstrate health insurance coverage, which is based on a percentage of the taxpayer's household

income." ECF 29-3, ¶ 8. Notably, the TCJA "did not repeal any provision of the Affordable Care

Act." *Id.* However, it "reduced the shared responsibility percentage from '2.5%' to 'zero percent,'

and the applicable dollar amount from '$695' to '$0.'" *Id.* (citing Pub. L. 115-97, 2017 HR 1, at

*2092 (Dec. 22, 2017)). This change, which went into effect on January 1, 2019 (ECF 29-3, ¶ 8),

essentially gutted the Individual Mandate.

Senator Pat Toomey (R-PA) made clear in floor debate that Congress intended to reduce

the payment but sought to preserve the remainder of the Affordable Care Act. He said:

> We don't change any of the subsidies. They are all available to anyone who
> wants to participate. We don't change the rules. We don't change eligibility.
> We don't change anything except one thing. We say that if you decide this
> plan doesn't fit your family or if you decide for all the subsidies you get it is
> still not worth it for you to have this plan and you opt out, you will no longer be
> punished with this tax. That is the only thing we do in this bill.

163 CONG. REC. S7672 (daily ed. Dec. 1, 2017); *see also* ECF 29-3, ¶ 30.

Several other senators echoed his view. Senator Shelley Moore Capito (R-WV) asserted:

"There has been a lot of misinformation about this provision, so let me just clarify. No one is

being forced off of Medicaid or a private health insurance plan by the elimination of the individual

mandate. By eliminating the individual mandate, we are simply stopping penalizing and taxing

people who either cannot afford or decide not to buy health insurance plans." 163 CONG. REC.

S7383 (daily ed. Nov. 29, 2017); *see also* ECF 29-3, ¶ 31.

And, Senator Orrin Hatch (R-UT) explained during the Senate Finance Committee's

markup of the tax bill:

14

[L]et us be clear, repealing the tax does not take anyone's health insurance away. No one would lose access to coverage or subsidies that help them pay for coverage unless they chose not to enroll in health coverage once the penalty for doing so is no longer in effect. No one would be kicked off of Medicare. No one would lose insurance they are currently getting from insurance carriers. Nothing—nothing— in the modified mark impacts Obamacare policies like coverage for preexisting conditions or restrictions against lifetime limits on coverage.

*Continuation of the Open Executive Session to Consider an Original Bill Entitled the Tax Cuts and Jobs Act Before the S. Comm. on Fin.*, 115th Cong. 106 (2017); *see also* ECF 29-3, ¶ 32.

Senator Tim Scott (R-SC) declared: "Anyone who doesn't understand and appreciate that the individual mandate and its effects in our bill take nothing at all away from anyone who needs a subsidy, anyone who wants to continue their coverage—it does not have a single letter in there about preexisting conditions or any actual health feature." 163 CONG. REC. S7666 (daily ed. Dec. 1, 2017); *see also* ECF 29-3, ¶ 33.

The State acknowledges in the Second Amended Complaint that, notwithstanding the passage of the TCJA, the statements of congressional legislators demonstrate a "clear" congressional intent "to maintain all provisions of the Affordable Care Act as enacted. . . ." ECF 29-3, ¶ 8. But, the State points to a speech delivered by President Trump on June 19, 2018, "shortly after another Congressional repeal effort had failed." *Id.* ¶ 37. Referring to the passage of the TCJA, President Trump "touted Congress's decision to reduce the shared responsibility payment to $0." *Id.* He proclaimed:[11]

Our historic tax cuts also ended one of the most unfair taxes imaginable – Obamacare's individual mandate. . . . Government will no longer punish you if you cannot afford Obamacare's sky-high premiums. Think of this: You pay a lot of money to the government in order not to have to buy in health

---

[11] Remarks by President Trump at the National Federation of Independent Businesses 75th Anniversary Celebration, THE WHITE HOUSE (June 19, 2018), https://www.whitehouse.gov/ briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration; *see also* ECF 29-3, ¶¶ 37-38 (summarizing President Trump's June 19, 2018 remarks).

insurance. Think of that. So you're paying money that you don't – that's a penalty. Incredibly, it was allowed. But you're paying money so that you don't have to buy healthcare. That was a beauty. It's over. It's gone. It's done.

President Trump also praised "one of his executive actions," a final administrative rule exempting "association health plans"—a category of plans that allows small businesses to band together to obtain health coverage—"from certain Affordable Care Act requirements . . . ." ECF 29-3, ¶ 38. The President commented that this measure was a "'truly historic step in [the Administration's] efforts to rescue Americans from ObamaCare and the ObamaCare nightmare.'" *Id.* Claiming that "'ObamaCare has been especially brutal for small businesses,'" the President maintained that the final rule would "make it easier for small businesses to band together to negotiate lower prices for health insurance and escape some of Obamacare's most burdensome mandates through association health plans." *See* ECF 29-3, ¶¶ 37-38; *see also supra* note 11.

### D.   *Texas v. United States*

In February 2018, nearly two months after the enactment of TCJA, "a group of states, led by Texas," filed suit in the Northern District of Texas, seeking a declaratory judgment and a preliminary injunction. ECF 29-3, ¶ 9 (citing *Texas*, No. 4:18-cv-00167-O, ECF 1 (N.D. Tex. Feb 26, 2018)). The plaintiff states are Texas, Wisconsin, Alabama, Arkansas, Arizona, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Maine. They sued the United States of America; HHS; Alex Azar, in his official capacity as Secretary of HHS; the IRS; and David J. Kautter, in his official capacity as Acting Commissioner of IRS. However, they did not sue the Attorney General of the United States or DOJ. The States of California, Connecticut, Delaware, Hawaii, Illinois, Kentucky, Minnesota, New Jersey, New York, North Carolina, Oregon Rhode Island, Vermont, and Washington, along with the Commonwealths of Virginia and Massachusetts

and the District of Columbia, intervened as defendants (collectively, the "Intervenor Defendants"). *See Texas*, No. 4:18-cv-00167-O, ECF 74 (N.D. Tex. May 16, 2018) (granting motion to intervene).  As noted, Maryland did not participate in the suit.

The plaintiffs in *Texas* sought, *inter alia*, a declaration that the ACA, as amended by the TCJA, is unconstitutional and that the remainder of the ACA is not severable.  *Texas*, No. 4:18-cv-00167-O, ECF 27, ¶ 57 (N.D. Tex. April 23, 2018) ("Amended *Texas* Complaint"); *see also* ECF 29-3, ¶ 9.  They asserted that once the TCJA Amendment becomes effective in 2019, the Mandate is no longer enforceable as a tax and is therefore invalid.  *Id.*  And, if the Mandate falls, so too must the entire Act.  *Id.*

On June 7, 2018, pursuant to 28 U.S.C. § 530D,[12] "Attorney General Sessions sent Congress a letter indicating that the Department of Justice will not defend the constitutionality of 26 U.S.C. § 5000A(a)," *i.e.*, the Individual Mandate provision, "in the context of *Texas v. United States* . . . ." ECF 29-3, ¶ 10; *See also* Letter from Jefferson B. Sessions, III to Paul D. Ryan, https://www.justice.gov/file/1069806/download (June 7, 2018) ("Sessions Letter").

Among his reasons for declining to defend the provision's constitutionality, Attorney General Sessions stated: "[T]he President has concluded that the statute is unconstitutional and made manifest that it should not be defended . . . ." *See* Sessions Letter, at 2.  Moreover, he explained that "the Department's decision not to defend Section 5000A(a)'s constitutionality will not prevent the court in *Texas v. United States* from resolving the question, given the posture of the case." *Id.*

_____

[12] 28 U.S.C. § 530D(a)(1)(B) provides: "The Attorney General shall submit to the Congress a report of any instance in which the Attorney General or any officer of the Department of Justice . . . determines to contest affirmatively, in any judicial administrative, or other proceeding, the constitutionality of any provision of any Federal statute, rule, regulation, program, policy, or other law . . . ."

17

Sessions also indicated that DOJ would "argue that § 5000A(a) is not severable" from certain provisions of the Act: the guaranteed-issue provisions, *see* 42 U.S.C. §§ 300 gg–1, 300gg–4(a); the community-rating provisions, *see id.* §§ 300gg(a)(1), 300gg–4(b); and the preexisting conditions provisions. *See id.* § 300gg–3. ECF 29-3, ¶ 10. Notably, however, Sessions stated that "the Department will continue to argue that Section 5000A(a) is severable from the remaining provisions of the ACA." *See* Sessions Letter, at 3.

Thereafter, DOJ, as government counsel, "filed a brief [in the *Texas* Case] urging the court to 'hold that the ACA's individual mandate will be unconstitutional as of January 1, 2019, and that the ACA's guaranteed-issue and community-rating provisions are inseverable from the mandate,' and further requesting that the court grant declaratory relief to that effect." ECF 29-3, ¶ 10 (citing *Texas* Case). Of relevance, at oral argument in the *Texas* Case on September 5, 2018, DOJ represented that "'the current administration supports protections for people with preexisting health conditions,'" but it also affirmed "the position that the minimum coverage requirement will be unconstitutional" and that the rest of the Act, including the community-rating and guaranteed-issue provisions, "'must fall' as well." ECF 29-3, ¶ 10.

As mentioned, Judge O'Connor issued his ruling on December 14, 2018, declaring unconstitutional the Individual Mandate, 26 U.S.C. § 5000A(a). *Texas*, 340 F. Supp. 3d 579. In his view, the Individual Mandate "is no longer fairly readable as an exercise of Congress's Tax Power and continues to be unsustainable under Congress's Interstate Commerce Power." *Id.* at 585. Further, he declared the remaining provisions of the Affordable Care Act inseverable and therefore invalid. *Id.*

Minutes after the decision was issued, President Trump tweeted: "As I predicted all along, Obamacare has been struck down as an UNCONSTITUTIONAL disaster! Now Congress must

pass a STRONG law that provides GREAT healthcare and protects pre-existing conditions. . . ."[13]
And, he tweeted: "Wow, but not surprisingly, ObamaCare was just ruled UNCONSTITUTIONAL
by a highly respected judge in Texas. Great news for America!"[14]

Two weeks later, on December 31, 2018, Judge O'Connor entered a partial judgment,
invalidating the Individual Mandate and declaring the ACA's remaining provisions inseverable
and therefore invalid. *See Texas*, 4:18-cv-00167-O, ECF 221 (N.D. Tex. Dec. 30, 2018).
However, he also stayed his Order of December 14, 2018. *See Texas*, 4:18-cv-00167-O, ECF 223
(N.D. Tex. Dec. 31, 2018).

On January 3, 2019, the Intervenor Defendants noted an appeal to the United States Court
of Appeals for the Fifth Circuit. ECF 221. *See Texas, et al. v. United States, et al.*, No. 19-10011.
The Fifth Circuit stayed proceedings on January 11, 2019, in light of the partial government
shutdown. *Id.* The shutdown ended on January 25, 2019. *See* Further Additional Continuing
Appropriations Act, H.R.J. Res. 28, 116th Cong. (2019).

### III.  Discussion

#### A.

Defendants argue that this Court is without subject matter jurisdiction to consider this case
because plaintiff lacks Article III standing to pursue its suit. According to the defense, the State's
claim is merely speculative.

It is a bedrock principle that Article III of the Federal Constitution limits judicial power to
"actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)

---

[13] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 14, 2018, 6:07 PM),
https://twitter.com/realDonaldTrump/status/1073761497866747904.

[14] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 14, 2018, 6:16 PM),
https://twitter.com/realDonaldTrump/status/1073763695807877120.

(citations omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct. 1540, 1547 (2016)).

The Supreme Court explained in *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011): "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary. . . . For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *See also Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("[T]he constitutional limitation of federal-court jurisdiction to actual cases or controversies" is "fundamental to the judiciary's proper role in our system of government[.]"); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (stating that Article III standing "enforces the Constitution's case-or-controversy requirement"), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (stating that under Article III of the Constitution "'the exercise of judicial power depends upon the existence of a case or controversy'") (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)); *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (stating that Article III "gives federal courts jurisdiction only over cases and controversies") (internal quotation marks and citations omitted).

Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). Conversely, in the absence of a case or controversy, "the court's subject matter jurisdiction ceases

20

to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."[15]

The "constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [] of justiciability.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted). Like standing, ripeness is an issue of subject matter jurisdiction. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see Nat'l Ass'n for the Advancement of Colored People v. Bureau of the Census*, PWG-18-891, 2019 WL 355743, at *8 (D. Md. Jan 19, 2019) ("NAACP") (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

As with standing, the ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). Whereas standing focuses on who can sue, ripeness "'concerns the appropriate timing of judicial

---

[15] Under the political question doctrine, which is not asserted here, courts may not "review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). It is a "narrow exception" to judicial review. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *see Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 561 (D. Md. 2018).

intervention.'" *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)); *see NAACP*, 2019 WL 355743, at *8 (noting that standing addresses who may sue, and ripeness addresses when a party may sue).

Notably, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). In other words, "the ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements' . . . ." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citations omitted); *see also South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019); *NAACP*, 2019 WL 355743, at *14.

The doctrines of ripeness and standing have largely blurred in declaratory judgment actions. *See* 13B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3532.5 (3d ed. 2018). In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court recognized that "standing and ripeness boil down to the same question." *Id.* at 128 n.8; *accord Susan B. Anthony*, 573 U.S. at 157 n.5; *see South Carolina v. United States*, 912 F.3d at 730; *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *NAACP*, 2019 WL 355743, at *8; *see also Capital Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374, 380 (M.D.N.C. 2017) (characterizing discussion of standing and ripeness as "one involving 'standing'" in light of *MedImmune* and *Susan B. Anthony*).

This case may be better decided under the doctrine of ripeness (which addresses when a party may sue) rather than standing (which addresses who may sue). *Cf. South Carolina*, 912 F.3d at 730 (quoting *Miller*, 462 F.3d at 319) ((citing ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.4 (4th ed. 2003)) ("'Although the phrasing makes the questions of who may sue and when they

sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness.'"); *accord NAACP*, 2019 WL 355743, at *8. Nevertheless, the parties have not addressed ripeness. Rather, they have addressed the question of justiciability through the lens of standing. Therefore, I shall do the same, given that the analysis is largely the same.

**B.**

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11. As discussed, *infra*, "the standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case . . . ." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

As indicated, the requirements for constitutional standing reflect that Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated in part on other grounds by Lexmark Int'l, Inc.*, *supra*, 572 U.S. 118; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1993) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III[.]"); *So. Walk at Broadlands Homeowner's Assoc. Inc. v. Openband at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)).

In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's exercise of jurisdiction. *United States v. Windsor*, 570 U.S. 744, 133 S. Ct. 2675, 2687 (2013); *see also*, *e.g.*, *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11; *Doe v. Sebelius*, 676 F. Supp. 2d 423, 428 (D.

Md. 2009). Prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (citation omitted).

One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th Cir. 1984)).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Lujan*, 504 U.S. at 561; *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). When, as here, "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal*, 911 F.3d at 187 (quoting *So. Walk*, 713 F.3d at 181-82); *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [since] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and quotation marks omitted); *accord Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018); *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205 (4th Cir. 2017); *NAACP*, 2019 WL 355743, at *17.

Therefore, in analyzing the standing issue, I shall accept as true the allegations in the SAC, so long as "there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir.), *cert. denied sub nom. Beck v. Shulkin*, ___ U.S. ___, 137 S. Ct. 2307 (2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

To establish Article III standing, a plaintiff must satisfy three elements. *See Lujan,* 504 U.S. at 560. They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d

260, 284 (4th Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

To meet the injury-in-fact requirement, a plaintiff must establish that it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural and hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Alternatively, a threatened injury can satisfy Article III standing, although "not all threatened injuries constitute an injury-in-fact." *Beck*, 848 F.3d at 271; *see South Carolina*, 912 F.3d at 726. As the Fourth Circuit recently explained in *Deal*, 911 F.3d at 189, the two concepts— actual, ongoing injury or imminent injury—are "disjunctive."

An "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see Lujan*, 504 U.S. at 564. In contrast, and of import here, "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original)). This requirement serves "to ensure that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

In some cases, it is enough that there is a "substantial risk" of a harm occurring that "prompt[s] plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. But, in such a case, the plaintiff cannot rely on an "attenuated chain of inferences" nor "on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). Nor can plaintiffs "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would

be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*; *see, e.g.*, *Wikimedia*, 857 F.3d at 216 ("Nor can Plaintiffs establish standing on the ground that . . . surveillance compels them to take burdensome and costly measures.").

Generally speaking, "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (internal quotation marks omitted). On the other hand, a claim "should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Id.* (internal quotation marks omitted). As the Fourth Circuit recently reiterated, "an alleged harm is too 'speculative' to support Article III standing when the harm lies at the end of a 'highly attenuated chain of possibilities.'" *South Carolina*, 912 F.3d at 727 (quoting *Clapper*, 568 U.S. at 410).

## C.

The parties primarily dispute whether the injury-in-fact element is satisfied here. An injury-in-fact is the "[f]irst and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 U.S. 83, 103 (1998). To demonstrate an injury-in-fact, the plaintiff must have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

For the purposes of meeting the injury-in-fact requirement, states "are not normal litigants." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). They may show harm to three kinds of interests: (1) proprietary or financial interests, (2) quasi-sovereign interest, and

27

(3) sovereign interests. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 152-55 (5th Cir. 2015), *aff'd by an equally divided court*, ___ U.S. ___, 136 S. Ct. 2271 (2016).

Maryland alleges harm to all three interests. I will discuss each, in turn.

### 1.    Proprietary and Financial Interests

Maryland alleges that it has "fundamentally altered its healthcare" scheme in reliance on the ACA. ECF 29-3, ¶ 43. And, it contends that the State's finances will suffer harm if defendants cease to enforce part or all of the ACA.

Like any other party, a state can establish standing by alleging a direct injury to its financial or proprietary interests. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437 (1992) (concluding that Wyoming had standing to challenge an Oklahoma law that caused Wyoming to lose tax revenues). In this regard, Maryland asserts: "Substantial numbers of Maryland residents have been able to obtain health insurance by virtue of the guaranteed issue, community rating, and prohibition on pre-existing condition exclusions provisions." ECF 29-3, ¶ 25. But, if "those provisions cease to be enforced," the State insists that many Marylanders would lose their coverage. *Id.* In turn, this would "lead[] to a substantial increase in the amount of uncompensated care provided by Maryland hospitals and other healthcare providers, particularly through emergency room visits." *Id.*

Further, if the uninsured population in Maryland increases, the State contends that, as "a payer of hospital rates," it will "be directly injured by any increase to the uncompensated care rate . . . ." *Id.* ¶ 48. Therefore, the State posits that it is "directly injured by an increase to the uncompensated care rate that will occur if the uninsured population in Maryland increases." *Id.*

Maryland also asserts current harm to its finances as a consequence of the substantial risk that defendants will no longer enforce the ACA. It claims that it has made several investments in reliance on the ACA, which are now at risk. *Id.* ¶ 43. To name a few, the State established the

Maryland Health Benefit Exchange (the "Exchange") to develop and operate the individual exchange; created a funding stream for the Exchange; and entered into a "Total Cost of Care Model" with the Centers for Medicare and Medicaid Services ("CMS"). *Id.*; *see also* ECF 8, ¶ 43.

In the State's view, the "uncertainty regarding the Defendants' future enforcement of the Act harms Maryland." ECF 29-3, ¶ 44. It claims that the State lacks "clear guidance whether public dollars are better spent investing in market reforms compatible with the Affordable Care Act . . . or in re-establishing needed consumer protections in the Maryland insurance market. . . ." *Id.* Such "uncertainty," it claims, could cause "inefficient use" or the "waste of public funds." *Id.*

Moreover, the State alleges that "programmatic uncertainties" currently "pose a risk of injury to Maryland's financial well-being." *Id.* ¶ 54. In particular, the State asserts that it has an "'above-average economic dependence on federal government employment and spending.'" *Id.* (citing S&P Global Ratings). Therefore, a "threatened decrease in federal spending requires Maryland to consider taking proactive financial management steps to maintain its bond rating, which could require either financial harm to Maryland or an inability to carry out desired programs to the fullest extent." *Id.* Further, it must proactively take steps to align its budget because of these uncertainties. *Id.* (citing statements of Maryland's Treasurer Nancy Kopp and S&P Global Ratings).[16]

The government maintains that Maryland is merely speculating as to nonenforcement, and also speculating that nonenforcement will reduce insurance rates and increase the volume of uncompensated care. ECF 33 at 14. Further, it claims that the State is merely speculating "that it

---

[16] *See* Nancy K. Kopp, Md. State Treasurer, Maryland Retains Triple AAA Bond Rating, To Sell Up To $510 Million of General Obligation Bonds (July 24, 2018), http://www.treasurer.state.md.us/media/110051/bond_rating_release_7_24_2018.pdf.

might see increased expenses associated with reinstituting state protections, restructuring its insurance market, or enforcing the law itself." *Id.*

## 2.    Quasi-Sovereign Interests

Maryland alleges harm to its quasi-sovereign interests to establish so-called *parens patriae* standing. Quasi-sovereign interests include a state's interest "in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). States also have a quasi-sovereign interest "in securing observance of the terms under which it participates in the federal system." *Id.* at 607-08. "This means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. Thus, "States have 'special solicitude' to sue the United States . . . if a quasi-sovereign interest of the state is at stake." *Indiana v. E.P.A.*, 796 F.3d 803, 810 (7th Cir. 2015) (citing *Massachusetts v. E.P.A.*, 549 U.S. at 520); *see also Michigan v. E.P.A.*, 581 F.3d 524, 529 (7th Cir. 2009) ("'[S]pecial solicitude' afforded to States for standing purposes when there is a quasi-sovereign interest at stake").

Although there are no "definitive limits on the proportion" of a state's residents harmed "by the challenged behavior," a state must allege injury on behalf of a "sufficiently substantial segment of its population." *Alfred L. Snapp*, 458 U.S. 592 at 607. The "indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.* A state cannot merely be "a nominal party without a real interest of its own . . . ." *Id.* at 600.

However, a state cannot sue as *parens patriae* "to protect citizens of the United States from the operation" of federal statutes. *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). In such cases, "it is no part of [a state's] duty or power to enforce their rights in respect of their relations

with the federal government.  In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate[.]"  *Id.*

The parties disagree about whether states can ever bring *parens patriae* suits against the federal government.  In the government's view, *Mellon* categorically bars such suits.  ECF 33 at 17.  Maryland rejects this theory, arguing that a state can sue federal agencies and officers to compel them to comply with federal law.  ECF 27 at 19.

I am not persuaded by the government's position.  In *Massachusetts v. E.P.A.*, *supra*, 549 U.S. 497, the Supreme Court rejected this position, noting "*Mellon* itself disavowed any such broad reading[.]"  *Id.* at 520 n.17.  The Court highlighted the "critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* (quoting *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447 (1945)); *accord D.C. v. Trump*, 291 F. Supp. 3d 725, 747 (D. Md. 2018); *Aziz v. Trump*, 231 F. Supp. 3d 23, 31 (E.D. Va. 2017).

Further, the government's argument "ignores an established line of cases" in which states brought suit "to enforce the rights guaranteed by a federal statute."  *Texas v. United States*, 86 F. Supp. 3d 591 (2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided court*, ___ U.S. ___, 136 S. Ct. 2271 (2016); *see, e.g.*, *Wash. Utilities & Transp. Comm'n v. F.C.C.*, 513 F.2d 1142 (9th Cir. 1975) (state regulatory agency filed *parens patriae* suit against Federal Communications Commission and the federal government); *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990) (state brought suit against the federal government under *parens patriae* theory); *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984) (state used *parens patriae* theory to maintain suit against HHS).

31

Maryland contends that it will suffer harms to two distinct quasi-sovereign interests if defendants stop enforcing the ACA. First, it claims that the loss of health insurance will undermine the "health and well-being" of its residents because the "lack of insurance has substantial negative health and economic effects for the uninsured and the population more broadly." ECF 27 at 18. Second, it claims to have "standing to ensure that its residents are not denied the substantial benefits the ACA affords them, including the right to secure insurance free from discrimination based on disability or other pre-existing conditions." *Id.* Maryland also alleges actual harm from the reduced enrollment that may result from "consumer confusion surrounding the implementation of the Government's decision not to enforce some or all of the Affordable Care Act." ECF 29-3, ¶ 48.

The government counters that such injuries, like the alleged injuries to the State's financial and proprietary interests, are speculative. ECF 33 at 14-15. And, as already noted, the government believes that the State cannot bring a *parens patriae* suit against the federal government. *Id.* at 17.

### 3.    Sovereign Interests

The State insists that nonenforcement of the ACA will inflict direct injury on its sovereign interests.

"A state possesses an interest in its 'exercise of sovereign power over individuals and entities within the relevant jurisdiction,' which 'involves the power to create and enforce a legal code.'" *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) (quoting *Alfred L. Snapp*, 458 U.S. at 601); *West Virginia v. E.P.A.*, 362 F.3d 861, 868 (D.C. Cir. 2004) (concluding that state has standing to challenge EPA regulations that would require revising state implementation plans under the Clean Air Act); *Florida v. Weinberger*, 492 F.2d 488, 494 (5th Cir. 1974) ("Florida has standing, arising from its clear interest . . . in being spared the

32

reconstitution of its statutory program[.]"). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where 'the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program' and does not 'simply purport [ ] to immunize [state] citizens from federal law.'" *Texas v. United States*, 809 F.3d at 153 (citing *Cuccinelli*, 656 F.3d at 269, 270).

According to Maryland, non-enforcement of the ACA will interfere with its "creation and enforcement of its insurance and healthcare regulatory regime[.]" ECF 27 at 15. Further, it argues that the State will need to modify its laws and divert state resources from other priorities. *Id.*

In contrast, the government maintains that such abstract injuries do not establish a sovereign harm. ECF 33 at 19. Rather, sovereign harms are limited to more concrete ones, such as "injuries to a State's interests in enforcing its laws or maintaining its borders." *Id.*

**D.**

The State's allegations clearly suggest that it will suffer a "concrete and particularized" injury *if* defendants cease to enforce part or all of the ACA. *Lujan,* 504 U.S. at 560. However, the State fails to plead facts sufficient to show that su0ch an injury is "imminent" and "not conjectural or hypothetical." *Id.*

As noted, to satisfy the injury-in-fact prong, an "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5). Under the "substantial risk standard," the future harm "may prompt plaintiffs to reasonably incur [present] costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010)).

33

Maryland claims to have suffered an injury because of the "substantial risk" of defendants' failure to enforce the ACA, and it purports to face "certainly impending" harm from such conduct. Because the substantial risk standard is a lower threshold to clear, I shall analyze whether the State has adequately alleged a substantial risk that defendants will no longer enforce part or all of the ACA. *See Clapper*, 568 U.S. at 414 n.5 (characterizing substantial risk standard as either the same as or less stringent than the "certainly impending" standard).

The State relies on its claims that the President and his administration have waged, and continue to wage, a relentless campaign to sabotage and nullify the ACA, through legislative and executive action. ECF 29-3, ¶ 11. It points out that repeal of the ACA is a "core policy goal" of the President, who is determined "to undo" the Act. *Id.* The State also alleges: "Since taking office, the Trump Administration has engaged in a sustained effort to 'explode' the Affordable Care Act by making it more difficult and expensive for individuals to procure health insurance through the Act's Exchanges." *Id.* ¶ 35 (citing Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains 'Law of the Land,' but Trump Vows to Explode It*, WASH. POST, Mar. 24, 2017, https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html (summarizing March 24, 2017 interview of Trump)).

In support of its claim of an imminent decision by the Administration not to enforce the ACA, Maryland points to various statements made by the President, indicating his contempt for the Act. For example, after President Trump suspended cost-sharing reduction payments, he tweeted: "The Democrats ObamaCare is imploding. Massive subsidy payments to their pet insurance companies has stopped. Dems should call me to fix!" ECF 29-3, ¶ 36. Similarly, after the Trump Administration promulgated a rule that exempts "association health plans" from some

ACA requirements, the President said the rule represented a "truly historic step in our efforts to rescue Americans from ObamaCare and the ObamaCare nightmare." *Id.* ¶ 38.

Further, the Second Amended Complaint alleges that various measures have already been implemented to undermine enforcement of the law. *Id.* ¶ 11. These include "suspending cost-sharing reduction payments; directing [the] agencies to implement statutorily unauthorized rules disrupting enforcement of nondiscrimination provisions and disrupting individual and small group market reforms; and curtailing funding for the federally-facilitated exchanges." *Id.* In the same vein, Maryland points to the President's Executive Order, titled "Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal," as evidence of an intent to dismantle the ACA. *Id.* ¶ 35; *see also supra* note 11. However, the State does not allege that the Executive Order undermined the ACA or impaired the proper functioning of health insurance markets. *See* ECF 29-3.

Maryland also highlights the Trump Administration's litigation position in the *Texas* Case, No. 4:18-cv-00167-O. As noted, in that case, pursuant to 28 U.S.C. § 530D, Attorney General Sessions sent a letter to Congress indicating that DOJ, with the approval of President Trump, would decline to defend the constitutionality of the ACA's Individual Mandate provision. ECF 29-3, ¶ 10. In addition, he represented that DOJ would argue that the Individual Mandate is not severable from the ACA's provisions as to guaranteed issue, community rating, and preexisting conditions. *Id.*

The State contrasts the Sessions Letter with a letter authored by Attorney General Eric Holder, Jr. in 2011, informing Congress of DOJ's decision not to defend Section 3 of the Defense of Marriage Act ("DOMA"), Pub. L. No. 104–199, 1 U.S.C. § 7 and 28 U.S.C. § 1738C. ECF 27 at 11. Holder stated that, despite DOJ's view that DOMA was unconstitutional, "the President has

35

instructed executive agencies to comply with Section 3 . . . , consistent with the Executive's obligation to take care that the laws be faithfully executed, unless and until Congress repeals Section 3 or the judicial branch renders a definitive verdict against the law's unconstitutionality." *Id.* (quoting Holder's letter of February 23, 2011, to Speaker of the House John Boehner, https://www.justice.gov/opa/pr/letter-attorney-general-congress-litigation-involvingdefense-marriage-act). In contrast to Holder, Attorney General Sessions "made no promise to continue to enforce the provisions [of the ACA that] he viewed as unconstitutional or inseverable during the pendency of litigation." ECF 29-3, ¶ 10.

The proposed SAC also identifies "[o]ther recent controversies" to demonstrate "the Executive Branch's willingness to abandon prior policies based on threatened or ongoing litigation, as opposed to judicial determination of merits issues." *Id.* ¶ 39. First, the Trump Administration relied on threatened litigation to rescind Deferred Action for Childhood Arrivals ("DACA") (i.e., protections for so called "Dreamers"). *Id.* Second, even though DOJ had obtained a preliminary injunction enjoining a website from distributing 3-D printed gun plans, the Administration entered a settlement agreement allowing the website to distribute the plans. *Id.* ¶ 40; *see also Defense Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (upholding the preliminary injunction), *cert. denied*, ___ U.S. ___, 138 S. Ct. 638 (2018). According to the State, the government entered that settlement "without notifying Congress as required under the applicable export-control statute." ECF 29-3, ¶ 40. Third, the Administration "revers[ed] course on a longstanding policy of the Secretaries of Health and Human Services and Treasury to make cost-sharing reduction (one way the Act subsidizes individual purchase of health insurance) payments ('CSR payments')[.]" *Id.* ¶ 36.

With these allegations in mind, Maryland primarily relies on three cases to establish standing. ECF 40 at 11-12. In the context of the allegations, they are not persuasive.

First, in *Monsanto*, 561 U.S. at 155, the Supreme Court concluded that plaintiffs would be injured by an executive agency's decision to deregulate a kind of genetically-engineered alfalfa crop. The Court found standing because the agency's decision to deregulate created a "significant risk" of contaminating plaintiff's "non-genetically-engineered" varieties of alfalfa. *Id.* As a result of that risk, plaintiffs would have to test their crops regularly for contamination and take measures to prevent gene flow. These activities would drive up their costs and cause a concrete harm to plaintiffs. Notably, in *Monsanto*, the government had actually made a decision to deregulate, and the harms were "readily attributable to [the agency's] deregulation decision." *Id.* Here, however, the alleged harms flow from concerns about a decision that the Trump Administration has not made and may never make.

Second, in *Thomas v. Union Carbide Agricultural Products Company*, 473 U.S. 568, 580 (1985), the plaintiff challenged a statutorily-mandated arbitration regime for data disputes between pesticide manufacturers. The plaintiff manufacturer had "engaged in an arbitration lasting many months and consuming 2,700 pages of transcript." *Id.* at 581. The Court concluded that "it is sufficient for purposes of a claim under Article III challenging a tribunal's jurisdiction that the claimant demonstrate it has been or inevitably will be subjected to an exercise of such unconstitutional jurisdiction." *Id.*

Maryland highlights the Supreme Court's reliance on the plaintiff suffering "the continuing uncertainty and expense of depending for compensation on a process whose authority is undermined because its constitutionality is in question." *Id.* But, this portion of the Supreme Court's analysis pertained to ripeness, not standing. And, even without the pervasive uncertainty,

the plaintiff still would have had standing, because it was "subject[] to" the allegedly unconstitutional arbitration regime. *Id.* at 580. However, unlike the plaintiff manufacturer, the State does not contend that it is subject to an unconstitutional statute. Rather, it relies on a longer causal chain with a broken first link: it speculates that the government may stop enforcing the ACA.

Third, in *EQT Production Company v. Wender*, 870 F.3d 322, 330-31 (4th Cir. 2017), an operator of natural gas wells challenged a local ordinance prohibiting permanent storage of wastewater in certain wells. The Fourth Court recognized standing because the credible threat of the county defendant enforcing the ordinance would force plaintiff to incur significant costs. *Id.* at 331.

Here, the State does not fear an imminent risk of enforcement. Rather, it fears nonenforcement, which it claims would result in significant costs and harm to the State. Whereas the executive agencies are responsible for enforcing the law and can therefore be expected to bring enforcement actions, they are categorically prohibited from flouting the law. To establish a plausible inference that an agency will imminently flout the law, particularly one affecting millions of people and billions of federal dollars, requires more persuasive allegations that defendants imminently intend not to enforce the ACA.

The President's profound disdain for the ACA cannot be seriously disputed. But, the State's allegations do not create a plausible inference of a substantial or certainly impending risk that the Trump Administration will cease enforcement of part or all of the ACA. Neither the President's zealous attempts to repeal the statute, nor his derisive comments about it, support an inference that he will fail to enforce the law.

Nor can the State claim standing based on the Trump Administration's decision to settle litigation over the cost-sharing reduction payments at issue in *United States House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 168 (D.D.C.) (the "CSR case"), *appeal held in abeyance*, 676 F. App'x 1 (D.C. Cir. 2016). Plaintiff asserts, ECF 29-3, ¶ 39: "[R]ecent controversies have demonstrated the Executive Branch's willingness to abandon prior policies based on threatened or ongoing litigation, as opposed to judicial determination of merits issues."

In the CSR case, Judge Rosemary M. Collyer concluded that Congress did not appropriate funds for the cost-sharing reduction payments. 185 F. Supp. 3d at 168. Additionally, in response to an emergency request for a ruling to compel the Trump Administration to continue making the payments, another court in the Northern District of California concluded that "although it's a close question, it appears initially that the Trump Administration has the stronger legal argument." *California v. Trump*, 267 F. Supp. 3d 1119, 1121 (N.D. Cal. 2017). Even if the Trump Administration improperly used that litigation as a ploy to terminate CSR payments, it would seem unlikely that it could use the same maneuver in the *Texas* Case. There, several states have intervened as defendants to uphold the constitutionality of the Individual Mandate and the ACA, and it is unlikely that the Trump Administration could settle the *Texas* Case without the agreement of the intervening defendant states.

The State also inflates the significance of the Sessions Letter informing Congress that DOJ would not defend the ACA in the *Texas* Case. Maryland focuses on the omission from the letter of any representation by Sessions that he would continue to enforce the provisions that DOJ views as unconstitutional or inseverable. ECF 29-3, ¶ 10. In plaintiff's view, this omission supports an "inference that Defendants will refuse to enforce the statute regardless of any court order." ECF 27 at 11. However, the Trump Administration's decision not to defend parts of the ACA in court

is not the same as failing to *enforce* it.  *Compare* 28 U.S.C. § 530D(a)(1)(B) *with* § 530D(a)(1)(i). The former amounts to a litigation position, the latter to potentially upending an industry that accounts for nearly one-fifth of the country's economy.  *See* OFFICE OF THE ACTUARY, CENTERS FOR MEDICARE AND MEDICAID SERVS., NATIONAL HEALTH EXPENDITURES 2017 HIGHLIGHTS, at 1, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ NationalHealthExpendData/Downloads/highlights.pdf.

Moreover, the government's actual words and actions in the *Texas* Case suggest the implausibility of the State's inferences.  As the State notes in the proposed Second Amended Complaint, "at oral argument [in the *Texas* Case] on September 5, 2018, *DOJ professed that 'the current administration supports protections for people with pre-existing health conditions, '"* but DOJ then "reaffirm[ed] its position that the minimum coverage requirement will be unconstitutional and that the community rating and guaranteed issue provisions—including pre-existing condition protections—'must fall' as well."  ECF 29-3, ¶ 10 (emphasis added).  During that same hearing, which predates the commencement of this case, the government also stated that a court ruling during the ACA's open enrollment period for health insurance would threaten to destabilize the insurance markets.  *See Texas*, No. 4:18-cv-00167-O, No. ECF 228.  As a consequence, it specifically asked the *Texas* court to defer ruling until after the end of the enrollment period.  *Id.*  That conduct is inconsistent with a claim of imminent failure to enforce.

Indeed, even after the entry of judgment in *Texas*, the government did not terminate enforcement of the ACA.  In a press release issued by HHS on December 17, 2018, concerning the *Texas* Case, HHS said:[17]

---

[17] https://www.hhs.gov/about/news/2018/12/17/statement-from-the-department-of-health-and-human-services-on-texas-v-azar.html.

The recent U.S. District Court decision regarding the Affordable Care Act is not an injunction that halts the enforcement of the law and not a final judgment. Therefore, HHS will continue administering and enforcing all aspects of the ACA as it had before the court issued its decision. This decision does not require that HHS make any changes to any of the ACA programs it administers or its enforcement of any portion of the ACA at this time. As always, the Trump Administration stands ready to work with Congress on policy solutions that will deliver more insurance choices, better healthcare, and lower costs while continuing to protect individuals with pre-existing conditions.

It is also noteworthy that the government did not oppose a stay of the judgment in the *Texas* Case, "pending appeal, given the potential for disruption to the healthcare markets if immediate implementation were required." *Texas*, No. 4:18-cv-00167-O, ECF 216, at 15-16. And, with the judgment now stayed pending the appeal in the Fifth Circuit, *see Texas*, No. 4:18-cv-00167-O, ECF 223 (N.D. Tex. Dec. 31, 2018), the prospect of the government suddenly ceasing to enforce the ACA is further diminished.

In sum, the State points to the President's rhetoric, his legislative agenda, his regulatory agenda, and his litigation positions to demonstrate that he might possibly terminate enforcement of the ACA. But, its claim consists of little more than supposition and conjecture about President Trump's possible actions. In effect, the State proclaims that the sky is falling. But, falling acorns, even several of them, do not amount to a falling sky.

Moreover, the State has not pointed to any actual threat by the President to terminate enforcement of the ACA. *Compare* Jeff Mason & Richard Cowan, *Trump Threatens To Use Emergency Power To Build Wall, End Shutdown*, REUTERS (Jan. 10, 2019) ("'I have the absolute right to declare a national emergency,' Trump told reporters at the White House. 'I'm not prepared to do that yet, but if I have to, I will.'").

The State's suit is tantamount to a request for an advisory opinion to thwart the possibility of the President deciding not to enforce the Act. Yet, "it is quite clear that the oldest and most

41

consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (internal quotation omitted). Similarly, the Court is not in "the habit of . . . decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case." *Flue-Cured Tobacco Coop. Stabilization Corp. v. E.P.A.*, 313 F.3d 852, 857 (4th Cir. 2002) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)); *see Jennings v. Rodriguez*, ___ U.S. ___, 138 S. Ct. 830, 842 (2018); *INS v. St. Cyr*, 533 U.S. 289, 300 (2001); *City of New York v. Dep't of Defense*, No. 18-1699, ___ F.3d ___, 2019 WL 208080, at *5 (4th Cir. Jan. 16, 2019); *cf. United States v. Simms*, No. 15-4640, ___ F. 3d ___, 2019 WL 311906, at *21-22 (4th Cir. Jan. 24, 2019).[18]

The President has a duty to "take care that the laws," including the ACA, "be faithfully executed." U.S. CONST. art. II, § 3. And, that power does not entail the authority to disregard a federal statute. As the Supreme Court stated long ago in *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838), "To contend that the obligation imposed on the President to see the laws faithfully executed implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613.

In my view, the State's allegations are speculative and thus deficient.[19] I have not "shut [my] eyes to such evidence when it stares [me] in the face." *See Int'l Refugee Assistance Project*

---

[18] Although standing is itself a constitutional question, *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), this Court must decide it, irrespective of whether it reaches the constitutionality of the ACA.

[19] In August 2018, the Mayor and City Council of Baltimore and several other cities, along with two individuals, filed suit against the President and others, alleging, *inter alia*, that the President has endeavored to nullify and sabotage the ACA and has violated his constitutional duty to faithfully execute the ACA. *See City of Columbus, et al. v. Trump, et al.*, No. DKC-18-2364, ECF 1. An Amended Complaint, almost 150 pages in length, was filed on January 25, 2019. *See id.*, ECF 44. I express no opinion as to the issues in that case.

*v. Trump*, 857 F.3d 554, 599 (4th Cir.), vacated, ___ U.S. ___, 138 S. Ct. 353 (2017).  Therefore, at this point in time, I must dismiss the case for lack of standing.[20]

Although the State's claim is not justiciable at this juncture, its claim may become ripe for review in the future, if its alleged injury "move[s] from the speculative to the concrete . . . ." *South Carolina*, 912 F.3d at 731.  In that circumstance, and because I shall grant the Motion to Dismiss (ECF 11) without prejudice, the State would be entitled to revive the litigation.

## E.  Motion for Preliminary Injunction

The State's petition for injunctive relief asks this Court to restrain and enjoin defendants from proceeding in this case with Mr. Whitaker appearing in his official capacity as the Acting Attorney General.  *See* ECF 6 at 1.  As noted, the State insists that, under the Attorney General Succession Act, 28 U.S.C. § 508, and the Appointments Clause of the Constitution, Art. II, § 2, Deputy Attorney General Rod Rosenstein should be designated as the Acting Attorney General, not Matthew Whitaker.

Plaintiff lacks standing to pursue this case.  Therefore, it is unnecessary to consider all of the prerequisites of injunctive relief.  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014). The Motion for Preliminary Injunction (ECF 6) is denied, as moot.

## F.  Motion to Substitute

The State contends that, even if it lacks standing, its request for relief under Rule 25 falls squarely "within the Court's inherent authority to supervise and manage the proceedings before it." ECF 31 at 5.  Pursuant to Fed. R. Civ. P. 25, it moves the Court "either (1) to order substitution

---

[20] Because I shall grant the Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1), it is unnecessary to consider the government's arguments as to Fed. R. Civ. P. 12(b)(6).

of Rod Rosenstein for Mr. Whitaker as a party defendant, or (2) to determine that Mr. Whitaker may not supervise the Department of Justice's litigation of the case as an attorney." ECF 51 at 5; *see also* ECF 6-1 at 3-4; ECF 31 at 5-6.

According to the State, its requests for relief do not "invoke[] the Court's Article III power to issue an order requiring anyone to take any action external to the litigation itself." ECF 31 at 5. "Just as the Court has inherent authority to order parties to participate in mediation, and to compel attendance at mediation by a government attorney with suitable authority, so, too, the Court can determine who holds the office; indeed, it must." *Id.* (internal citations omitted). If substitution "required finding an Article III injury in each case," then Fed. R. Civ. P. 25(d) "could not provide for the 'automatic' substitution of a successor official at all." *Id.* at 5-6.

Fed. R. Civ. P. 25(d) provides:

An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Rule 25(d) applies only where, as here, the officer is sued "in an official capacity." *See* 7C WRIGHT & MILLER § 1960. Under Rule 25(d), "any misnomer not affecting the parties' substantial rights must be disregarded." Automatic substitution is "merely a procedural device for substituting a successor for a past officeholder as a party," and "is distinct from and does not affect any substantive issues which may be involved in the action." Fed. R. Civ. P. 25 advisory committee notes to 1961 amendment.

As the Supreme Court explained in *Lewis v. Clarke*, ___ U.S. ___, 137 S. Ct. 1285, 1291-92 (2017):

> In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself. This is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation. The real party in interest is the government entity, not the named official.

(citing *Edelman v. Jordan*, 415 U.S. 651, 663-65 (1974)) (internal citations omitted); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). The officer's name is not even needed. *See* Fed. R. Civ. P. 17(d) ("A public officer who sues or is sued in an official capacity may be designated by official title rather than by name").

Because amended Rule 25(d) makes substitution automatic, it "does away with" the former Rule's "requirement of a showing of substantial need" for continuing and maintaining the action. *See* WRIGHT & MILLER § 1960; *see also Air Line Pilots Ass'n v. Civil Aeronautics Bd.*, 750 F.2d 81, 87 (D.D.C. 1984). As the Advisory Committee note to the 1963 amendment states, "where the successor does not intend to pursue the policy of his predecessor which gave rise to the lawsuit, it will be open to him after substitution . . . to take . . . appropriate steps to avert a judgment or decree."

The government contends that it is immaterial whether the correct Attorney General is named. ECF 28 at 22. It argues that because the Office of the Attorney General is properly named, an "error in identification would not deprive DOJ of notice of the litigation, relieve it from being bound by the judgment, affect the scope or operation of any relief, or have any other substantive effect on the parties or the litigation." *Id.* at 23. Further, the government rejects Maryland's argument that the State "needs to know the official to name in the suit because it 'needs to know whom it is litigating against and negotiating with' in this case." *Id.* at 23 (quoting ECF 6-1 at 29). In the government's view, it is enough that "the signature block in Defendants' filings already

includes DOJ counsel of record and the chain-of-command through the Senate-confirmed Assistant Attorney General supervising the Civil Division." *Id.*

Notably, the Supreme Court recently denied a motion to substitute filed by the petitioner in *Michaels v. Whitaker*, No. 17-15279 (9th Cir. Nov. 3, 2017), *cert. denied*, No. 18-496 (Jan. 14, 2019). On petition for writ of certiorari, the petitioner sought to substitute Mr. Rosenstein, in his official capacity as Acting Attorney General, for Mr. Sessions. Specifically, the petitioner contended that Mr. Rosenstein, as the Senate-confirmed Deputy Attorney General, automatically succeeded to the role of Acting Attorney General under 28 U.S.C. § 508(a) and that the appointment of Mr. Whitaker violated Article II of the Constitution. On January 14, 2019, the Supreme Court denied the motion to substitute and the petition for writ of certiorari, without comment.

In support of its position, the State relies on *Glassroth v. Houston*, 299 F. Supp. 2d 1244 (M.D. Ala. 2004). In that case, the plaintiff initially filed suit against Roy S. Moore, in his official capacity as the Chief Justice of the Alabama Supreme Court. *Id.* at 1245. While the case was pending, Moore was removed from judicial office. *Id.* And, following his removal, Moore moved to recuse the federal district judge from presiding over the matter. *Id.* In response, Senior Associate Justice J. Gorman Houston filed a motion to strike the recusal motion, contending that, because Moore was removed from office, Houston was the proper defendant. *Id.*

The court granted Houston's motion, finding that, pursuant to Rule 25(d), Houston automatically replaced Moore as the defendant, because "Moore was sued in his official capacity only." *Id.* Furthermore, "there [wa]s no question that Moore ha[d] otherwise ceased to hold office as Chief Justice." *Id.* (quotation marks and alterations omitted). And, it was uncontested that,

upon Moore's removal from office, Houston was the lawful successor under Alabama state law. *Id.*

The State's arguments are unavailing. Unlike in *Glassroth*, the lawful successor to the Office of the Attorney General is vigorously contested here. Although the State presents sound arguments that Mr. Rosenstein is the clear successor to the Office, courts have disagreed. *See, e.g.*, *United States v. Valencia*, No. 5:17-cr-882-DAE, 2018 WL 6182755, \*2-8 (W.D. Tex. Nov. 27, 2018) (ruling "that the appointment of Matthew Whitaker as Acting Attorney General is statutorily and constitutionally valid at this time"); *United States v. Peters*, No. 6:17-cr-55-REW-HAI-2, 2018 WL 6313534 (E.D. Ky. Dec. 3, 2018) ("The President complied with FVRA procedures in appointing Mr. Whitaker.").

The State cannot skirt Article III standing requirements by couching its request for injunctive relief in a Rule 25(d) motion. The purpose of Rule 25(d) is to facilitate the continuity of litigation when an officeholder dies, resigns, or otherwise ceases to hold office. *See, e.g.*, WRIGHT & MILLER §§ 1959, 1960. Such a motion is not the proper vehicle to contest the legality of an officeholder's appointment in a case where the movant lacks standing.

Accordingly, I shall deny, as moot, the State's Motion to Substitute (ECF 6).

## IV. Conclusion

For the reasons stated above, I shall GRANT the State's Motion for Leave (ECF 29). I shall also grant the government's Motion to Dismiss (ECF 11), without prejudice, pursuant to Fed. R. Civ. P. 12(b)(1). Therefore, I shall DENY, as moot, the State's Motion for Preliminary Injunction (ECF 6) and its Motion to Substitute (ECF 6).

This case is dismissed, without prejudice to being reinstated at a later time. An Order follows.

Date:   February 1, 2019                                    /s/
                                                  Ellen Lipton Hollander
                                                  United States District Judge